## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| LISA MORRIS, MICHAEL BUI, and TUMIKA WILLIAMS on behalf of themselves and all others similarly situated, | CASE NO. 3:18-CV-157-RJC-DSC |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT** |
| vs. | **JURY TRIAL DEMANDED** |
| BANK OF AMERICA, N.A., | |
| Defendant. | |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs Lisa Morris, Michael Bui, and Tumika Williams ("Plaintiffs"), on behalf of themselves and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1.      While Defendant may generally assess contracted for bank fees in any number, amount, or method it desires, it may not assess such fees in violation of its binding contracts with its accountholders.  Unfortunately, Bank of America's contract documents and disclosures did not keep up with its efforts to devise new and obscure methods to increase the number and amount of fees it could assess on its accountholders in order to greatly increase profits.

2.      Plaintiffs bring this action on behalf of themselves and a class of all similarly situated consumers against Defendant Bank of America, N.A. ("BofA" or "Bank"), arising from a systematic, multi-pronged effort by the Bank to extract unearned fees from the checking and

savings accounts of unwitting consumers via several related and illegal practices that breach the Bank's contracts; that are deceptive and misleading; and that are designed to unfairly and illegally increase the Bank's fee revenue, including, but not limited to

a) the undisclosed and improper assessment of multiple Non-Sufficient Funds Fees ("NSF Fees") on the *same* electronic transaction and/or multiple Overdraft Fees ("OD Fees") and NSF Fees on the *same* electronic transaction ("Multiple Single Transaction Fees");

b) the undisclosed and improper assessment of OD Fees and/or NSF Fees on transfers to other BofA accounts, a practice that assesses $35 fees for supposedly "overdrawing" or attempting to overdraw one BofA account in order to put an accountholder's funds into another BofA account ("Intra BofA Transfer Transaction Fees");

c) the undisclosed and improper *premature* deduction of OD Fees and/or NSF Fees from consumers' checking accounts, which in turn directly causes even more OD Fees and NSF Fees ("Premature Fees"); and

d) the undisclosed and improper assessment of monthly savings account service fees ("MSAS Fees") on savings accounts that have met all of BofA's requirements for waiver of those service fees ("Monthly Account Service Fees").

3.      Together, these fee practices work in concert to increase Defendant's revenues while catching accountholders in a cycle of deceptive and improper fees and charges.

4.      Bank of America charges accountholders the following fees relevant to these allegations: (1) a $35 NSF fee when there are insufficient funds to pay a transaction and it *rejects* the charge; (2) a $35 OD Fee when there are insufficient funds to pay a requested transaction and it *accepts* the charge; (3 a $5 monthly MSAS Fee when the account fails to meet BofA's requirements for waiver of those fees. Collectively, these fees are referred to herein as "BofA Account Fees."

5.      Through the imposition of these and other BofA Account Fees, BofA makes several billion dollars a year. These punitive fees are, by definition, most impactful on consumers who already have minimal funds in their accounts. As described herein, the illegal fee practices at issue

in this litigation, and that make up a significant part of BofA's multi-billion-dollar fee revenue stream, are charged improperly and in violation of BofA's contracts, other state law, and consumer protection law.

6.     As discussed more fully below, it is a breach of both the Bank's contracts and reasonable consumer expectations for the Bank to charge more than one $35 NSF Fee on the *same transaction*, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a *single* NSF Fee.  Similarly, it is a breach of both the Bank's contract and of reasonable consumer expectations for the Bank to charge both a $35 NSF *and* a $35 OD Fee on the *same transaction*, since the contract explicitly states—and reasonable consumers understand—that the same transaction cannot incur both types of fees.

7.     As discussed more fully below, it is an illogical and unconscionable breach of both the Bank's contracts and reasonable consumer expectations for the Bank to charge OD Fees— which are a fee for the extension of credit—when that credit is extended for the bank to *pay itself* or transfer funds to another BofA account.  In other words, BofA cannot charge a customer OD Fees on a loan *from itself, to itself*.  Similarly, it is an illogical and unconscionable breach of the Bank's contract for it to charge *NSF Fees*—which are a charge putatively to compensate the bank for the "trouble" of sending back a transaction for which there are insufficient funds—for the privilege of rejecting a transaction to itself, when it knows that the effort will be futile before it even undertakes the transaction.

8.     As discussed more fully below, it is an illogical and unconscionable breach of the Bank's contract and reasonable consumer expectation for BofA to prematurely deduct OD Fees and NSF Fees from already-empty accounts, when it knows the consumer does not have funds to pay those OD and NSF Fees.  This early deduction of OD and NSF Fees has harmful consequences,

3

depleting an already-empty account even further, and ensuring that subsequent deposits are used *first* to pay the BofA Account Fees instead of consumers' purchases and debits. BofA's decision to pay itself first for OD and NSF Fees *before* consumer purchases means that any additional consumer purchases incur yet *more* OD and NSF Fees.

9.      Lastly, it is illogical, unconscionable, a breach of the Bank's contract and reasonable consumer expectation a breach of the Bank's contract for BofA to assess $5 monthly service fees on certain savings accounts that meet its written conditions for the waiver of such fees.

10.     Plaintiffs, and other BofA customers, have been injured by BofA's improper practices. On behalf of themselves and the Class, Plaintiffs seek damages, restitution and injunctive relief for BofA's breach of contract, conversion, unjust enrichment, and violation of state consumer protection laws.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business and is headquartered in the North Carolina, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

13.     Plaintiff Morris is a citizen and resident of Oklahoma. Plaintiff maintains checking and savings accounts at Bank of America. At all times relevant, Plaintiff patronized a BofA

4

banking center located in Tulsa, Oklahoma.

14.    Plaintiff Bui is a citizen and resident of California.  Plaintiff maintains a checking account at Bank of America.  At all times relevant, Plaintiff patronized a BofA banking center located in Garden Grove, California.

15.    Plaintiff Williams is a citizen and resident of Georgia. Plaintiff maintains checking and savings accounts at Bank of America.  At all times relevant, Plaintiff patronized a BofA banking center located in Georgia.

16.    Defendant BofA is a national bank with its headquarters and principal place of business located in Charlotte, NC.  Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative classes.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

17.    When a BofA checking account consumer attempts a transaction but has insufficient funds in the account to cover that transaction, BofA either approves the transaction into overdraft (and charges a $35 OD Fee) or rejects the transaction (and charges a $35 NSF Fee).

18.    These fees and how and when they are to be charged are discussed in BofA's contracts with customers.

19.    The practices described herein violate various contract terms, and are part of a multifaceted strategy to increase fee revenue improperly, illegally, and deceptively at the expense of accountholders.  These practices feed off each other:  once BofA ensnares an accountholder with one improper fee, it becomes that much more likely that the same

5

accountholder will fall victim to other of the improper fee practices, as his or her financial

position erodes due to the first and subsequent levy of improper fees.

