**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

LISA MORRIS, MICHAEL BUI, AND
TUMIKA WILLIAMS, on behalf of
themselves and all others similarly situated,

<em>Plaintiffs</em>,

<em>v.</em>

BANK OF AMERICA, N.A.,

<em>Defendant</em>.

No. 3:18-cv-157-RJC-DSC

---

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

---

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ............................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................ 1

LEGAL STANDARD ........................................................................................................... 2

ARGUMENT ...................................................................................................................... 2

    I.   BANA breaches contractual promises and covenants. ................................................ 2

        A.   BANA charges multiple NSF and/or OD fees on the same item. ........................... 2

            1.   Express Breach ................................................................................................... 3

            2.   Implied Covenant .............................................................................................. 7

                i.   Oklahoma Law: Plaintiff Morris ................................................................. 8

                ii.   California Law: Plaintiff Bui ...................................................................... 9

        B.   The Contract bars the assessment of Fees on payments and transfers from BANA to BANA. ...................................................................................................... 9

            1.   Express Breach ................................................................................................... 9

            2.   Implied Covenant ............................................................................................ 13

        C.   The Contract bars deduction of Fees until new funds are deposited. ..................... 13

            1.   Express Breach ................................................................................................. 13

            2.   Implied Covenant ............................................................................................ 15

        D.   BANA's Contract bars the assessment of MSAS Fees. ........................................ 16

    II.   Plaintiffs have stated a valid conversion claim. ............................................................ 17

    III.  Plaintiffs have stated a valid unjust enrichment claim. ................................................ 19

    IV.  BANA's unfair and deceptive practices violate state UDAP statutes. ............................ 21

        A.   The contracts do not excuse BANA's unfair and deceptive conduct. .................... 21

        B.   Federal banking regulations do not displace generally applicable state UDAP statutes that prohibit BANA's unfair and deceptive conduct. ................................ 22

        C.   The plaintiffs have stated a proper claim under California's Unfair Competition Law. ................................................................................................. 25

CONCLUSION ................................................................................................................. 25

## TABLE OF AUTHORITIES

*Ashcroft v. Iqbal*
556 U.S. 662, 678 (2009) ....................................................................................... 2

*Baker Hughes Oilfield Operations, LLC v. Iron Hawk Energy Grp. Joint Venture*
No. 17-CV-00652-GKF-JFJ, 2018 WL 3298072, at *3 (N.D. Okla. June 13, 2018)........20

*Beeler v. Ditech Fin., LLC*
No. 16-CV-54, 2016 WL 4136513, at *1 (M.D. Ga. Aug. 1, 2016)................................23

*Berkeley v. Wells Fargo Bank*
No. 15-CV-00749-JSC, 2016 WL 67221, at *5 (N.D. Cal. Jan. 6, 2016) ..........................6

*Beshara v. Southern Nat'l Bank*
928 P.2d 280, 288 (Okla. 1996) .......................................................................................8,9

*Best Buy Stores, L.P. v. Manteca Lifestyle Center, LLC*
859 F. Supp. 2d 1138, 1152 (E.D. Cal. 2012).....................................................................9

*Briggs v. Freeport-McMoran Copper & Gold, Inc.*
No. CIV-13-1157-M, 2015 WL 1461884 (W.D. Okla. Mar. 30, 2015) ..........................20

*Brown v. Okla. State Bank & Trust Co.*
860 P.2d 230 (Okla. 1993) .........................................................................................18,19

*Browning et. al. v. Univlever United States, Inc.*
2017 WL 7660643, at *3 (C.D. Cal. Apr. 26, 2017) .......................................................19

*Carlisle v. Nat'l Commercial Servs., Inc.*
No. 14-CV-515, 2017 WL 1075088, at *12 (N.D. Ga. Feb. 22, 2017) ...........................23

*Clark v. Aaron's, Inc.*
914 F. Supp. 2d 1301, 1308–09 (N.D. Ga. 2012) ...........................................................20

*Conatzer v. Am. Mercury Ins. Co.*
15 P.3d 1252, 1255 (Okla. Civ. App. 2000) ....................................................................24

*Cooper v. Union Bank*
9 Cal. 3d 371, 507 P.2d 609 (1973) ................................................................................17

*Daniel v. Ford Motor Co.*
806 F.3d 1217, 1225 (9th Cir. 2015) ..............................................................................25

*Decatur Auto Ctr. v. Wachovia Bank, N.A.*
583 S.E.2d 6 (Ga. 2003)...................................................................................................18

Case 3:18-cv-00157-RJC-DSC   Document 26   Filed 09/24/18   Page 3 of 33

*Eaton v. Bank of Oklahoma, N.A.*
No. CJ-2010-5209 (D. Ct. Tulsa Cnty., Okla.) (order filed Apr. 12, 2011) ......................24

*Faircloth v. A.L. Williams & Assocs., Inc.*
426 S.E.2d 601, 605 (Ga. Ct. App. 1992) ........................................................................18

*F.T.C. v. AMG Servs., Inc.*
29 F. Supp. 3d 1338, 1349 (D. Nev. 2014) ......................................................................21

*F.T.C. v. Cyberspace.Com LLC*
453 F.3d 1196, 1200 (9th Cir. 2006) ................................................................................21

*First Nat'l Bank & Trust Co. of Vinita v. Kissee*
859 P.2d 502, 509 (Okla. 1993) ..........................................................................................8

*Fong v. E. W. Bank*
227 Cal. Rptr. 3d 838, 844 (Ct. App. 2018) ....................................................................17

*Ga. Lottery Corp. v. First Nat. Bank*
560 S.E.2d 345 (Ga. Ct. App. 2002) ................................................................................18

*Gil v. Bank of Am., N.A.*
42 Cal. Rptr. 3d 310 (Ct. App. 2006) ..............................................................................17

*Gutierrez v. Carmax Auto Superstores Calif.*
228 Cal. Rptr. 3d 699, 722 (Ct. App. 2018) ....................................................................25

*Gutierrez v. Wells Fargo Bank, N.A.*
730 F. Supp. 2d 1080, 1113 (N.D. Cal. 2010) ...................................................................8

*Gutierrez v. Wells Fargo Bank, NA*
704 F.3d 712 (9th Cir. 2012) ...............................................................................8,22, 23

*Gutierrez v. Wells Fargo*
622 F. Supp. 2d 946, 954 (N.D. Cal. 2009) .......................................................................9

*Hitch Enterprises, Inc. v. Cimarex Energy Co.*
859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012) ..............................................................20

*Horne v. Harbour Portfolio VI, LP,*
304 F. Supp. 3d 1332, 1344 (N.D. Ga. 2018) ..................................................................24

*Huddle House, Inc. v. Two Views, Inc.*
No. 1:12-CV-03239-RWS, 2013 WL 1390611, at *4

(N.D. Ga. Apr. 4, 2013) ....................................................................................20

*Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*
281 Ga. App. 450, 453–54 (2006) ...................................................................16

*In re Gen. Motors Corp.*
MDL 04-1600, 2005 WL 1924335, at \*3 (W.D. Okla. Aug. 8, 2005) .............24

*In re HSBC Bank*
1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014) ..............................................................9

*Labra v. Cal-W. Reconveyance Corp.*
No. C 09-2537 PJH, 2010 WL 889537, at \*8–9 (N.D. Cal. Mar. 11, 2010) ......6