I.     **MULTIPLE SINGLE TRANSACTION FEES - BOFA ASSESSES MULTIPLE NSF FEES ON THE SAME TRANSACTION IN BREACH OF ITS AGREEMENTS**

    A.     **Plaintiffs' Experiences**

    20.     On June 19, 2017, Ms. Morris attempted to make on online bill payment of $60

towards her Citibank credit card bill through her BofA checking account. Because Ms. Morris

had insufficient funds in her checking account, BofA rejected that payment request and charged

Ms. Morris, a $35 NSF Fee for doing so. Unbeknownst to Plaintiff, that very same transaction

was processed again by BofA three days later, on June 22, 2017. Again, BofA rejected that

payment attempt and again charged Plaintiff a $35 NSF Fee for doing so. Then, yet again on

June 27, 2017, the very same transaction was processed by BofA another time. This time, BofA

paid the transaction and charged Plaintiff a $35 OD Fee for doing so. In sum, *BofA charged*

*Plaintiff $115 in NSF ($70) and OD ($35) fees to process a single $60 credit card payment.*

    21.     On a separate occasion, on September 7, 2017, Ms. Morris initiated a $27 bill

payment to her Comenity credit card account from her BofA checking account. BofA rejected

that payment attempt and charged Plaintiff a $35 NSF Fee for doing so. Unbeknownst to

Plaintiff, that very same transaction was processed again by BofA the next day, on September 8,

2017. Again, BofA rejected that payment attempt and again charged Ms. Morris a $35 NSF Fee

for doing so. In sum, *BofA charged Plaintiff $70 in fees to attempt to process a single $27 credit*

*card payment.*

    22.     On a separate occasion, on November 15, 2017, Plaintiff initiated a $20 bill

payment to her Citibank credit card account. BofA rejected that payment attempt and charged

Plaintiff a $35 NSF Fee for doing so. Unbeknownst to Plaintiff, that very same transaction was

processed by BofA again five days later, on November 20, 2017. Again, BofA rejected that

payment attempt and again charged Plaintiff a $35 NSF Fee for doing so. Then, yet again on

November 24, 2017, the very same transaction was processed again. BofA again rejected the

transaction and again charged Plaintiff a $35 NSF Fee for doing so. In sum, *BofA charged*

*Plaintiff $115 in NSF fees to attempt to process a single $20 credit card payment.*

23.     Plaintiff understood her bill payments to be single transactions as is laid out in

BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee. BofA itself also

understood the transactions to be single transactions, and its systems categorized them as such.

Indeed, on Ms. Morris' bank statements, BofA described subsequent attempts to debit each

transaction as a "***RETRY*** PAYMENT" (emphasis added).

24.     Ms. Morris took no affirmative action to reinitiate or resubmit any of the

transactions, which were resubmitted for payment automatically and solely by BofA.

25.     Similarly, on November 30, 2017, Plaintiff Bui initiated a $150 bill payment to his

insurance company. BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee

for doing so. Unbeknownst to Plaintiff, that very same transaction was processed by BofA again

a few days later, on December 6, 2017. Again, BofA rejected that payment attempt and again

charged Plaintiff a $35 NSF Fee for doing so. In sum, *BofA charged Plaintiff $70 in NSF fees to*

*attempt to process a single $150 bill payment transaction that it never actually paid.*

26.     Plaintiff understood his bill payments to be single transactions as is laid out in

BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee. BofA itself also

understood the transactions to be single transactions, and its systems categorized them as such.

Indeed, on Mr. Bui's bank statements, BofA described subsequent attempts to debit each

transaction as a "***RETRY*** PAYMENT" (emphasis added).

27.    Mr. Bui took no affirmative action to reinitiate or resubmit any of the transactions, which were resubmitted for payment automatically and solely by BofA.

**B.    BofA's Processing Practice**

28.    BofA maintains two separate and simultaneous transaction systems, as well as a third separate system that is used to assess OD fees.

29.    An "intraday" transaction processing system at BofA maintains an account's available balance in real time, increasing and decreasing during the day based on an accountholder's activity.

30.    A second transaction processing system is the "nightly batch processing" system.  It is in this system that transaction posting actually occurs at BofA.

31.    This two-system processing means that BofA has the capability—which it uses routinely—to withhold processing transactions it knows will be futile, especially transactions to itself (in the form of payments to itself or transfers to other BofA accounts).

32.    For example, BofA offers a checking account feature called "Keep the Change," in which debit card purchase amounts are "rounded up" to the nearest dollar amount, and the "round-ups from your debit card purchases are accumulated and transferred daily from your checking account to your [BofA] savings account."  When the checking account balance is too low to support the round-up transfer, BofA simply cancels the automatic transfer, rather than attempting a transfer that would be futile or forcing through a transfer that would cause an overdraft.

33.    In short, when BofA knows the processing of a given electronic transaction will be futile—that is, will serve no other purpose than to create bank fees—BofA has the technological capability not to make the transfer.

8

34. In short, BofA can easily code transactions it considers "overdrawn" to not incur OD/NSF Fees.

35. Upon information and belief, BofA's systems are programmed to recognize a single transaction featuring the same dollar amount and merchant when that single transaction is submitted for payment multiple times and to charge additional NSF Fees on that single transaction when BofA resubmits it for payment.

36. At least one of BofA's competitors, JP Morgan Chase, N.A.—the country's largest consumer bank—does not undertake these types of practices. Instead, it charges only one NSF fee even if it makes multiple attempts to obtain payment on the charge.

37. Based on the promises and disclosures made in BofA's account disclosures, BofA accountholders can have no reasonable expectation that BofA will undertake such practices that are eschewed by other major banks and against industry standards or otherwise reasonably disclosed.

### C. BofA's Relevant Account Disclosures

38. Bill pay transactions and transfers between BofA accounts are governed by the Bank's "Online Banking and Transfers Outside Bank of America Service Agreement and Electronic Disclosure" ("Online Banking Agreement") and its Deposit Agreement. All three documents promise that only one NSF Fee or OD Fee will be charged *per transaction transfer or payment*, and indicate BofA will not intentionally create NSF or OD Fees on transfers to other BofA accounts.

39. According to the Online Banking Agreement:

**Transfer/Payment Authorization and Sufficient Available Funds**

- You authorize Bank of America to withdraw, debit or charge the necessary funds from your designated account in order to complete all of your designated transfers and payments.

9

- You agree that you will instruct us to make a withdrawal only when a sufficient balance is or will be available in your accounts at the time of the withdrawal.
- The completion of a transfer or payment is subject to the availability of sufficient funds (including any overdraft protection plans) at the time the transaction is posted. **If enough funds to complete the transfer or payment are not available, we may either (i) complete the transaction and overdraw the account or (ii) refuse to complete the transaction. In either case, we may charge [\*\*]a[\*\*] non-sufficient funds (NSF), returned item, overdraft, or similar fee.** Transfers or payments from SafeBalance Banking® accounts will not be completed if there are not sufficient funds on the date of the scheduled transfer or payment. Please refer to the applicable account agreement and fee schedule for details. If you schedule a payment from an account maintained at another financial institution and there are insufficient funds in that account, you may be charged a fee by that financial institution.
- **At our option, we may make [\*\*]a[\*\*] further attempt to issue the payment or process the transfer request.**
- Bank of America is under no obligation to inform you if it does not complete a payment or transfer because there are non-sufficient funds or credit in your account to process the transaction. In this case, you are responsible for making alternate arrangements or rescheduling the payment or transfer within Online Banking.

[…]

**[\*\*]An[\*\*] NSF-fee, returned item, overdraft or similar fee may also apply if you schedule payments or transfers and your available balance is not sufficient to process the transaction on the date scheduled or, in the case of a personal check, on the date when the check is presented to us for payment.**

(emphases added).

40. BofA's Deposit Agreement states:

"Item" means "all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image, or a photocopy of any of the foregoing.

[…]

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item…without notice to you, **we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).**

(emphases added).

41. BofA's Debit Card Agreement states:

When you do not have enough available funds in your account…to cover everyday non-recurring debit card purchases or ATM withdrawals, we will decline the transaction and you will not be subject to overdraft fees. For check, ACH, recurring debit card transaction and online bill payments, we may decline or return the transaction unpaid or complete it and overdraw your account.