*Luck v. Regions Bank*
546 S.E.2d 342 (Ga. Ct. App. 2001) ...............................................................18

*Marsu, B.V. v. Walt Disney Co.*
185 F.3d 932, 937 (9th Cir. 1999) .....................................................................9

*Martin v. Bimbo Foods Bakeries Distribution, Inc.*
No. 5:14-CV-17-BR, 2014 WL 3487618, at \*4
(E.D.N.C. July 11, 2014) .................................................................................21

*McKell v. Washington Mut., Inc.*
49 Cal. Rptr. 3d 227 (Ct. App. 2006) ..............................................................17

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*
591 F.3d 250, 253 (4th Cir. 2009) .....................................................................2

*Owens v. Andrews Bank & Tr. Co.*
220 S.E.2d 116, 119 (S.C. 1975) .....................................................................19

*Peviani v. Nat. Balance, Inc.*
774 F. Supp. 2d 1066, 1071 (S.D. Cal. 2011) .................................................25

*People v. Servantes*
103 Cal. Rptr. 2d 870 (Ct. App. 2001) .............................................................25

*Sisemore v. Dolgencorp, LLC*
212 F. Supp. 3d 1106, 1109 (N.D. Okla. 2016) ..............................................24

*Smith v. State Farm Mut. Auto. Ins. Co.*
113 Cal. Rptr. 2d 399, 415 (Ct. App. 2001) ....................................................25

*Steenbergen v. First Fed. Sav. & Loan*
753 P.2d 1330 (Okla. 1987) ..................................................................................18,19

*Trazo v. Nestle USA, Inc.*
113 F. Supp. 3d 1047 (N.D. Cal. 2015) ..................................................................19,20

*Trulock v. Freeh*
275 F.3d 391, 399 (4th Cir. 2001) ..............................................................................2

*Valencia v. Volkswagen Grp. of Am. Inc.*
119 F. Supp. 3d 1130, 1142–43 (N.D. Cal. 2015) .........................................................20

*Watters v. Wachovia Bank, N.A.*
550 U.S. 1, 11 (2007) ..............................................................................................22

*Welco Elecs., Inc. v. Mora*
166 Cal. Rptr. 3d 877, 887 (Ct. App. 2014) ..................................................................17

*White v. Wachovia Bank, N.A.*
563 F. Supp. 2d 1358, 1363 (N.D. Ga. 2008) ...............................................................15

*Williams v. Nat'l Auto Sales, Inc.*
651 S.E.2d 194, 197 (Ga. Ct. App. 2007) .....................................................................18


Statutes

12A O.S. § 1-304 ......................................................................................................8

60 Okl. St. § 312 ....................................................................................................19

Ga. Code § 10-1-396(1) ......................................................................................23, 24

Okla. Stat. tit. 15, § 752 .........................................................................................21

Okla. Stat. tit. 15, § 754 .........................................................................................23

12 C.F.R. § 7.4002(a)..............................................................................................22

OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices
2002 WL 521380, at *2 n.2 (Mar. 22, 2002) ...............................................................23

# INTRODUCTION

In an aggressive effort to increase fee revenue at the expense of named Plaintiffs and Class Members herein, Defendant Bank of America ("BANA" or the "Bank") employs four distinct (but related) practices – all of which violate the Bank's contractual agreements and state law:

- BANA charges multiple $35 insufficient funds fees ("NSF Fees") *and* $35 overdraft ("OD Fees") (collectively NSF and OD Fees are referred to herein as "Fees") on the same transactions when it repeatedly re-processes them, even though the Bank's agreements authorize only one fee (and only one type of fee) per charge;

- BANA assesses Fees on payments or attempted payments *to itself*, even when it knows such transaction attempts will be futile and its contracts do not authorize such fees;

- BANA deducts Fees prematurely and from already-empty accounts, and prior to the time promised (after deposits) in its contractual agreements to ensure that even more Fees are assessed on accounts; and

- BANA charges monthly savings account service fees ("MSAS Fees"), despite a contractual promise to waive such fees for accountholders who make certain transfers into their savings accounts.

For the reasons discussed below, Plaintiffs have adequately alleged that each of these practices are deceptive and/or violate BANA's express and implied contractual promises. BANA's Motion to Dismiss ("Motion") should be denied in its entirety.

# FACTUAL BACKGROUND

Like millions of Americans, Lisa Morris, one of the named Plaintiffs, lives paycheck to paycheck. From time to time, that means a bill payment or other charge will overdraw the checking account she opened at Bank of America. When that happens, she knows she may have to pay a single $35 fee to which she agreed when she opened her account. But when Ms. Morris tried to use her Bank of America checking account to pay $60 toward her credit-card bill in June 2017, for example, she never expected that a week later she would owe the bank over a hundred dollars in

1

multiple NSF and OD Fees from a single $60 charge. Compl. ¶ 20. These types of unauthorized Fees were devastating financial blows to her and the other Plaintiffs and Class Members

BANA compounded the burdens of these unauthorized Fees by also charging multiple Fees on payments made to BANA-related entities, and by immediately deducting Fees from already empty accounts instead of waiting for deposits as specified in BANA's contracts. *Id.* ¶ 60, 108. These improper Fee deductions resulted in the assessment of even more Fees, further violating BANA's contracts. *Id.* ¶ 122. Likewise, the Bank charged MSAS Fees on savings accounts even when the accounts met the conditions for fees to be waived. *Id.* ¶ 141–44.

## LEGAL STANDARD

In reviewing whether the Defendant has carried its burden to show that the Plaintiffs' complaint must be dismissed for failing to state a claim on which relief can be granted, the Court must "draw all reasonable inferences in favor of the plaintiff," *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 253 (4th Cir. 2009), and "assume all facts plead by Appellants to be true," *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001). Only if a complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" should it be dismissed. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct." *Id*.

## ARGUMENT

## I.    BANA breaches contractual promises and covenants.

### A.    BANA charges multiple NSF and/or OD fees on the same item.

### 1.   *Express Breach*

Plaintiffs allege that BANA assesses multiple $35 NSF Fees (as well as multiple $35 OD Fees) on the same, small dollar Automated Clearing House (ACH) or bill-pay electronic transactions—a practice that is deceptive and in violation of BANA's contractual terms.[1] For instance, Plaintiff Morris incurred $105 in NSF Fees as a result of three separate payment attempts (through no fault of her own) on the same $60 credit card payment. This practice is not universal in the banking industry. Many major banks like JP Morgan Chase—the largest consumer bank in the country—do not engage in the practice of charging more than one NSF or OD Fee on the same item when a bank chooses to process it for payment multiple times. Compl. ¶ 36. Other banks that do engage in the practice expressly disclose it, unlike BANA.

Here, the BANA's contractual agreements bar both a) the assessment of more than one Fee (or type of Fee) on the same payment; and b) the practice of re-submitting the same payment multiple times. BANA's contract expressly states that only *one* re-submission will take place, and never says that even that single re-submission can incur a Fee. *Id.* ¶¶ 39–41.