**D. BofA May Not Charge More Than One NSF Fee on a Single Transaction that is Submitted for Payment Multiple Times, and It May Not Charge Both OD and NSF Fees on a Single Transaction**

42. Consistent with BofA's express representations in its contracts, Plaintiffs and reasonable consumers understand that any given instruction by them for payment to be one, singular transaction and one "item" as that term is used in BofA's contract documents.

43. BofA's contract documents bar BofA from assessing multiple NSF Fees on the same instruction for payment. As BofA expressly promises: "*An* NSF-fee, returned item, overdraft or similar fee may also apply if you schedule payments or transfers and your available balance is not sufficient to process the transaction on the date scheduled." This provision expressly states "an" (singular) NSF or OD Fee may be assessed, not multiple fees. And the Bank also states that *a* fee "may" be charged if there are insufficient funds "on the date scheduled," but *not* on later dates when re-processing is attempted by the Bank at its sole discretion.

44.     The Online Banking Agreement provides BofA the authority to charge only one NSF or OD Fee per item or instruction for payment.  While that Agreement states that the bank "may" attempt again to process the transaction *a* single additional time, the Agreement does not state that such a single re-attempt will incur an additional NSF or OD Fee.

45.     The Online Banking Agreement states that a single NSF or OD Fee will be charged if "you schedule payments of transfers" for which there are insufficient funds.  But, as alleged herein, Plaintiffs only scheduled their payments or transfers *once*, and took no action to request re-processing of their transactions.  Because Plaintiffs only scheduled a given payment once, BofA was only entitled to charge one OD or NSF on each payment.  In other words, when a transaction is returned for insufficient funds, it cannot be the basis for another NSF or OD Fee without an additional action from the accountholder to again seek payment for the item.  Any other interpretation would permit BofA to process a transaction repeatedly throughout the day, thus conceivably racking up myriad NSF or OD fees at its sole discretion.

46.     Moreover, the Online Banking Agreement's terms are starkly binary:  for a given transaction, the Bank may either pay *or* return it, but it cannot do both for the same transaction, and it cannot do the same thing more than once.

47.     The Deposit Agreement makes similar representations.  It defines "item" to encompass all submissions for payment of the same transaction.  "Item" cannot mean each re-submission of the same transaction because it is defined to mean "**all orders and instructions** for the payment, transfer or withdrawal of funds" and there is no *new* order or instruction for payment of a re-submitted item.  It is simply another attempt at the original order or instruction.  Again, Plaintiff never took any action to re-submit or renew her original instructions for payments on her credit card accounts.

48.     The Deposit Agreement's terms also are also starkly binary: for a given transaction, the Bank may pay *or* return an item, but it cannot do both for the same transaction, and it cannot do the same thing more than once.  And because NSF or OD Fees are charged on "items," the Bank is not authorized to charge multiple fees on additional iterations of the same "item."

49.     The Debit Card Agreement makes a similarly binary promise: "For check, ACH, recurring debit card transaction and online bill payments, we may decline or return the transaction unpaid or complete it and overdraw your account."

50.     In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies, by employing the following practices:

a)  *First*, the Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations.  BofA uses its contractual discretion to choose a meaning of that term which directly causes more NSF Fees or OD Fees—in Plaintiff Morris' case, for example, to assess ***$111 in bank fees on a $20 credit card payment***; and

b)  *Second*, the Bank maintains it has huge amount of discretion not to charge or "deduct" NSF Fees on given transactions.  Presumably, each separate time BofA exercises its option to reprocess a check or other payment or transfer, it views each reprocessing as a separate "transaction" entitling it to another bite at the NSF/OD fee apple.  By charging more than one NSF Fee on a given transaction, BofA engages in bad faith and contradicts reasonable consumer expectations.

51.     For the same reasons, the contract documents also bar BofA from assessing both NSF Fees and OD Fees on the same item or transaction.

52.     This practice is not universal in the banking industry. Major banks like Chase—the largest consumer bank in the country—do not engage in the practice of charging more than one NSF or OD Fee on the same item when it is processed for payment multiple times.

53.     Banks like BofA that employ this abusive practice know how to plainly and clearly disclose it. Indeed, other banks that do engage in this abusive practice disclose it expressly to their accountholders—something Defendant here never did.

54.     For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as BofA, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

(emphasis added).

55.     First Hawaiian Bank engages in the same abusive practices as Bank of America, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

56.     Klein Bank similarly states in its Online Banking Agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this

section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.

57.     BofA intentionally provides no such disclosure, in an effort to deceive its accountholders.

**E.      Even if BofA Could Charge More Than One NSF or OD Fee on a Single Transaction that is Submitted for Payment Multiple Times, It Cannot Attempt to Process a Payment More Than Twice**

58.     BofA's Online Banking Agreement, which governs electronic transactions like the ones at issue in this case, expressly states: "At our option, we may make *a* [single] further attempt to issue the payment or process the transfer request."

59.     But, as occurred with Plaintiff Morris, BofA often makes three attempts and charges fees ***each time***, both in violation of the contract.

**II.      BOFA TRANSFER TRANSACTION FEES: BOFA ASSESSESS OD AND NSF FEES ON TRANSFERS TO OTHER BofA ACCOUNTS AND ON PAYMENTS TO ITSELF**

**A.      Plaintiff's Experience**

60.     BofA charges overdraft and NSF Fees—sometimes numerous fees for the same transactions—when it knows or is chargeable with knowing, that an accountholder's payment or transfer from a BofA checking account to *another BofA account* may cause the first account to become overdrawn.  In other words, BofA charges its accountholders $35 NSF or OD Fees to attempt to pay or transfer funds to *itself*, or to reject a payment or transfer to *itself*, when it knows, or is chargeable with knowing, that the transferable account is or will be in an insufficient or overdrawn state if the payment or transfer is honored.

61.     This result is absurd, undisclosed, and violative of the contract.

62.     For example, Plaintiff Morris makes payments from her BofA checking account to a BofA home equity line of credit ("HELOC").

63.     On May 4, 2016, a payment to the HELOC was attempted on Plaintiff Morris'
account.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so.
The Bank resubmitted that very same transaction the next day, on May 5, 2016.  Again, BofA
rejected that payment attempt and again charged Plaintiff Morris a $35 NSF Fee for doing so.  In
sum, *BofA charged Plaintiff $70 in fees to attempt and fail to process a single payment to itself,
even though it knew each payment attempt would be futile before it initiated them.*

64.     Since there is no contractual basis which permits BofA to attempt to pay *itself* from
an account that has insufficient funds to do so, this technique is both illegal and beyond reasonable
consumer expectations.

65.     On July 5, 2016, a payment to the HELOC was attempted on Plaintiff Morris'
account.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so.
The Bank resubmitted that very same transaction the next day, on July 6, 2016.  Again, BofA
rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so.  In sum,
*BofA charged Plaintiff $70 in fees to attempt and fail to process a single payment to itself, even
though it knew each payment attempt would be futile before it initiated them.*

66.     Rather than cancelling or delaying the transfer to the HELOC account, based on its
actual or chargeable knowledge of Plaintiff Morris' account balances, BofA pushed it through then
forced Plaintiff Morris to pay repeatedly for an attempted transaction that was unauthorized and
costless to the Bank, all to the Plaintiff's detriment.

67.     In short, for pushing through attempts for payment to *itself* that it knew, or should
have known, would be futile, BofA charged Plaintiff Morris multiple $35 NSF Fees.

68.     This is true even though BofA had the ability to check account balances before
submitting transactions for payment to itself, using its bird's-eye view of all BofA accounts.

69.     BofA has the contractual discretion to reject transfer attempts.  There is no authorization or justification for BofA to attempt a transaction to itself that it knows will fail.  Its motivation and rationale for doing so is not unique among financial institutions.  It can be characterized by one obvious word, which need not be repeated here.