Nevertheless, BANA seems to assert that each time an electronic payment is re-submitted, even though the consumer does nothing to facilitate this re-submission, it becomes a *new*, unique transaction worthy of *new* and multiple NSF or OD Fees. Motion at 7–8. The problem with this argument is that neither BANA's deposit agreement, nor its Online Banking Agreement, contain this language. Moreover, this disputed premise is far from obvious as a matter of common sense and becomes even less so when one considers that *BANA's own bank statements* refer to the re-

---

[1] NSF Fees, which are assessed when a bank *rejects* an attempted transaction, are distinct from overdraft fees ("OD Fees"), which are assessed when a bank *authorizes* a transaction even though there are insufficient account funds.

submitted transactions as "***RETRY*** PAYMENTS"—*i.e.*, reiterations of the same initial transaction, not transactions *ex nihilo*. Compl. ¶ 26.

BANA's argument also fail because its deposit agreement and fee schedule indicate only a single NSF or OD Fee will be charged on a transaction, regardless of the number of times it is resubmitted, unlike other banks that charge multiple NSF Fees on the same transaction and who expressly state the policy.[2] For example, according to the Online Banking and Transfers Outside Bank of America Service Agreement and Electronic Disclosure ("OBTOBASA"):

> If enough funds to complete the transfer or payment are not available, we may either (i) complete the transaction and overdraw the account or (ii) refuse to complete the transaction. In either case, **we may charge <u>a</u> non-sufficient funds (NSF),** returned item, overdraft, or similar fee.
> […]
> At our option, we may make **<u>a</u> further attempt** to issue the payment or process the transfer request.
> […]
> Bank of America is under no obligation to inform you if it does not complete a payment or transfer because there are non-sufficient funds or credit in your account to process the transaction. In this case, **you are responsible for making alternate arrangements or rescheduling the payment or transfer within Online Banking**.
> […]
> <u>An</u> NSF-fee, returned item, overdraft or similar fee may also **apply if you schedule payments or transfers** and your available balance is not sufficient to process the transaction on the date scheduled[.]

*Id.* ¶ 39 (emphases added). BANA's use of the singular "an" or "a" to describe this Fee assessment must be given its plain and ordinary meaning.

While the OBTOBASA also states that a single NSF or OD Fee will be charged if "you schedule payments of transfers" for which there are insufficient funds, as alleged herein, Plaintiffs

---

[2] First Citizens Bank, another major institution in the Carolinas, engages in the same abusive practice as BANA, but at least expressly states: "Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**." Compl. ¶ 54.

only scheduled their payments or transfers *once*, and took no action to request re-processing of their transactions. Thus, BANA was only entitled to charge *one* OD *or* NSF on each payment. In other words, when a transaction is returned for insufficient funds, a re-submission cannot be the basis for another NSF or OD Fee without an additional action from the accountholder to again seek payment for the item. Any other interpretation would permit BANA to process a transaction repeatedly throughout the day, thus conceivably charging millions of dollars in Fees on a single transaction at its sole discretion.[3] This absurdity is the logical extension of BANA's argument.

While the OBTOBASA also states that the bank "may" attempt again to process the transaction a *single* additional time, it never states that such a single re-attempt will incur additional NSF or OD Fees. Moreover, and as alleged by Plaintiff Morris, BANA actually re-submitted her transactions for payment *two* additional times, not *one*—something expressly barred by the contract. In the example of Plaintiff's Citibank credit card payment, BANA first processed it for payment on June 19, 2017; attempted to process it again on June 22; and then a third time on June 27. Compl. ¶ 20. It charged NSF Fees *each* time—which it was barred from doing—and it resubmitted the same transaction for payment three times, which it was also barred from doing.

There is yet another crucial statement in the OBTOBASA, which also makes the assessment of multiple NSF Fees on the same transaction impermissible: "[in the event of] non-sufficient funds or credit in your account to process the transaction…**you are responsible for making alternate arrangements or rescheduling the payment or transfer within Online**

---

[3] In addition, the Fee Schedule authorizes NSF Fees only on "Items." But "Item" cannot mean each re-submission of the same transaction because it is defined to mean "**all orders and instructions** for the payment, transfer or withdrawal of funds" and there is no *new* order or instruction for payment of a re-submitted item. It is simply another attempt at the original order or instruction. Plaintiffs never took any action to re-submit or renew their original instructions for payments on their credit card accounts.

**Banking**." *Id.* ¶ 39 (emphasis added). This is a clear promise that in the event of a returned payment, BANA will *not* attempt to resubmit it without affirmative action by the accountholder.

Here, there was only one attempted transaction by Plaintiffs. Since they provided an authorization to debit their accounts only once; there is only one "item" however many times BANA chooses to re-submit it for payment. Since even BANA designates this as a "RETRY PAYMENT," this Court should decline to determine, on a Motion to Dismiss, that BANA is authorized to re-submit a single charge multiple times and charge multiple Fees when its own contractual language can be described, at best, as vague and ambiguous.

Despite this contractual language, BANA argues Plaintiffs' claims are "premised on a misinterpretation of the pertinent contracts" because "according to the applicable Deposit Agreement and Schedule of Fees, each time that BANA received an order or instructions to process [payments], BANA was entitled to either pay the transaction and assess an OD Fee or decline it and assess an NSF Fee." Motion at 7-8. This cursory and conclusory argument is insufficient for dismissal as BANA can point to no contract provision, in any document, that says BANA can assess multiple Fees "each time" a transaction is re-submitted for payment. In addition, BANA has offered no justification for its decision to re-submit Plaintiffs' payments *two* times, when the OBTOBASA said it "may" only do so a maximum of *once*. Plaintiffs have adequately alleged breach of contract claims and BANA's Motion should be denied.[4]

---

[4] BANA also argues that Plaintiff Bui's contract claims fail because "he fails to establish that he performed or had the ability to perform under the contract." The argument is nonsensical. First, Bui did not fail to perform. The assessment of OD or NSF Fees—due to insufficient funds transactions—is expressly contemplated by the contract. Receiving those fees cannot be a breach. Second, if Bui failed to perform under the contract, it does not entitle BANA to punish him however it would like. By BANA's logic, BANA could charge a $1,000 NSF Fee and Bui would be without remedy. The proposition is ridiculous.

Moreover, BANA's reliance on *Berkeley v. Wells Fargo Bank*, No. 15-CV-00749-JSC, 2016 WL 67221, at *5 (N.D. Cal. Jan. 6, 2016) and *Labra v. Cal-W. Reconveyance Corp.*, No. C

## 2.     *Implied Covenant*

Even if the Court determines that there is no express breach, however, the Bank's multiple-NSF Fee practice violates the implied covenant of good faith and fair dealing as well. BANA abuses its contractual discretion in the following ways: (1) the Fee Schedule authorizes the assessment of Fees on an "item," and the Bank interprets that term in bad faith by making each re-submission of the same payment a new "item," in a manner that directly causes the assessment of more Fees; (2) the Bank says it "**may** charge a non-sufficient funds (NSF)" fee in the event of an insufficient funds transaction, when it fact its policy is to *always* assess NSF Fees on the same transaction multiple times in the event of re-submission; and (3) the Bank says it "**may** make a further attempt to issue the payment or process the transfer request," when it fact it *always* does so, as a matter of policy, up to two more times. By charging more than one NSF or OD Fee on a given transaction, BANA engages in bad faith and contradicts reasonable consumer expectations.