B.      **The Purpose and Nature of OD and NSF Fees**

70.     When a bank rejects an attempted transaction submitted by a different bank on a checking account due to insufficient funds, it sends an electronic notification back to the merchant stating that the transaction was not approved.  BofA charges a $35 NSF Fee when it performs this action.  Because rejection is essentially cost-free, the $35 NSF is pure profit – particularly when the rejected payment is to itself.

71.     The rejection of an attempted transaction submitted by another bank provides zero benefit to the accountholder, as the CFPB has noted:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (i.e., result in overdrafts) or returned unpaid (i.e., were NSFs). **Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due.** At the median, study banks paid into overdraft 83% of transactions that exceeded the available balance in 2011 and returned 17%.

*CFPB Study of Overdraft Programs*, CFPB (June 2013), at 26 (emphasis added), available at https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf.

72.     When bank approves a transaction submitted by a different bank for an account with insufficient funds, it pays the transaction and charges a $35 OD Fee for the service of extending credit for that transaction.

73.     When a bank pays an overdraft, it is extending credit. It is very expensive credit, indeed, according to the FDIC:

> For almost all study population banks operating an automated overdraft program, the main fee associated with the program was an NSF usage fee. Usage fees reported by these banks ranged from $10 to $38; the median fee was $27, charged on a per-transaction basis in almost all cases. In this context, a $27 fee charged for a single advance of $60 that was repaid in two weeks **roughly translated into an APR of 1,173 percent.** Many surveyed banks (24.6 percent) assessed additional fees on accounts that remained in negative balance status in the form of flat fees or interest charged on a percentage basis.

FDIC Study of Bank Overdraft Programs, 2008 (emphasis added).

74.     In a normal situation, when BofA is making an approve or reject decision on a transaction submitted by another bank for payment, BofA usually has little or no insight into the nature of the transaction or the costs and benefits of paying or returning that transaction. As such, for those transactions BofA relies exclusively on an automated, internal program that makes pay or return decisions based on an accountholder's credit risk, past overdraft behavior, and account balance history:

> As automated processes are necessary for institutions that choose to authorize or decline ATM and POS transactions that will overdraw an account, many institutions—including study banks—use these same processes to make pay-return decisions for check and ACH transactions. These institutions generally run programs that assign to each account a limit as to the amount of overdraft coverage the institution is willing to extend. For accounts that have opted in to ATM and POS debit overdraft coverage, when a request for authorization is received that exceeds the available funds, the bank will determine whether to authorize the transaction by reviewing it against the assigned overdraft coverage limit.

> Similarly, in nightly (or intra-day) posting, the bank will review potential NSF and overdraft items against the assigned overdraft coverage limit. Items processed during nightly (and intra-day) posting will generally be paid up to the coverage limit; once the account's limit is reached, subsequent items will be returned unpaid.

*CFPB Study of Overdraft Programs*, at 49.

75.     But when BofA is deciding whether to submit, approve or reject transactions that transfer money to *other BofA* accounts or that *pay itself*, BofA is both the submitting Bank *and* the merchant being paid. This provides BofA will unique insight into, and control over, whether and how transactions to pay or transfer money to itself are processed.

76.     Thanks to an aggressive "cross-selling" effort by BofA, there are hundreds of thousands of BofA checking accountholders who also regularly pay BofA or transfer funds to BofA, because they also hold BofA savings accounts, lines of credit, credit cards, and mortgages.

**C.      BofA Has Made a Major Effort to Cross-Sell Its Products, Promising Convenience and Efficiency but Also Providing It With a Bird's-Eye View of Its Accountholders' Financial Details**

77.     Banks like BofA have made a major effort to "cross-sell" products. Consumers may have a checking account, but also a credit card, line of credit, and/or savings account, etc.

78.     This allows for assessment of additional fee revenue.

79.     Selling additional products to existing customers has long been a key priority for many banks with the explicit goal of improving the bottom line.

80.     As one industry publication put it: "Cross-selling comes with its advantages, of course. It considerably reduces customer acquisition costs, servicing, and marketing and communication costs and thereby substantially increases spread for banks. It is well understood and key finding that greater the number of products held by customer leads to an increased

probability of retention." *Cross Selling at Banks: Adopting the Right Strategy for a Healthy Bottom Line*, Customer Think (Jan. 2010), available at http://customerthink.com/cross_selling_at_banks_adopting_right_strategy_for_health_bottom_line/.

81.     It continues: "The more relationships a bank has with a customer, the more loyal the customer will be and the bank gets to know the customer through several relationships, thus the assessment of the credit quality of the customer can be bettered.  At the end it will be a win-win situation for both the bank and customer as it is cheaper and easier to get customer from one's own data base than going out for getting new customers.  Banks should be careful in exploiting this situation and see that the bottom line along with the top line goes up and not just cross sell of products."

82.     The Bank shares information across accounts, targeting products and services, as it tracks in intimate detail various consumer accounts at once, giving the bank unique access to the complete financial picture of a consumer on an hour to hour basis.

83.     BofA routinely and systematically shares detailed information across accounts, and informs consumers this is so: "We may share information that we have about you and your accounts among the Bank of America family of companies."  Deposit Agreement.

84.     In some cases, the cross-selling and information gathering is used solely to charge consumers with fees and increase fee revenue.

    **D.**     **BofA's Relevant Account Disclosures**

85.     The Deposit Agreement states:

"Sending Funds Transfers"

This Sending Funds Transfers section applies to wire transfers…and **transfers we make between your Bank of America accounts.**

We **may reject payment orders**.  We notify you of any rejection orally, electronically, or in writing.

(emphasis added).

86.    BofA's Deposit Agreement also states:

"Item" means "all orders and instructions for the payment, transfer or withdrawal of funds from an account.  As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image, or a photocopy of any of the foregoing.

[…]

[W]e may authorize and pay overdrafts for other types of transactions.  Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments.

[…]

We may debit your account for a check or other item drawn on your account either on the day it is **presented to us for payment**, by electronic or other means, or on the day we receive notice that the item has been **deposited for collection at another financial institution**---whichever is earlier.  If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We **may determine your balance** and make our decision on an insufficient funds item at any time between **our receipt of the item or notice and the time we must return the item**. We are

required to determine your account balance only once during this time period.

[…]

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic notice of return….If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

[…]

(emphases added).

### E. BofA May Not Charge OD or NSF Fees on Transfers or Payments to Itself

87. The "Sending Funds Transfers" section of the Deposit Agreement governs *all* transfers to other BofA accounts.

88. The "Sending Funds Transfers" section provides no authorization for BofA to charge OD or NSF on such transactions—indeed, unlike other sections of the contract, it never mentions such fees once.

89. Consistent with express representations in the contract, reasonable consumers understand that the Bank may "reject" payment orders and transfers to other BofA accounts. It can do so without even submitting them unnecessarily. Read reasonably and in good faith, the contract indicates BofA will not bother submitting a transaction when it knows attempted payment will be futile.

90. Reasonable consumers are entitled to understand that BofA will not use the intimate, detailed financial information regarding various BofA accounts held by the same person as a tool to maximize NSF and OD Fees charged to them.

91. Reasonable consumers believe the Bank would reject transfers to itself, or to other BofA accounts, when such transfers would cause an NSF or OD Fee to be charged. There is no reason to try a transaction over and over when the bank knows or should know it would be an entirely futile effort.

92. With the exception of the "Sending Funds Transfers" section, all the contract provisions excerpted above that purport to authorize the assessment of OD and NSF Fees are written only for the common situation in which BofA is transferring checking account funds to an entity that is not itself.