Courts have found that the contract term "may" is a lie when a contracting party actually *knows* an event will take place. In a case involving the manipulation of debit card transaction posting order, a bank used the phrase "may" to describe a posting order it had *already adopted*. As one court presiding over bank fee litigation held:

> The phrasing '[w]e may choose' suggested to customers that the bank would either exercise discretion or that it had not yet chosen to go to a high-to-low scheme. **In fact, the bank knew good and well that it was already imposing and would continue to impose high-to-low bookkeeping—the worst possible system from the customer's perspective.**

---

09-2537 PJH, 2010 WL 889537, at *8–9 (N.D. Cal. Mar. 11, 2010) are distinguishable. In each case, the plaintiff failed to make timely mortgage payments but nevertheless brought suit under the contract. In both cases, the courts held that the plaintiffs failed to allege that the defendants' breach caused their harm. That is not the case here.

7

*Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1113 (N.D. Cal. 2010), *aff'd in part,*

*rev'd in part and remanded sub nom. Gutierrez v. Wells Fargo Bank, NA,* 704 F.3d 712 (9th Cir.

2012) (emphasis added). On this basis, the court entered judgment in favor of plaintiff and a class

on a covenant of good faith and fair dealing claim and others. The same result should apply here.

### i.  Oklahoma Law: Plaintiff Morris[5]

BANA claims that Plaintiff Morris' good faith and fair dealing allegations are either an

impermissible tort claim or duplicative of the breach of contract claim. Motion at 11–14. But

Plaintiff's breach of good faith claim is a part of her breach of contract claim and challenges the

way BANA exercises its contractually prescribed discretion. This Court need not delve into the

analysis of whether Plaintiff Morris could assert a *separate* tort claim for the breach of the covenant

of good faith and fair dealing because Plaintiff Morris does not attempt to do so. Her claim is tied

to the specific language of the BANA account documents.

The common law of Oklahoma "implies in all contracts a mutual covenant that the parties

will act towards each other in good faith." *Beshara v. Southern Nat'l Bank*, 928 P.2d 280, 288

(Okla. 1996); *see also* 12A O.S. § 1-304 ("Every contract of duty within the Uniform Commercial

Code imposes an obligation of good faith in its performance and enforcement."). The common law

further imposes an implied covenant upon all contracting parties that no party will act to injure the

other parties' reasonable expectations nor impair the rights or interests of the other to receive the

benefits of the contract. *First Nat'l Bank & Trust Co. of Vinita v. Kissee*, 859 P.2d 502, 509 (Okla.

1993). Specifically, "banks have an obligation to exercise fair dealing and good faith" with their

---

[5] Plaintiffs brought their common law claims under North Carolina law and pleaded other states' laws in the alternative. Compl. ¶¶ 162–163. BANA did not address this choice of law issue in its brief and instead moved under various states law where the Plaintiffs reside. As such, Plaintiffs North Carolina claims remain viable.

customers. *Beshara*, 928 P.2d at 288. Here, Plaintiff's breach of good faith and fair dealing claim is not duplicative because it alleges that BANA abused its contractual discretion. Compl. ¶ 50.

Plaintiffs have sufficiently alleged that BANA has both breached the relevant contract and breached the covenant of good faith and fair dealing. Multiple federal courts have recognized that contractual provisions providing a financial institution with discretion over bank fees provide a basis for a breach of the implied covenant. *See, e.g.*, *In re HSBC Bank*, 1 F. Supp. 3d 34, 54 (E.D.N.Y. 2014) (permitting claim to proceed despite HSBC's argument that it had contractual authority to post debit transactions from high to low); *Gutierrez v. Wells Fargo*, 622 F. Supp. 2d 946, 954 (N.D. Cal. 2009) (permitting claim to proceed despite Wells Fargo's argument that it had contractual authority to post items to checking account in any order the bank chose).

### ii.     California Law: Plaintiff Bui

For all the same reasons discussed *supra*, Plaintiff Bui's implied covenant claim is also not duplicative of his express breach claim. The implied covenant of good faith and fair dealing is present in all contracts in California. *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 937 (9th Cir. 1999) (quoting *Carma Developers, Inc. v. Marathon Dev. Cal., Inc.,* 826 P.2d 710 (Cal. 1992)). Under California law, "[b]ad faith sufficient to constitute a breach of the covenant of good faith and fair dealing includes conduct described as 'inaction,' 'subterfuge,' 'lack of diligence,' 'evasion of the spirit of the bargain,' and 'abuse of power.'" *Best Buy Stores, L.P. v. Manteca Lifestyle Center, LLC*, 859 F. Supp. 2d 1138, 1152 (E.D. Cal. 2012) (quoting *R.J. Kuhl Corp. v. Sullivan*, 13 Cal. App. 4th 1589, 1602 (1993)). Plaintiff Bui has adequately stated a claim.

### B.     The Contract bars the assessment of Fees on payments and transfers from BANA to BANA.

#### 1.     Express Breach

BANA charges its accountholders Fees to attempt to transfer funds to *itself*, or to reject a

payment or transfer to *itself*, when it already knows that the transferor account is (or will be) in an insufficient or overdrawn state if the payment is honored.[6] This practice is an absurdity: BANA processes transfers to itself that is knows will be rejected, for the sole purpose of assessing (often multiple) Fees on accountholders—even though it has both the contractual authority and technical capability to reject such transfers. BANA has the capability—which it uses routinely—to withhold processing transactions it knows will be futile. Compl. ¶ 31. For example, BANA offers a checking account feature called "Keep the Change," in which debit card purchase amounts are "rounded up" to the nearest dollar amount, and the "round-ups from your debit card purchases are accumulated and transferred daily from your checking account to your [BANA] savings account." *Id.* ¶ 32. When the checking account balance is too low to support the round-up transfer, BANA simply cancels the automatic transfer, rather than attempting a transfer that would be futile or forcing through a transfer that would cause an overdraft. *Id*. In short, when BANA knows the processing of a given electronic transaction will serve no other purpose than to create bank fees, BANA has the technological capability not to make the transfer, and it sometimes does so. *Id.* ¶ 33.

   BANA's Deposit Agreement states, in the *only* provision in any account document that *specifically addresses* intra-bank transfers,  that "[w]e **may reject payment orders**" from one BANA account to another. Compl. ¶ 85 (emphasis added).[7] While the Agreement does not expressly say *why* it may so "reject," the provision reasonably indicates BANA will not even begin to submit and process an intra-bank transfer when it knows attempted payment will be futile—that it obviously will reject such a doomed transfer attempt. Importantly, it is *only* in this section

---

[6] BANA appears to challenge this allegation as a factual matter. Motion at 5. Such an assertion cannot be credited on a motion to dismiss; discovery is required.

[7] This provision appears in the "Sending Funds Transfers" section of the Deposit Agreement, a section which expressly "applies to . . . transfers we make between your Bank of America accounts." Compl. ¶ 85.

governing intra-bank "funds transfers" that BANA *ever* uses the word "reject" with respect to a transaction or payment attempt. It provides itself such power with respect to no other transaction type. This unique usage of the word "reject" by BANA must be assumed to have been intentional, and therefore a clear indication that, as Plaintiffs allege, BANA has special powers with respect to intra-bank transfers—including a special ability to "reject" them that it has with no other type of payment or transfer.