93. One provision expressly states that reality: "BofA states that "[w]e may debit your account for a check or other item drawn on your account either on the day it is **presented to us for payment**, by electronic or other means, or on the day we receive notice that the item has been **deposited for collection at *another* financial institution**—whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account." BofA cannot present an item to itself for payment, nor are transfers or payments to BofA "deposited for collection at another financial institution"—the funds are deposited where they started out, at BofA.

94. Other contract provisions are nonsensical when a BofA account is both the payee and the payor, and thus have little or no applicability to the situation at issue in this Action:

- BofA states that it "when it determines" there are insufficient funds for an item, it will either pay or return the item. But for transfers or payments to itself, it makes this "determination" even before submitting the item to itself.
- BofA states that "[w]e **may determine your balance** and make our decision on an insufficient funds item at any time between **our receipt of the item or notice and the time we must return the item**." But it does not "receive" the item (since it already has it) and it has no "time" to return the item (since it already has it). No reasonable understanding of

English term "receive" can indicate one entity or person giving something to itself.

- BofA also states that "[i]f we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item." But of course, BofA does not need "electronic notice" of its own rejection.

95.     Even if provisions of the Deposit Agreement other than the "Sending Funds Transfers" section had any applicability to payments or transfers from a BofA checking account to other BofA accounts, those provisions also indicate BofA will not charge NSF or OD Fees on such transactions to itself.

96.     Reasonable consumers understand that transfers to BofA accounts or payments to BofA do not count as "items" subject to NSF or OD Fees, since BofA has the right to protect its interests (and assess fees, if necessary) on the accounts that a consumer is attempting to transfer to or make a payment on. For example, if a consumer attempts a bill payment to a BofA line of credit or credit card on insufficient funds, BofA can charge a late fee in that circumstance. No reasonable consumer expects it will also charge NSF Fees on the originating account.

97.     Neither the Deposit Agreement or any other account document ever states that transfers to other BofA accounts or payments to other BofA accounts will incur NSF or OD Fees.

98.     The Deposit Agreement does not state that BofA will attempt to push through a transfer or payment to itself, even where it knows, or should know, that it will instantly decline that same transaction.

99.     In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of

accountholders and breaches its duty of good faith and fair dealing when it applies these policies, by employing the following practices:

a) *First*, the Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations. BofA uses its contractual discretion to choose a meaning or that term which directly causes more NSF Fees and OD Fees.

The contract documents never state that BofA will attempt to push through a transfer or payment to itself, even where it knows full well that the transaction will decline—this totally futile payment submission has no purpose, except a bad faith purpose to create more account fees.

b) *Second*, even if it were proper to push through a futile attempt, the Bank maintains it has discretion not to charge or "deduct" NSF Fees on given transactions. By charging both NSF Fees and OD Fees on a given transaction, BofA engages in bad faith and contradicts reasonable consumer expectations.

That is especially true because when items such as a bounced check are returned, a payee can then turn to other means to recoup its payment. When BofA returns a payment to itself, it of course has many other means to try to seek payment. It could assess a late fee on the account itself (and does, it many cases). Or, it could check the balance again before trying to debit.

c) *Third*, no reasonable consumer believes the Bank would knowingly submit transactions it has the express power to reject. Consistent with express representations in the contract, reasonable consumers understand that the

Bank may "reject" payment orders and transfers to other BofA accounts. It can do so without even submitting them unnecessarily. Good faith performance of the contract requires BofA will not submit a transaction when it knows attempted payment will be futile.

100.     BofA violates the covenant of good faith and fair dealing when it authorizes transactions for payment or transfer to itself that it knows will be declined.

## III.     PREMATURE FEES: BOFA DEDUCTS OD AND NSF FEES FROM ALREADY-EMPTY CHECKING ACCOUNTS IN BREACH OF ITS AGREEMENTS

### A.     Background

101.     The reason an OD or NSF Fee is assessed on an account is because that account does not have sufficient funds to cover a given transaction. At the moment a fee is assessed, then, there are by definition no funds in the account to immediately pay the OD or NSF Fee (or else there generally would not have been an OD or NSF Fee in the first place).

102.     This claim does not concern whether such OD or NSF are properly assessed, but rather challenges *when* such fees are to be deducted from a consumer's account.

103.     BofA promises it will pay NSF or OD Fees that it is owed from accountholders' "next deposits"—that is, after new funds are deposited to the account that are sufficient to pay the owed fees. And this makes good common sense: for neither type of fee does it make sense to deduct them from a bank account before there are funds to pay it, and reasonable consumers do not expect the Bank will undertake such a practice. Indeed, otherwise it would just be deducting such fees while only incurring new fees in an unending cycle of fees.

104.     Some of BofA's competitors understand this, and hold fees in suspense until funds exist in the account to pay them.

105.    If, on the other hand, bank fees are prematurely deducted from an empty account, that means there is a great likelihood that the next deposit made by the accountholder will be immediately consumed (at least in part) by the bank fees, *before* any other transactions can be paid. Subsequent consumer transactions are thus much more likely to be paid into overdraft, causing even *more* fees that perpetuate the cycle.

106.    When BofA prematurely deducts its own bank fees from an already-empty account, it merely performs an accounting trick.  It is a sleight of hand that serves no purpose whatsoever— except to ensure that its bank fees have *priority* from any future deposit, and thus to ensure it captures even more OD and NSF Fee revenue when actual purchases are drawn on insufficient funds.  Unfortunately, the Bank never informs consumers it will undertake this fee-maximizing policy.

107.    The effect of doing so is devastating, and directly causes more fees, as occurred with Plaintiff Williams.  Worse, the contract never authorizes the immediate deduction of fees from an empty account, and in fact states that BofA will do the *opposite* and "**use deposits you…make to your account to pay overdrafts, fees and other amounts you owe us.**"

### B.  <u>Plaintiff's Experience</u>

108.    During 2017 alone, BofA has charged Plaintiff Williams nearly $1500 in OD and NSF Fees—a crushing financial burden.  As described herein, numerous of those OD and NSF Fees were assessed as a direct result of BofA's policy of immediately deducting OD and NSF Fees from an already-empty account. In other words, many of the OD and NSF Fees assessed to Ms. Williams were caused by other OD and NSF Fees, with BofA's undisclosed decision to pay itself for OD and NSF Fees first.

109.    On October 24, 2017, Plaintiff Williams ended the day with a balance of $-228.52 (of which $35 were fees deducted from an empty account)

110.     Her principal balance outstanding was thus only $-193.52 at the end of October 24.

111.     No further activity occurred on the account until October 31, when BofA charged an OD Fee of $35, deducted a $250.70 bill pay transaction that it also rejected later that day, and also charged a $35 NSF Fee for that rejection.

112.     At the end of the day on October 31, then Plaintiff Williams ended the day at $-549.22, (of which $105 were OD or NSF Fees prematurely deducted from her already-empty account)

113.     Plaintiff's total principal balance outstanding was thus $-444.22 at the end of October 31.

114.     On November 1, 2017, no activity occurred except that BofA recredited the $250.70 transaction it had earlier deducted but then rejected.  At the end of the day on November 1, 2017, Plaintiff ended the day at $-298.42 (of which $105 were NSF or OD Fees prematurely deducted from an empty account).

115.     Plaintiff's total principal balance outstanding was thus $-193.42 at the end of November 1.

116.     Then, on November 2, 2017, several things happened.  A deposit of $628.73 posted, debits of $45.77 and $248 also posted, and BofA also rejected a $40 bill pay transaction, upon which BofA charged a $35 NSF Fee.