Moreover, the Deposit Agreement never states that transfers to other BANA accounts or payments to other BANA accounts will incur Fees. To the contrary, the Deposit Agreement makes common sense statements that indicate Fees will *only* be assessed on "items" deposited for collection at a *different* financial institution. Specifically, in the Deposit Agreement, "Item" is defined as a transaction deposited for collection *at another financial institution*: "BANA states that "[w]e may debit your account for a check or other item drawn on your account either on the day it is **presented to us for payment**, by electronic or other means, or on the day we receive notice that the item has been **deposited for collection at *another* financial institution**— whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account." *Id.* ¶ 86 (emphasis added). BANA obviously cannot "present an item" to itself for payment, nor are transfers or payments to BANA "deposited for collection at another financial institution"—the funds are deposited where they originated, at BANA. This is important because the Fee Schedule—the specific document that informs consumers of the amount and circumstances of BANA bank fees—says Fees are assessed only on "items." Because a transfer to BANA-related entities is not defined as an "item," BANA may not assess Fees on such a transfer.

In support of dismissal, BANA argues that "because [Plaintiff Morris] had insufficient funds in her account when she attempted [her] HELOC payment, the terms of the [OBTOBASA] specifically allowed BANA to process the transaction and assess an OD Fee or decline the payment and assess an NSF Fee." Motion at 8. In support of this argument, BANA relies on a single general provision in the OBTOBASA, which purports to cover all uses of internet banking services: "if enough funds to complete the transfer or payment are not available, we may either (i) complete the transaction and overdraw the account or (ii) refuse to complete the transaction [and "may" assess Fees]." But this *general* statement cannot trump the provisions in the Deposit Agreement, quoted above, that *specifically* govern intra-bank transfers and Fee assessment. Indeed, the OBTOBASA says this expressly, referring to the Deposit Agreement to address questions about Fee assessment:

> Your use of Online Banking services or Transfers Outside Bank of America may also be affected by a deposit or other agreement between us for your linked Bank of America accounts. When you link an account to Online Banking services or Transfers Outside Bank of America, you do not change the agreements you already have with us for that account. …**You should review those and other Bank of America account related agreements and fee schedules for any applicable fees, for limitations on the number of transactions you can make, liability rules for electronic fund transfers**, and for other restrictions that might impact your use of an account with Online Banking services or Transfers Outside Bank of America (emphasis added).

For all the reasons discussed above, the specific Deposit Agreement provisions governing intrabank transfers do not allow Fee assessment on those transactions.

In sum, the Bank's contract reserves for BANA the right to "reject" intra-bank transfers *ab initio*, and the Bank defines "item" in the fee schedule in a way that does not include intra-bank transfers. Together, and in the absence of any specific disclosure in the OBTOBASA that BANA will assess Fees on intra-bank transfers, these provisions mean the contract must be read to prohibit those Fees and BANA's Motion should be denied.

### 2.    *Implied Covenant*

Even if the Court determines that there is no express breach, however, the Bank's practice violates the covenant of good faith and fair dealing. Consistent with express representations in the Deposit Agreement, reasonable consumers understand that the Bank may "reject" payment orders and transfers to other BANA accounts. It can do so without even submitting them unnecessarily. Good faith performance of the contract requires BANA will not submit a transaction when it knows attempted payment will be futile. But the Bank abuses its purported contractual discretion to "reject" intra-bank transfers, and instead initiates them in bad faith for processing when it knows the only result will be Fee penalties.

Further, even if it were proper to push through a futile attempt, the Bank maintains it has discretion whether or not to "charge" or "deduct" NSF Fees on given transaction attempts. It is in bad faith and violative of reasonable consumer expectation for the Bank to use that discretion to charge Fees on transfers to itself, especially since it *also* charges fees (including late fees) on the accounts *to which transfer was attempted*. *See* OBTOBASA (in the event of a failed transfer "you will be fully responsible for all late fees, interest charges or other action taken by the Payee."). For example, when BANA returns a payment to itself, it could (and does) assess a late fee on the account itself if appropriate. It is absurd and in bad faith to also charge an NSF Fee on the same failed payment, thus doubly penalizing the insufficient funds transfer attempt.

### C.    **The Contract bars deduction of Fees until new funds are deposited.**

### 1.    *Express Breach*

Plaintiffs' third claim centers on an express, clear promise in the Deposit Agreement: "**[w]e ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us**." Compl. ¶ 127 (emphasis added). This provision promises that (at least

"ordinarily") bank fees will not be withdrawn until newly-deposited funds exist to pay them. That makes good sense: by definition, an account on which an overdraft transaction has posted has no funds in it. Immediately deducting funds for Fees from an already-empty account would make no sense and serve no purpose.

Despite this language, however, BANA does not "ordinarily" use deposits to pay Fees; instead, BANA ordinarily and *immediately* deducts Fees, as soon as it determines the existence of an overdraft transaction on the already empty account. By contravening its contractual promise and deducting Fees immediately, BANA can manufacture *even more* Fees on checking accounts. Further, BANA's practice is to deduct Fees last on any given day, after all other consumer debits. Compl. ¶ 124. By deducting Fees from accounts prior to the day a new deposit posts to an account, BANA drives the account balance further negative, which leads to additional Fees.

Moreover, BANA knows how to disclose this practice clearly and unambiguously but chose not to. Indeed, some of BANA's competitors in the banking industry also engage in the practice of immediate deduction of Fees but, unlike BANA, they disclose the practice clearly and expressly to their accountholders. For example, Fifth Third Bank, a major bank in the Midwest and a BANA competitor, expressly states in its deposit agreement the timing with which it will deduct Fees: "If you are charged overdraft or returned item fees, the fees will be an additional debit (-) to your account and will further increase the negative balance in your account if a deposit is not made on time." Compl. ¶ 134 (emphasis added). Similarly, First Citizens Bank, a major bank in the Carolinas, clearly explains its fee timing and tells accountholders in its deposit agreement that it will use bank fees to drive accounts further into the red: "When we charge a fee for NSF items, the charge reduces the available balance in your account and may **put your account into (or**

**further into) overdraft**." Compl. ¶ 135. Instead of clearly disclosing its practice, as other banks do, BANA chose to conceal its true practice and violate a contractual promise to do the opposite.

BANA's main argument for dismissal is that BANA expressly stated that such Fees "posted to Williamses' account when incurred." Motion at 10 (citing contract language stating "[w]e generally determine at the time we post a debit to your account whether it creates an overdraft and whether an overdraft or returned item fee applies"). But that language does not say anything about *when* a Fee "posts." Indeed, a Fee is "created" and determining whether a Fee "applies" makes no temporal promise as to Fee deduction or payment whatsoever. Nor, contrary to BANA's argument, does the agreement "state[] that BANA may use its own discretion in determining the posting order." Motion at 10. To the contrary, it expressly states what its posting order is, and that Fees post last in that order. Plaintiffs have stated a claim for breach of contract.

### 2.    *Implied Covenant*

BANA's argument for dismissal of the express contract claim is that it had "discretion in determining posting order." Motion at 10. Contractual discretion must be used in good faith, however, and Plaintiffs assert that BANA acted in bad faith when it deducted Fees from empty accounts, thus contravening its own stated posting order. Nevertheless, BANA argues, in conclusory fashion, that the claim seeking relief under the implied covenant of good faith and fair dealing must also be dismissed since there can be no breach of the implied covenant where the deposit agreement permits the actions taken by BANA. But, as explained above, the agreement does *not* permit BANA's actions. *See White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1363 (N.D. Ga. 2008) (declining to dismiss plaintiff's breach of the implied covenant of good faith and fair dealing at the motion to dismiss stage when plaintiff alleged that Wachovia "breached the contract provisions [of its Deposit Agreement] *de facto* even if it maintained performance *de jure*"

15

in manipulating transactions to maximize overdraft fees); *see also Hunting Aircraft, Inc. v. Peachtree City Airport Auth.,* 281 Ga. App. 450, 453–54 (2006) ("[W]here the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith."). In any event, there is a separate basis for an implied covenant claim because Plaintiffs allege that BANA abuses contractual discretion to deduct Fees from accounts at a time earlier than permitted. Compl. ¶ 138. BANA's argument for dismissal fails.