117.     Crucially, the only reason the $40 bill pay transaction was returned for insufficient funds and assessed a $35 NSF Fee is because of the $105 in NSF and OD Fees had been prematurely deducted by the Bank from an empty account before all debits on that day were deducted, as BofA promised.

118. If BofA had, as it promised, started with the account's principal balance on November 2 and deducted OD and NSF Fees last (as it promised), the $40 bill pay transaction would not have incurred an NSF Fee.

119. How BofA processed the charges:

| | |
|---|---|
| Account Balance on 11.1 (including NSF/OD Fees): | $-298.42 |
| Deposit Payment 11.2: | $628.73 |
| Remainder after NSF/OD Fees: | $330.31 |
| Remainder after 1st two debits: | $36.54 |
| Insufficient Funds for $40 charge: | $-3.46 |
| NSF Fee assessed ($35): | $-38.46 |

120. Here is how BofA should have processed the charges:

| | |
|---|---|
| Account Balance on 11.1: | $-193.42 |
| Deposit Payment 11.2: | $628.73 |
| Remainder after 1st two debits: | $141.54 |
| Remainder after $40 charge: | $101.54 |
| Pending NSF/OD Fees: | $-105 |
| Remainder after old OD/NSF Fees: | $-3.46 |

121. This pattern occurred repeatedly with Plaintiff, as it has with many other BofA accountholders.

**C. BofA's Breaches of Relevant Account Disclosures**

122. The premature deduction of NSF and OD Fees results in the further assessment of even more NSF and OD Fees via a complex interaction between BofA's transaction posting order and the time of deduction of OD and NSF Fees.

123. With respect to transaction posting order, BofA promises on any given banking day to determine insufficient funds transactions (for which OD and NSF Fees are charged) only *after* it has posted credits to an account, and only *after* it has deducted and paid all consumer debit transactions for which there are sufficient funds. Only then, promises BofA, are bank fees like OD and NSF Fees deducted and paid from an account. When a deposit of new funds arrives in the

account, BofA promises that it will be used to pay for consumer purchases before it is used to pay the Bank for its own fees.

124.     With respect to the timing of deduction of OD and NSF Fees, BofA promises the deduction only occurs from the next deposit, which could be days in the future. By withdrawing OD and NSF Fees from already-empty accounts, **prior** to the deposit of new account funds by an accountholder, BofA eviscerates its posting order promise to always deduct bank fees *last* on any given day. BofA's premature deduction of bank fees ensures that new deposits are first used up to pay bank fees, *instead of* to pay purchases—the direct opposite of what it has promised.

125.     With respect to Ms. Williams, BofA deducted OD and NSF Fees from an already-empty account. It did so to ensure that future deposits would be eaten up by those fees, making it more likely that Ms. Williams purchases would incur more OD and NSF Fees. And that is exactly what happened. When Ms. Williams made a deposit, that deposit was used to pay those OD and NSF Fees first, leaving insufficient funds to pay her purchases, and resulting in more OD and NSF Fees on transactions that should not have received them.

126.     BofA's contract essentially means that it will hold OD and NSF Fees and other bank fees in suspense until such time as deposits post to an account. It also promises that when deposits post to an account, those new funds will be used to pay account debits *before* they are used to pay bank fees.

127.     According to its contract, the Bank may only deduct fees once an account is replenished by a new deposit, but not before, and even then it must pay consumer debits and purchases before paying itself back for its bank fees:

> **Fees**
>
> You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.

[…]

**Charging an Account**

We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us[.] We may make these deductions at any time without prior notice to you or request from you. If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you. You agree to pay immediately all fees, overdrafts and other amounts you owe us.

We **may use deposits** you or others make to your account…**to pay fees**, overdrafts or other amounts that you owe us.

[…]

Insufficient Funds—Overdrafts and Returned Items

If we overdraw your account, you agree to repay us immediately, without notice or demand from us. **We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.**

[…]

**Posting Orders**

This section summarizes how we generally post some common transactions to your account [on a given banking day].

[…]

- We add deposits and other credits to your balance.
- Then, we subtract from your balance in date and time order the types of debits listed in this paragraph, when our systems receive date and time information[.]

[…]

- **[Lastly], we subtract from your balance most fees** (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

128.    The Agreement states that BofA will "ordinarily" "use deposits…to pay fees"—an

express promise that OD and NSF Fees will not be deducted until a subsequent deposit occurs.

129.    The Agreement thus states that consumers agree to "re*pay* immediately" any fees, but such "repayment" cannot occur until positive funds exist in the account, which must occur when a deposit happens.

130.    The Agreement never states that BofA will use deposits to pay itself for bank fees *first* and never describes when it will break from its "ordinary" posting order.

131.    The Agreement never states that BofA will use bank fees to cause other transactions to incur more bank fees.

132.    Consistent with express representations in the contract, reasonable consumers understand that *assessment* of bank fees is de-linked from *deduction* of those fees from accounts— that bank fees are "ordinarily" not immediately deducted from accounts where there are no funds to pay them. Obviously, consumers are obligated to *pay* owed bank fees, but they cannot pay owed OD and NSF Fees until they are able to make a new deposit.  It serves no purpose to deduct fees before a consumer can pay, other than to make an end-run around BofA's promise to use new deposits to pay consumer debits before its own bank fees.

133.    BofA knew how to disclose this practice consumers, but chose to do the opposite. BofA's competitors in the banking industry who engage in this conduct disclose the practice clearly and expressly to their accountholders—something BofA never does in an attempt to deceive its accountholders.

134.    For example, Fifth Third Bank, a major bank in the Midwest, expressly states in its deposit agreement that it will *not* wait until a deposit is made, will deduct fees immediately, and use bank fees to drive accounts further into the red:

>    These are the ways a debit (-) may be handled when there is not enough money in your account:
>    • If you choose to enroll, Overdraft Protection may be used to pay the debit (-) (using funds from another Fifth Third account).

• Overdraft Coverage may be applied by the Bank, at the Bank's discretion, to pay the debit (-), resulting in a negative balance in your account. • Your debit (-) may be returned unpaid

If you are charged overdraft or returned item fees, the fees will be an additional debit (-) to your account and **will further increase the negative balance in your account if a deposit is not made on time.**

(emphasis added).

135. Similarly, First Citizens Bank, a major bank in the Carolinas, expressly tells accountholders its fee timing and tells accountholders in its deposit agreement that it will use bank fees to drive accounts further into the red:

> Because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

136. And BB&T, another Bank of America competitor, states in its deposit agreement:

> DEDUCTION OF FEES. Maintenance and activity fees and fees for returned deposited checks, returned items, overdrafts, stop payment orders, charges for check printing, and other service charges made in accordance with the rules of the Bank in effect at the time of such charge **shall be deducted from your account and may be posted prior to other debits.** The Bank shall not be liable for refusing to honor items presented for payment because of insufficient funds as a result of deducting such fees. Any fees (or portions thereof) that were not posted due to insufficient funds at the time of posting may be collected at a later date without prior notice when sufficient funds are available in the account.

(emphasis added).

137. But instead of clearly disclosing its abusive practice like its competitors, BofA chose to conceal its true practice.

138.    In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies.

139.    Specifically, the Bank uses its discretion to deduct fees by prematurely deducting them, in violation of other contract promises regarding its "ordinary" practice, and at a time that serves no purpose other than to maximize the number of OD and NSF Fees assessed.

140.    The Bank abuses its discretion to determine when and how it will deduct fees and when and how it will "use deposits" to pay fees, by adopting an undisclosed practice that deducts fees prematurely, when the Bank already knows there are no funds in the account to pay them.