> **D.**    **BANA's Contract bars the assessment of MSAS Fees.**

Plaintiff Morris transferred funds from her checking account to her savings account in order to avoid a monthly service charge. Compl. ¶ 138. Still, during the immediately following statement cycle for her savings account, she was assessed a $5 monthly service charge, in violation of the contract which states: "To avoid the monthly maintenance fee you may also make combined monthly automatic transfers of $25 or more from your Bank of America checking account to your savings account during the immediately preceding statement cycle." Compl. ¶ 142. BANA argues that the fees were proper because Plaintiff Morris "does not allege that her transfers were *automatic*." Motion at 9 (emphasis added). But BANA's argument is based on the purported difference between "automatic" and "manual" transfers—terms that are defined *nowhere* in the account documents. While there is no definition of the term "automatic" in the Deposit Agreement or Fee Schedule, there are clear indications that transfers to savings accounts are not included. *See* Deposit Agreement, 22 ("debits include…automatic payments that use your account number (generally referred to as automated clearing house (ACH) debits)").

Here, Morris specifically made a $25 transfer to *avoid* the fee, and she would not have known what BANA's definition of "automatic" meant since it was not defined in her agreement. BANA apparently wants "automatic" to mean a transfer that it set to occur well into the future

(how far, it doesn't say). But "automatic" is also reasonably understood to mean simply an event that happens without BANA's involvement and that is done via an automated process on a computer. In any event, whether Morris' transfers were "automatic" (and what "automatic" means in this situation) is a fact issue not ripe for resolution on a Rule 12(b)(6) motion.

## II.    Plaintiffs have stated a valid conversion claim.

BANA erroneously claims that California courts hold that a bank cannot be sued for conversion. Motion at 15. This is incorrect. The California Court of Appeal recently held that a depositor can sue a bank for conversion, and in doing so distinguished the same cases that BANA cites in its brief. *Fong v. E. W. Bank*, 227 Cal. Rptr. 3d 838, 844 (Ct. App. 2018). As the court in *Fong* explained, "there is no special rule preventing a depositor from pursuing a conversion action against the bank that holds his or her money." *Id.* at 845; *see also Cooper v. Union Bank*, 507 P.2d 609 (Cal. 1973); *Gil v. Bank of Am., N.A.*, 42 Cal. Rptr. 3d 310 (Ct. App. 2006). Further, *McKell v. Washington Mut., Inc.*, 49 Cal. Rptr. 3d 227 (Ct. App. 2006), is easily distinguishable. As the court in *Welco Elecs., Inc. v. Mora*, 166 Cal. Rptr. 3d 877, 887 (Ct. App. 2014) explains, *McKell* involved a mortgage company that overcharged its customers. The mortgage company did not convert funds that it held on behalf of its customers, as here. The court in *McKell* prefaced its holding by stating that, "[m]oney cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved." 49 Cal. Rptr. 3d at 255. Here, there is a specific, identifiable sum involved. BANA charged a specific, identifiable fee against Plaintiffs' accounts and converted Plaintiffs' funds to pay the fee. BANA's claim that Plaintiffs consented to the conversion is false. As explained in the Complaint, Plaintiffs never consented to the Defendant charging multiple NSFs on the same transaction. *See* Compl. ¶ 143. BANA's conduct breached its contract with the Defendants, and its conduct was unconscionable.

Likewise, Georgia law also recognizes conversion claims by a depositor against a bank. In *Decatur Auto Ctr. v. Wachovia Bank, N.A.*, 583 S.E.2d 6 (Ga. 2003), the Georgia Supreme Court held that "[c]onversion is also available for specific amounts of money placed on deposit with a bank . . . and for overdrafts charged by a bank on existing accounts," *id*. at 9 (citing *First Union Nat. Bank v. Davies–Elliott, Inc*., 452 S.E.2d 132 (Ga. Ct. App. 1994); *Luck v. Regions Bank*, 546 S.E.2d 342 (Ga. Ct. App. 2001); *Ga. Lottery Corp. v. First Nat. Bank*, 560 S.E.2d 345 (Ga. Ct. App. 2002)). BANA argues that Plaintiffs did not make a demand for return of the property, and therefore the conversion action fails. Motion at 17. Georgia law does not require such a demand. "[T]o prove conversion does not require a showing of a demand and refusal; it requires only that the defendant, who comes into possession of the property unlawfully, disposes of the property without authority and retains the proceeds." *Williams v. Nat'l Auto Sales, Inc.*, 651 S.E.2d 194, 197 (Ga. Ct. App. 2007). Here, Plaintiffs allege that BANA unlawfully took possession of Plaintiffs' property and retained the property. Compl. ¶¶ 182–83. "Demand and refusal is necessary only when the defendant comes into possession of the property lawfully," *i.e*., "where he finds it, and retains it for the true owner." *Williams*, 651 S.E.2d at 197 (citing *Lovinger v. Hix Green Buick Co.*, 140 S.E.2d 83, 86 (Ga. Ct. App. 1964)). Finally, BANA's reliance on *Faircloth v. A.L. Williams & Assocs., Inc.*, 426 S.E.2d 601, 605 (Ga. Ct. App. 1992) is misplaced. *Faircloth* involved a debt owed due to a contract and not the conversion of any funds. *Id*.

A number of Oklahoma Supreme Court decisions recognize the possibility of an action for conversion of money by a bank. *See Brown v. Okla. State Bank & Trust Co.*, 860 P.2d 230 (Okla. 1993); *Steenbergen v. First Fed. Sav. & Loan*, 753 P.2d 1330 (Okla. 1987). The Oklahoma Supreme Court distinguished the rule regarding conversion claims of general debts versus specific amounts of money. "Money may be the subject of conversion, when it is capable of being

identified, and there may be conversion of determinate sums even though the specific coin and bills are not identified." *Owens v. Andrews Bank & Tr. Co.*, 220 S.E.2d 116, 119 (S.C. 1975) (citing 89 C.J.S. Trover and Conversion § 23 (1955)). In *Steenbergen*, the Oklahoma Supreme Court held that the bank was liable for the conversion of the depositor's funds. "[S]pecifically identified and designated sums belonging to the depositor, and its use of the check in an unauthorized manner, does constitute conversion." 753 P.2d at 1332. Here, BANA converted specifically identified and designated sums of Plaintiffs' money each time it has charged Fees.[8]

### III.    Plaintiffs have stated a valid unjust enrichment claim.

Defendant summarily claims that there is "no standalone cause of action in California for unjust enrichment" and therefore Bui's claim must fail. Defendant quotes *Browning v. Univlever United States, Inc.*, 2017 WL 7660643, at *3 (C.D. Cal. Apr. 26, 2017) for this proposition, but *Browning* quoted *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015), where the Ninth Circuit *reversed* a district court's dismissal of an unjust enrichment claim under California law. The Ninth Circuit recognized that under Rule 8(d)(2), "A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones." *Id.* The court in *Astiana* held that unjust enrichment "describe[s] the theory underlying a claim that a defendant has been unjustly conferred a benefit through mistake, fraud, coercion, or request." *Id.* (internal quotation marks omitted). Following *Astiana*, federal courts have upheld unjust enrichment claims from dismissal under California law. *See Trazo v.*

---

[8] Oklahoma does recognize a cause of action for conversion of money, but instead calls it a "chose in action" or "thing in action." 60 Okl. St. § 312. The elements of the claim for conversion are identical to those of a chose in action. *See Brown*, 860 P.2d 230. Even if this Court believes that the conversion claim is improperly pled, then Plaintiffs respectfully request that the Court allow amendment of the Complaint so that the claim for conversion is considered one for a chose in action.