## IV.    MSAS FEES: BOFA CHARGES MONTHLY SERVICE FEES ON SAVINGS ACCOUNTS EVEN WHEN SUCH ACCOUNTS HAVE MET CONDITIONS FOR WAIVER OF THE SERVICE FEE

141.    Plaintiff Morris also maintains a savings account with BofA.

142.    According to BofA's Fee Schedule for Personal Accounts, dated November, 2016:

> Regular Savings
>
> Monthly maintenance fee - $5
> To avoid the monthly maintenance fee, meet one of the following requirements during each statement cycle:
>
> […]
>
> To avoid the monthly maintenance fee you may also make combined monthly automatic transfers of $25 or more from your Bank of America checking account to your savings account during the immediately preceding statement cycle.

143.    On March 3, 2017, Plaintiff Morris transferred $235 from her checking account to her savings account.  Still, during the immediately following statement cycle for her savings

34

account, she was assessed a $5 monthly service charge on April 26, 2017, in violation of the contract.

144.    On September 29, 2017, Plaintiff Morris transferred $25 from her checking account to her savings account.  Still, during the immediately following statement cycle for her savings account, she was assessed a $5 monthly service charge on November 28, 2017, in violation of the contract.

## CLASS ALLEGATIONS

145.    Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

146.    The proposed classes are defined as:

**Class 1 – Multiple Single Transaction Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same transaction and/or NSF and OD Fees on the same transaction. (the "Nationwide Multiple Single Transactions Fees Class").
Proposed Class Representatives: Morris and Bui

> Alternative State Subclass of Oklahoma residents
> Proposed Class Representative: Morris

> Alternative State Subclass of California residents
> Proposed Class Representative: Bui

**Class 2 – Intra BofA Transfer Transaction Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF or OD Fees on transfers to other BofA accounts (the "Nationwide Intra BofA Transfer Transaction Fees Class").
Proposed Class Representative: Morris

> Alternative State Subclass of Oklahoma residents
> Proposed Class Representative: Morris

**Class 3 – Premature Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged OD and NSF Fees because bank fees were deducted from a newly-posted deposit of funds prior to the deduction of consumer debits. (the "Nationwide Premature Fees Class").
Proposed Class Representative: Williams

       Alternative State Subclass of Georgia residents
       Proposed Class Representative: Williams

**Class 4 - Monthly Account Service Fees Class**
All Bank of America savings account holders in the United States who, during the applicable statute of limitations, were charged monthly service fees on savings accounts even when they met the conditions for waiver of the fees (the "Nationwide BofA Savings Account Fee Class").
Proposed Class Representative: Morris

       Alternative State Subclass of Oklahoma residents
       Proposed Class Representative: Morris

The National Classes and alternative State Subclasses are collectively referred to herein as the "Classes."

147.    Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

148.    Excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

149.    The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BofA's records.

150. The claims of the representative Plaintiffs are typical of the claims of the Classes they seek to represent in that the representative Plaintiffs, like all Class members, were charged improper and deceptive fees as alleged herein. The representative Plaintiffs, like all Class members, have been damaged by BofA's misconduct in that they have been assessed unfair and unconscionable BofA Account Fees. Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

151. There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

152. Among the questions of law and fact common to the Classes are whether BofA:

    a.    Violated contract provisions by charging various unauthorized BofA Account Fees;

    b.    Breached its covenant of good faith and fair dealing with Plaintiffs and other members of the Classes through its BofA Account Fee policies and practices;

    c.    Converted money belonging to Plaintiffs and other members of the Classes through its BofA Account Fee policies and practices;

    d.    Was unjustly enriched through its BofA Account Fee policies and practices; and

    e.    Violated the consumer protection acts of certain states through its BofA Account Fee policies and practices.

    f.    The proper method or methods by which to measure damages, and

    g.    The declaratory relief to which the Classes are entitled.

153.     Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful BofA Account fee policies and practices of BofA's Account Agreement and other related documents.  Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

154.     Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

155.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

156.     Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

157.     The State of North Carolina has a significant interest in regulating the conduct of businesses operating within its borders. North Carolina, which seeks to protect the rights and

interests of North Carolina and all residents and citizens of the United States against a company headquartered and doing business in North Carolina, has a greater interest in the Plaintiffs' claims than any other state and is most intimately concerned with the claims and outcome of this litigation.

158.    The principal place of business of BofA in Charlotte, North Carolina is the "nerve center" of its business activities—the place where its high-level officers direct, control, and coordinate the corporation's activities, including account and major policy, financial, and legal decisions related to BofA Account Fees.

159.    BofA's corporate decisions regarding how to treat Account Fees were made from and in North Carolina.

160.    BofA's tortious conduct emanated from North Carolina.

161.    Application of North Carolina law to the Class with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because North Carolina has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Classes.

162.    Under North Carolina's choice of law principles, which are applicable to this action, the common law of North Carolina applies to the nationwide common law claims of all Class members. Additionally, given North Carolina's significant interest in regulating the conduct of businesses operating within its borders, North Carolina's consumer protection statutes may be applied to non-resident consumer plaintiffs.

163.    In the alternative, Plaintiffs assert that common elements of the fifty states' laws can be grouped and tried on a common basis or that state specific Subclasses (as outlined *supra*) can be certified and tried on a common basis.

# FIRST CLAIM FOR RELIEF
## Breach of Contract
### (On Behalf of Plaintiffs and the Classes)

164.   Plaintiffs repeat paragraphs 1 through 163 above.

165.   Plaintiffs and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

166.   No contract provision authorizes BofA to charge: (1) multiple NSF fees on a single transaction; (2) NSF and OD fees on the same transaction; (3) NSF or OD fees on a transaction with a BofA related entity.

167.   In addition, BofA's contract promises that it will waive the $5 monthly service fee on savings accounts when certain conditions are met, but it charges the service fee even when such conditions are met by accountholders like Plaintiffs.

168.   In addition, no contract provision authorizes BofA to deduct bank service fees first out of new deposits and thereby cause additional OD and NSF Fees.

169.   Therefore, BofA breached the terms of its Account Agreement by charging these fees.

170.   Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

171.   Plaintiffs and members of the Classes have sustained damages as a result of BofA's breaches of the account contract.

## SECOND CLAIM FOR RELIEF
### Breach of the Covenant of Good Faith and Fair Dealing
### (On Behalf of Plaintiffs and the Classes)

172.    Plaintiffs repeat paragraphs 1 through 163 above.

173.    Plaintiffs and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

174.    Under the laws of North Carolina and the states where BofA does business, good faith is an element of every contract pertaining to the assessment of Account Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

175.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

176.    BofA has breached the covenant of good faith and fair dealing in the Account Agreement through its BofA Account Fee policies and practices as alleged herein.

177.    Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

41

178.    Plaintiffs and members of the Classes have sustained damages as a result of BofA's breach of the covenant of good faith and fair dealing.

### THIRD CLAIM FOR RELIEF
#### Conversion
#### (On Behalf of Plaintiffs and the Classes)

179.    Plaintiffs repeat paragraphs 1 through 163 above.

180.    BofA had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

181.    BofA has wrongfully collected Account Fees from Plaintiffs and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

182.    BofA has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiffs and the members of the Classes, without legal justification.

183.    BofA continues to retain these funds unlawfully without the consent of Plaintiffs or members of the Classes.

184.    BofA intends to permanently deprive Plaintiffs and the members of the Classes of these funds.

185.    These funds are properly owned by Plaintiffs and the members of the Classes, not BofA, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiffs and the members of the National Class.

186.    Plaintiffs and the members of the Classes are entitled to the immediate possession of these funds.

187.    BofA has wrongfully converted these specific and readily identifiable funds.

188.    BofA's wrongful conduct is continuing.

189.    As a direct and proximate result of this wrongful conversion, Plaintiffs and the members of the Classes have suffered and continue to suffer damages.