*Nestle USA, Inc.*, 113 F. Supp. 3d 1047 (N.D. Cal. 2015). As the court in *Valencia v. Volkswagen Grp. of Am. Inc.*, explains, "[t]he Ninth Circuit also instructed that such a claim should not be dismissed as duplicative or superfluous of other claims because a party may set out alternative claims for relief." 119 F. Supp. 3d 1130, 1142–43 (N.D. Cal. 2015)

Similarly, Defendant misstates Georgia law on unjust enrichment. There, as well, a plaintiff is allowed to plead alternative theories for recovery. "While a party, indeed, cannot recover under both a breach of contract and unjust enrichment theory, a plaintiff may plead these claims in the alternative." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1308–09 (N.D. Ga. 2012). Further, Plaintiffs have challenged the contracts and conducts at issue in this case as unconscionable. Compl. ¶¶ 8, 9, 10, 111, 153. Since Plaintiffs have challenged the validity of the provision in the contract that BANA claims bars its claims, the claim can stand. *See Huddle House, Inc. v. Two Views, Inc.*, No. 1:12-CV-03239, 2013 WL 1390611, at \*4 (N.D. Ga. Apr. 4, 2013).

Oklahoma courts have also consistently allowed plaintiffs to plead of alternative theories of recovery and for unjust enrichment. *See Hitch Enterprises, Inc. v. Cimarex Energy Co.*, 859 F. Supp. 2d 1249, 1258 (W.D. Okla. 2012) ("The plaintiffs however at this stage of the litigation are permitted to plead alternative theories and demand relief in the alternative."); s*ee also Baker Hughes Oilfield Operations, LLC v. Iron Hawk Energy Grp. Joint Venture*, No. 17-CV-00652, 2018 WL 3298072, at \*3 (N.D. Okla. June 13, 2018) (denying dismissal of unjust enrichment because "Oklahoma procedure clearly permits pleading alternative remedies, just as it allows alternative theories of recovery, as long as plaintiffs are not given double recovery for the same injury"). BANA's reliance on *Briggs v. Freeport-McMoran Copper & Gold, Inc.*, No. CIV-13-1157, 2015 WL 1461884 (W.D. Okla. Mar. 30, 2015) is misplaced. In *Briggs*, the court refused to

dismiss a plaintiff's unjust enrichment claim. "Plaintiffs have the right to plead alternative theories of recovery and, therefore, plaintiffs' unjust enrichment claim should not be dismissed." *Id.* at 6.

## IV. BANA's unfair and deceptive practices violate state UDAP statutes.

### A. The contracts do not excuse BANA's unfair and deceptive conduct.

Seeking to avoid consumer-protection scrutiny of its unfair and deceptive Fees, BANA argues that the unfair and deceptive practices (UDAP) statutes of North Carolina and Oklahoma do not apply because a contract governs the underlying conduct. Motion at 20–22. But a defendant cannot eliminate liability for its unfair and deceptive practices simply by ensuring those practices are baked into its one-sided contracts of adhesion. If the law were otherwise, quintessential deceptive acts and practices targeted by state UDAP statutes—such as false representations and bait-and-switch tactics—could be made lawful through even further deception: inconspicuous or ambiguous "disclosures" buried in the fine print. As courts have recognized, unfair or deceptive conduct may be actionable under federal or state UDAP statutes "even if the fine print and legalese were technically accurate and complete." *F.T.C. v. AMG Servs., Inc.*, 29 F. Supp. 3d 1338, 1349 (D. Nev. 2014). In *Martin v. Bimbo Foods Bakeries Distribution, Inc.*, for instance, the court rejected the defendant's argument "that plaintiff's allegations amount to nothing more than a standard breach of contract action," because there, as here, "plaintiff is claiming that not only did defendant [act] contrary to [the contract's] terms but also [that] defendant acted unfairly and deceptively," No. 5:14-CV-17-BR, 2014 WL 3487618, at *4 (E.D.N.C. July 11, 2014); *see also* Okla. Stat. tit. 15, § 752 ("Deceptive trade practice" includes "a misrepresentation, omission or other practice," and "may occur before, during or after a consumer transaction is entered into"). BANA cannot take refuge in its unfair and deceptive contracts from laws intended to prohibit just that. *See F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006).

**B.** **Federal banking regulations do not displace generally applicable state UDAP statutes that prohibit BANA's unfair and deceptive conduct.**

Seeking to sidestep state consumer protection law entirely, BANA argues that the National Banking Act preempts state restrictions on unfair and deceptive acts and practices in North Carolina and California and that the UDAP statutes of Oklahoma and Georgia do not apply to "regulated" industries. Motion at 20–24. But that is not the law. Rather, "[f]ederally chartered banks are subject to state laws of general application in their daily business," so long as state law does not *conflict* with the NBA. *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).

There is no conflict here. Although BANA asserts that "preemption is warranted" "to the extent that the NCUDTPA stands as an obstacle" to the NBA (Motion at 20), BANA does not point to any purported conflict between the NBA and the UDAP statutes at issue here. While national banks have the authority to "charge . . . customers non-interest charges and fees, including deposit account service charges" under regulations promulgated by the Office of the Comptroller of the Currency, 12 C.F.R. § 7.4002(a), this authority to impose fees does not exempt national banks from all generally applicable state laws that incidentally affect the imposition of such fees. As the Ninth Circuit has recognized, such "an expansive interpretation—with no limiting principle—'would swallow all laws.'" *Gutierrez v. Wells Fargo Bank*, 704 F.3d 712, 727 (9th Cir. 2012) (quoting *Aguayo v. U.S. Bank*, 653 F.3d 912, 925 (9th Cir. 2011)). BANA's argument that the OCC's banking regulations shield it from liability under state UDAP statutes is "conclusively undercut by the OCC itself, which, far from concluding that the Unfair Competition Law is expressly preempted under its regulations, 'has specifically cited [California's Unfair Competition Law] in an advisory letter cautioning banks that they may be subject to such laws that prohibit unfair or deceptive acts or practices.'" *Id.* at 726 (quoting *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549, 555 (9th Cir. 2010)). That letter informs banks such as BANA that "[a] number

of state laws prohibit unfair or deceptive acts or practices, and such laws may be applicable to insured depository institutions." OCC Advisory Letter, Guidance on Unfair or Deceptive Acts or Practices, 2002 WL 521380, at *2 n.2 (Mar. 22, 2002) (citing Cal. Bus. Prof. Code 17200 *et seq.* and 17500 *et seq.*).