190.    By reason of the foregoing, Plaintiffs and the members of the Classes are entitled to recover from BofA all damages and costs permitted by law, including all amounts that BofA has wrongfully converted.

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

191.    Plaintiffs plead this claim in the alternative.  Plaintiffs repeat paragraphs 1 through 163 above, excluding paragraphs that allege an express contractual provision governs the conduct at issue.

192.    Plaintiffs, on behalf of themselves and the Classes, assert a common law claim for unjust enrichment.

193.    By means of BofA's wrongful conduct alleged herein, BofA knowingly provided banking services to Plaintiffs and members of the Classes that was unfair, unconscionable, and oppressive.

194.    BofA knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes.  In so doing, BofA acted with conscious disregard for the rights of Plaintiffs and members of the Classes.

195.    As a result of BofA's wrongful conduct as alleged herein, BofA has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Classes.

196.    BofA's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

197.    Under the common law doctrine of unjust enrichment, it is inequitable for BofA to

be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of Account Fees on Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. BofA's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

198. The financial benefits derived by BofA rightfully belong to Plaintiffs and members of the Classes. BofA should be compelled to disgorge in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by BofA traceable to Plaintiffs and the members of the Classes.

199. Plaintiffs and members of the Classes have no adequate remedy at law.

### FIFTH CLAIM FOR RELIEF
### North Carolina Consumer Protection Law
**(On Behalf of Plaintiffs and the Classes)**

200. Plaintiffs repeat paragraphs 1 through 163 above.

201. As described herein, BofA's unconscionable and unfair actions regarding the assessment of BoA Account Fees, including NSF and OD Fees, as well as MSAS Fees, constitute unfair competition and unfair and deceptive trade practices as defined by the laws of the United States of America and the State of North Carolina, including but not limited to N.C.G.S. § 75.1-1 *et seq.*

202. As described herein, the assessments are both unfair and deceptive, as they violate industry standards and offend public policy, and they deceive customers who do not expect the charges.

203. BoA's actions affected commerce in North Carolina, as many of its North Carolina customers were charged these unfair and deceptive fees.

44

204.    Plaintiff relied upon Bank of America's representations that it would not charge multiple NSF and OD fees; would not charge such fees to itself; would not deduct fees before other charges; and would not charge unauthorized MSAS Fees.  This reliance was reasonable, as it was based upon both BoA's account agreements, industry practice, and common sense.

205.    Plaintiffs have been actually damaged as the direct and proximate result of BofA's unfair competition and unfair and deceptive trade practices by overcharges on their account.

206.    Plaintiffs are entitled to recovery of treble damages and, in the discretion of the Court, reasonable attorneys' fees and costs by virtue of BofA's unfair and deceptive trade practices.

## SIXTH CLAIM FOR RELIEF
### Oklahoma Consumer Protection Law
**(On Behalf of Morris and the Alternative Oklahoma Subclasses)**

207.    Plaintiffs repeat paragraphs 1 through 163 above.

208.    BoA's conduct, as described herein, constitutes a "deceptive trade practice," which is defined in the Oklahoma Consumer Protection Act to include "a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person." *See* Okla. Stat. tit. 15 § § 752(13), 753(20).

209.    BoA's unlawful conduct occurred, and continues to occur, in the conduct of trade or commerce and in the course of BoA's business.

210.    As an actual and proximate result of Defendant's misconduct, Plaintiffs and the Classes were injured and suffered damages by BoA's conduct, including by overpaying BoA Account Fees.

211.    BoA is liable to Plaintiffs and the Class for damages in amounts to be proven at trial, including attorneys' fees and costs under § 761.1.

## SEVENTH CLAIM FOR RELIEF
## California Unfair Competition Law
## Deceptive Prong Business and Professions Code § 17200
## (On behalf Bui and the Alternative California Subclass)

212.     Plaintiffs repeat paragraphs 1 through 163 above.

213.     BofA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, et seq.

214.     The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

215.     By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

216.     BofA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when affirmatively and knowingly misrepresenting its NSF Fee practices. Such representations are likely to mislead the public.

217.     As a result of Defendants' violations of the UCL's "deceptive" prong, Plaintiff Bui and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services, in particular multiple NSFs, and thereby have suffered and will continue to suffer actual damages. In addition, Plaintiff Bui requests an injunction on behalf of the general public to prevent BofA from continuing to misrepresent its NSF fees.

## EIGHTH CLAIM FOR RELIEF
## California Unfair Competition Law
## Unfair Prong Business and Professions Code § 17200
### (On behalf Bui and the alternative California Subclass)

218.    Plaintiffs repeat paragraphs 1 through 163 above.

219.    BofA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, et seq.

220.    The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

221.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

222.    BofA's conduct violates the UCL's "unfair" prong in the following respects, among others: Defendant misrepresented its true NSF Fee practices and that consumers would be charged multiple NSF fees on the same item.

223.    BofA's conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

224.    The harm to Plaintiff Bui and the California Subclass members arising from BofA's unfair practices relating to the imposition of multiple NSF fees outweighs the utility, if any, of those practices.

225.    BofA's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff Bui and members of the California Subclass.

226.    BofA's conduct was substantially injurious to consumers in that they have been forced to endure multiple NSF Fees with misleading and/or inadequate disclosure.

227.    As a result of BofA's violations of the UCL's "unfair" prong, Plaintiff Bui and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

### NINTH CLAIM FOR RELIEF
### Georgia Consumer Protection Act, *O.C.G.A. Sections 10-1-390 et seq.*
### (On behalf of Williams and the alternative Georgia Subclass)

228.    Plaintiff repeats paragraphs 1 through 163 above.

229.    As described herein, BofA's unconscionable and unfair actions regarding its Account Fee policies and practices constitute unfair competition and unfair and deceptive trade practices as defined by the laws of the United States of America and the State of Georgia, including but not limited to O.C.G.A. § 10-1-390 *et seq.*

230.    Plaintiff Williams has been damaged as the direct and proximate result of BofA's unfair competition and unfair and deceptive trade practices.

231.    Plaintiffs are entitled to recovery of treble damages and, in the discretion of the Court, reasonable attorneys' fees and costs by virtue of BofA's unfair and deceptive trade practices.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

48

1.      Declaring BofA's Account Fee policies and practices described herein to be wrongful, unfair and unconscionable;

2.      Restitution of all BofA Account fees paid to BofA by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.      Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

4.      Actual damages in an amount according to proof;

5.      Punitive and exemplary damages;

6.      Pre-judgment interest at the maximum rate permitted by applicable law;

7.      Treble damages and attorneys' fees as provided by law;

8.      Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9.      Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: July 12, 2018                Respectfully submitted,


By: /s/ DAVID M. WILKERSON
Larry McDevitt
NC State Bar No. 5032
David M. Wilkerson
NC State Bar No. 35742
The Van Winkle Law Firm
11 North Market Street
Asheville, NC 28801
(828) 258-2991
*dwilkerson@vwlawfirm.com*
*lmcdevitt@vwlawfirm.com*

Jeffrey D. Kaliel
Sophia Gold
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielpllc.com*

Attorneys for Plaintiff
and the Putative Class
Admitted Pro Hac Vice

James J. Pizzirusso
HAUSFELD LLP
1700 K St., NW, Ste 650
Washington, DC 20006
(202) 540-7154
*jpizzirusso@hausfeld.com*
Attorneys for Plaintiff
and the Putative Class
Admitted Pro Hac Vice

## CERTIFICATE OF SERVICE

      I hereby certify that I have this day served the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

Dated:  July 12, 2018

s/  David M. Wilkerson
David M. Wilkerson