Applying this guidance and general preemption principles, courts have found that UDAP claims like those asserted here are not preempted by the NBA. Applying California Law, for instance, the Ninth Circuit ruled that "[a]s a non-discriminating state law of general applicability that does not 'conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties,' the [California] Unfair Competition Law's prohibition on misleading statements under the fraudulent prong of the statute is not preempted by the National Bank Act." *Gutierrez*, 704 F.3d 726. Here, as in *Gutierrez*, BANA has "not articulate[d] how abiding by the Unfair Competition Law's prohibition of misleading statements would prevent or significantly interfere with its ability to engage in the business of banking." 704 F.3d at 727. Thus, Plaintiffs' claims are not preempted.

Likewise, Oklahoma and Georgia's generally applicable UDAP statutes are not displaced by federal regulation of the banking industry. In both states, the UDAP statute provides a "safe harbor" only if the *specific conduct at issue* is regulated by state or federal law. Ga. Code § 10-1-396(1); Okla. Stat. tit. 15, § 754. On its face, the Georgia Fair Business Practices Act (FBPA)[9]

---

[9] BANA argues that the plaintiffs' GFBPA claim should be dismissed for failure to provide "ante litem notice." Motion at 25. But where, as here, the defendant is registered with the Secretary of State as a "foreign profit corporation which has a principal office" and corporate headquarters outside of the state, courts have not required a written demand prior to suit. *Carlisle v. Nat'l Commercial Servs., Inc.*, No. 14-CV-515, 2017 WL 1075088, at *12 (N.D. Ga. Feb. 22, 2017), *aff'd*, 722 F. App'x 864 (11th Cir. 2018); *see also Beeler v. Ditech Fin., LLC*, No. 16-CV-54, 2016 WL 4136513, at *1 (M.D. Ga. Aug. 1, 2016). At most, this raises an issue of fact not suitable for resolution on a motion to dismiss.

exception for "regulated" conduct applies only to "actions or transactions" that are "specifically authorized" by federal or state regulation. Ga. Code § 10-1-396(1); *see also Horne v. Harbour Portfolio VI, LP*, 304 F. Supp. 3d 1332, 1344 (N.D. Ga. 2018) (denying motion to dismiss FBPA claim because defendants "have not pointed to any statute or regulation dealing with the specific claims at issue here"). Similarly, the exception for "regulated" actions under the Oklahoma Consumer Protection Act (OCPA) "does not apply when a defendant's conduct" is merely "governed *in some respects* by a state or federal agency." *Sisemore v. Dolgencorp, LLC*, 212 F. Supp. 3d 1106, 1109 (N.D. Okla. 2016) (emphasis added). Rather, the regulatory exception to OCPA applies only when the "*specific conduct at issue*" is regulated. *Id.* (emphasis added). But BANA has not identified *any* attempt by the OCC or the CFPB to "regulate the *particular activity*" alleged in Plaintiff's Second Amended Complaint. *In re Gen. Motors Corp.*, MDL 04-1600, 2005 WL 1924335, at *3 (W.D. Okla. Aug. 8, 2005) (emphasis added).

None of the cases cited by BANA stand for the proposition that the OCPA exemption applies broadly to national banks' practices. And Oklahoma courts have found banks' fee practices to be within the purview of the OCPA. *See, e.g.*, *Eaton v. Bank of Oklahoma, N.A.*, No. CJ-2010-5209 (D. Ct. Tulsa Cnty., Okla.) (order filed Apr. 12, 2011) (denying Bank of Oklahoma's motion to dismiss plaintiff's OCPA claim alleging deceptive overdraft fee practices). Oklahoma courts understand that "for the exemption to apply, . . . the regulatory body [must] regulate the *particular activity* at issue." *In re Gen. Motors Corp.*, 2005 WL 1924335, at *3 (internal citations omitted) (emphasis added); *see also Conatzer v. Am. Mercury Ins. Co.*, 15 P.3d 1252, 1255 (Okla. Civ. App. 2000); *Sisemore v. Dolgencorp, LLC*, 212 F. Supp. 3d 1106, 1109 (N.D. Okla. 2016). Thus, both the Oklahoma and Georgia UDAP statutes are applicable to BANA's conduct, and the defendant's motion to dismiss these state-law claims should be rejected.

**C.** **The plaintiffs have stated a proper claim under California's UCL.**

BANA also argues that the plaintiffs have insufficiently pleaded reliance under California law.[10] Motion at 22–23.[11] But plaintiffs alleged that Mr. Bui "understood his bill payments to be single transactions as is laid out in BofA's contract, capable at most of receiving a single NSF or OD Fee." Compl. ¶ 26. Reliance on such an omission or misrepresentation "can be presumed, or at least inferred, when the omission is material," that is, "a reasonable consumer 'would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015). Here, there is no doubt that a "reasonable consumer" would "attach importance" to the fact that BANA would attempt to impose multiple improper fees. *Id.* And if there were any doubt, that would be a question of fact not suitable for resolution on a motion to dismiss. At the very least, Plaintiffs should have the opportunity to amend the Complaint.

## CONCLUSION

For the foregoing reasons, BANA's Motion to Dismiss should be denied.

---

[10] Defendant also argues that allegations under the UCL must meet the heightened pleading standard of Rule 9(b). Motion at 22 n.13. Not so. "[C]auses of action under the CLRA and UCL must be stated with reasonable particularity, which is a more lenient pleading standard than is applied to common law fraud claims." *Gutierrez v. Carmax Auto Superstores Calif.*, 228 Cal. Rptr. 3d 699, 722 (Ct. App. 2018). But even if the Rule 9(b) standard applied, the plaintiffs' allegations pass muster. Plaintiffs provide the "who" by identifying BANA, Compl. ¶ 25, the "when" by stating the exact dates on which the unlawful fees were imposed, *id.*, and there "where" and "how" by providing the relevant contracts and representations by BANA and explaining how they were deceptive or fraudulent, *id.* ¶¶ 26, 38–57. *See Peviani v. Nat. Balance, Inc.*, 774 F. Supp. 2d 1066, 1071 (S.D. Cal. 2011).

[11] BANA's argument that UCL claims must be "tethered" to a specific constitutional, statutory, or regulatory provision likewise misses the mark. Motion at 23. In addition to the "public policy" test on which BANA fixates, California courts also apply an alternative "balancing" test that defines an "unfair" business practice as one in which "the gravity of the harm to the victim outweighs the utility of the defendant's conduct." *Smith v. State Farm Mut. Auto. Ins. Co.*, 113 Cal. Rptr. 2d 399, 415 (Ct. App. 2001); *see also People v. Servantes*, 103 Cal. Rptr. 2d 870 (Ct. App. 2001). BANA's misrepresentations readily cross the line into the "unfair" conduct proscribed by California law.

Dated: September 24, 2018

Respectfully submitted,

/s/ Larry McDevitt

Larry McDevitt
NC State Bar No. 5032
David M. Wilkerson
NC State Bar No. 35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
lmcdevitt@vwlawfirm.com
dwilkerson@vwlawfirm.com

Jeffrey D. Kaliel
Sophia Gold
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com
*Admitted Pro Hac Vice*

James J. Pizzirusso
HAUSFELD LLP
1700 K St., NW, Ste 650
Washington, DC 20006
(202) 540-7154
jpizzirusso@hausfeld.com
*Admitted Pro Hac Vice*

*Attorneys for Plaintiffs
and the Putative Class*

26

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record in this matter.

Dated: September 24, 2018

/s/ Larry McDevitt
Larry McDevitt

27