# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | |
|---|---|
| LISA MORRIS, MICHAEL BUI, TUMIKA WILLIAMS, ALBERT EDGE and KRISTEN VALPERGA on behalf of themselves and all others similarly situated,<br><br>     Plaintiffs,<br><br>     vs.<br><br>BANK OF AMERICA, N.A.,<br><br>     Defendant. | CASE NO. 3:18-CV-157-RJC-DSC |

## STIPULATION AND SETTLEMENT AGREEMENT AND RELEASE

Subject to approval by the Court, this Stipulation and Settlement Agreement and Release ("Settlement Agreement") is made and entered into by (1) Plaintiffs Lisa Morris, Michael Bui, Tumika Williams, Albert Edge, and Kristen Valperga ("Class Representatives"), individually and as representatives of the Settlement Class (defined below) and (2) Bank of America, N.A. ("BANA"). The Class Representatives and BANA are collectively referred to herein as "the Parties." The Parties intend this Settlement Agreement to fully and finally resolve and settle all released rights and claims to the extent set forth below and subject to the terms and conditions set forth below.

## RECITALS

1.    Plaintiff Lisa Morris, an Oklahoma resident, filed this class action on March 29, 2018, alleging that BANA breached its customer agreements, converted her funds, was unjustly enriched, and violated the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S.

§ 75.1-1, *et seq*. (the "NCUDTPA") and the Oklahoma Consumer Protection Act, 15 OK Stat. § 15-753, *et seq*. (the "OCPA") by (i) charging insufficient funds and overdraft fees ("NSF/OD Fees") in connection with reinitiated automated clearinghouse ("ACH") transactions ("Retry Transaction Fee Claims"), (ii) charging NSF/OD Fees in connection with certain BANA-to-BANA account transactions ("Intrabank Transaction Fee Claims"), and (iii) assessing monthly maintenance fees on savings accounts, which Plaintiff contended should have been waived ("MMF Claims") (collectively, the "Action"). *See* ECF No. 1.

       2.      On June 6, 2018, Plaintiff Morris filed an amended class action complaint adding Plaintiff Michael Bui, a California resident, as a class representative for the Retry Transaction Fee Claims in the Action, as well as a claim for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. (the "UCL"). *See* ECF No. 15.

       3.      On July 12, 2018, Plaintiffs Morris and Bui filed a second amended class action complaint adding Plaintiff Tumika Williams, a Georgia resident, as a class representative with respect to new allegations challenging BANA's practice of applying deposits to previously assessed NSF/OD Fees before processing upcoming debits ("Fee Accrual Claims"), as well as a claim for violation of the Georgia Fair Business Practices Act, O.C.G.A.§ 10-1-390 *et seq.* (the "GFBPA"). *See* ECF No. 19.

       4.      On August 27, 2018, BANA moved to dismiss the second amended class action complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* ECF Nos. 22-23.

       5.      On January 8, 2019, United States Magistrate Judge David S. Cayer issued a memorandum opinion and recommendation ("M&R") granting in part and denying in part BANA's motion to dismiss, and specifically, dismissing with prejudice Plaintiffs' claims for conversion, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and

denying the motion as to the claims for breach of contract and for violations of the NCUDTPA, the UCL, the OCPA, and the GFBPA. *See* ECF No. 38.

6.     On January 22, 2019, BANA filed a partial objection to that part of the Magistrate Judge's M&R denying BANA's motion to dismiss Plaintiffs' claims for violation of the NCUDTPA, the UCL, the OCPA, and the GFBPA. *See* ECF No. 39.  Plaintiffs filed a response in support of the M&R.

7.     On March 29, 2019, the Court adopted in part and declined to adopt in part the Magistrate Judge's M&R. *See* ECF No. 42. Specifically, the Court adopted that part of the M&R dismissing Plaintiffs' claims for conversion, unjust enrichment, breach of the implied covenant of good faith and fair dealing, and denying BANA's motion to dismiss as to the claims for violation of the NCUDTPA and the UCL. The Court declined to adopt the M&R with respect to Plaintiffs claims for violations of the OCPA and the GFBPA, instead, dismissing those claims. *Id*. Thus, the only claims remaining in the Action are for (1) breach of contract, (2) violation of the UCL, and (3) violation of the NCUDTPA. *Id*.

8.     Following the Court's Order on the Motion to Dismiss, and after the Court issued a Scheduling Order, the Parties began an extensive discovery effort that lasted nearly two years.

9.     On November 5, 2018, Plaintiff Kristen Valperga filed a class action complaint against BANA in the United States District Court, Northern District of California, San Francisco Division, Case No. 3:18-cv-06724-RS, asserting almost identical allegations and claims to those asserted in the Action in connection with the Retry Transaction Fee Claims, including for breach of contract and breach of the covenant of good faith and fair dealing, violation of the UCL, and unjust enrichment (the "Valperga Action").

3

10. Plaintiff Kristen Valperga dismissed the Valperga Action without prejudice on June 6, 2019 and her counsel made appearances in the Morris Action.

11. On January 14, 2020, Plaintiffs Morris, Bui, and Williams filed the operative third amended class action complaint adding Plaintiff Albert Edge, a North Carolina resident, as a class representative with respect to the Retry Transaction Fee Claims in the Action, and asserting the following remaining claims for (1) breach of contract, (2) violation of the UCL, and (3) violation of the NCUDTPA. *See* ECF No. 64.

12. BANA filed an answer to the third amended class action complaint on January 28, 2020. *See* ECF No. 66.

13. Throughout the Morris Action, the Parties engaged in extensive discovery, exchanging tens of thousands of pages of documents and then taking depositions of BANA's representatives and some of the Class Representatives. BANA produced documents related to its NSF/OD practices such as bank contractual agreements, marketing and internal studies on NSF/OD fees, customer complaints related to its fees, and documents showing how much money it made from the disputed fees at issue, among others.

14. Specifically, on May 7, 2019, Plaintiffs served on Defendant: (1) First Set of Interrogatories, (2) First Set of Requests for Production, and (3) Rule 30(b)(6) Deposition Notice.

15. On or about June 24, 2019, Plaintiffs sent Defendant a proposed (1) Protective Order, (2) ESI Protocol, and (3) ESI search terms.

16. The parties immediately began meeting and conferring on various discovery issues, such custodial ESI searches and the production of data on resubmitted ACH transactions.

17. Plaintiffs filed their notice of intent to serve a non-party subpoena on the National Automated Clearinghouse Association ("NACHA").

4

18.    Plaintiffs then negotiated extensively for production of documents and deposition testimony with NACHA.

19.    Plaintiffs ultimately deposed a NACHA corporate representative on November 10, 2020.

20.    Plaintiffs filed their notice of intent to serve non-party subpoenas on four non-party banks, which they served on May 29, 2020: JP Morgan Chase, First Hawaiian Bank, Klein Bank and First Citizens Bank.

21.    Plaintiffs then negotiated for production of documents with these entities. With respect to JP Morgan Chase, Plaintiffs engaged in motions practice in order to seek production of documents JP Morgan Chase did not wish to produce.

22.    On November 7, 2019, Plaintiffs served on Defendant: (1) Second Set of Interrogatories, (2) Third Set of Requests for Production.

23.    On January 23, 2020, Plaintiffs served on Defendant: (1) Third Set of Interrogatories, (2) Third Set of Requests for Production

24.    On October 7, 2019, Defendant produced documents [BANA_MORRIS- 00000001 - BANA_MORRIS-00001413], which Plaintiffs promptly reviewed.

25.    On October 25, 2019, Defendant produced documents [BANA_MORRIS-00001414 - BANA_MORRIS-00005484], which Plaintiffs promptly reviewed.

26.    On November 1, 2019, Defendant produced documents [BANA_MORRIS-00005485 - BANA_MORRIS-00006842], which Plaintiffs promptly reviewed.

27.    On December 6, 2019, Defendant produced documents [BANA_MORRIS-00006843- BANA_MORRIS-00007334], which Plaintiffs promptly reviewed.

5

28.     On December 23, 2019, Defendant produced documents [BANA_MORRIS-00007335 - BANA_MORRIS-00008953], which Plaintiffs promptly reviewed.

29.     On January 23, 2020, Defendant produced documents [BANA_MORRIS-00008954 - BANA_MORRIS-00010564], which Plaintiffs promptly reviewed.

30.     On January 29, 2020, and pursuant to a subpoena, third party Global Lending produced documents [BANA_01.24.2020_Global Lending_00000001-BANA_01.24.2020_Global Lending_00000017], which Plaintiffs promptly reviewed.

31.     On February 4, 2020, third party Paypal produced documents [BANA_01.28.2020_Paypal_00000001 - BANA_01.28.2020_Paypal_00000030], which Plaintiffs promptly reviewed.

32.     On February 21, 2020, third party Citibank produced documents [BANA_02.03.2020_Citibank_00000001    BANA_02.03.2020_Citibank_00000004], which Plaintiffs promptly reviewed.

33.     On February 27, 2020, Defendant produced documents [BANA_MORRIS-00010565 - BANA_MORRIS-00010685], which Plaintiffs promptly reviewed.

34.     On March 3, 2020, third party Citibank produced documents [BANA_03.02.2020_Citibank_00000001 - BANA_03.02.2020_Citibank_00000055], which Plaintiffs promptly reviewed.

35.     On March 9, 2020, third party Farmers Insurance produced documents [BANA_03.05.2020_Farmers_00000001 - BANA_03.05.2020_Farmers_00000015], which Plaintiffs promptly reviewed.

36.     On March 23, 2020, Defendant produced document [BANA_MORRIS-00010686], which Plaintiffs promptly reviewed.

6

37.     On March 27, 2020, Defendant produced documents [BANA_MORRIS-00010687 - BANA_MORRIS-00010688], which Plaintiffs promptly reviewed.

38.     On April 10, 2020, Defendant produced documents [BANA_MORRIS-00010689 - BANA_MORRIS-00041604], which Plaintiffs promptly reviewed.

39.     On April 24, 2020, Defendant produced documents [BANA_MORRIS-00041605 - BANA_MORRIS-00067321], which Plaintiffs promptly reviewed.

40.     On May 18, 2020, Defendant produced documents [BANA_MORRIS-00067322 - BANA_MORRIS-00067431], which Plaintiffs promptly reviewed.

41.     Over the course of several weeks, the Parties negotiated a stipulation bringing into evidence the deposit agreements and account disclosures of certain banks on April 10, 2020.

42.     On October 8, 2019, Plaintiffs responded to Defendant's First Set of Interrogatories, First Set of Requests for Admission, and First Set of Requests for Production and produced documents.

43.     The Parties thereafter met and conferred extensively regarding those responses.

44.     On December 18, 2019, Plaintiffs served supplemental responses to Defendant's First Set of Requests for Admission.

45.     The Parties thereafter met and conferred extensively regarding those responses.

46.     On November 22, 2019, Plaintiffs deposed a BANA corporate representative in Charlotte, NC.

47.     On December 12, 2019, Plaintiffs deposed a BANA corporate representative in Los Angeles, CA.

48.     On November 18, 2020, Plaintiffs deposed BANA employee Cathy Pullen.

7

49.     On September 17, 2020, Plaintiffs noticed the depositions of BANA employees Barry Hallman, Kevin Condon, Riaz Bhamani, Eric Reeves, Christopher Wong, Preston Taylor. Plaintiffs were preparing to take those depositions when the Parties agreed in principle to resolve the Action.

50.     While discovery was ongoing, the Parties participated in two formal mediations with Judge Layn Phillips (ret.), as well as several post-mediation telephone conferences. The Parties first mediated in person on August 26, 2019. The mediation did not result in a settlement. The Parties then attended a virtual mediation over a year later with Judge Phillips, on September 8, 2020. The second mediation also did not result in a settlement but brought the Parties closer together.

51.     After several more months of litigation, including engaging in extensive meet and confer regarding discovery and depositions, the Parties reached agreement on all material terms of a settlement on December 20, 2020 after accepting a mediator's proposal.

52.     The Parties filed a notice of settlement on December 28, 2020.  *See* ECF No. 79.

53.     The Court then directed the Parties to file a motion for preliminary approval of a class settlement by April 28, 2021 by text order dated January 4, 2021, which was extended to May 12, 2021 by request of the parties.

54.     The Parties are ready and willing to make and enter into this Settlement Agreement to settle the claims of Class Representatives and all putative class members in the Action.

55.     The Parties recognize that the outcome of the Action is uncertain, and that a final resolution through the litigation process would likely require several years of protracted adversarial litigation and appeals; involve substantial risk and expense; and could result in additional expenses associated with possible future litigation raising similar or duplicative claims.

Class Counsel have concluded, after inquiry and investigation of the facts, that the terms of this Settlement Agreement are fair, reasonable, adequate, and in the best interests of the Settlement Class; and the Parties and their counsel have agreed to resolve the Action as a class action settlement according to the terms of this Settlement Agreement.

56.     BANA denies all wrongdoing and liability and denies that Class Representatives' claims entitle them or the class members to any relief and deny that anyone was harmed by the conduct the Class Representatives allege.   Nevertheless, BANA desires to settle Class Representatives' and the putative class members' claims on the terms described herein, solely for the purpose of avoiding the burden, expense, risk, and uncertainty of continuing litigation, and in order to put the litigation to rest.

57.     Without any admission or concession whatsoever by the Parties as to the strength or weakness of the merits of the claims and defenses asserted in the Action, it is hereby stipulated and agreed by the undersigned, on behalf of Plaintiffs, the Settlement Classes, and BANA that all Released Claims against BANA be fully and forever settled, compromised, released, and dismissed on the merits with prejudice on the following terms and conditions, subject to the Court's approval:

<u>**AGREEMENT**</u>

## 1.  DEFINITIONS

As used in this Settlement Agreement, the terms defined below shall have the meanings assigned to them when capitalized in the same fashion as in this Section 1 of this Settlement Agreement.

1.1.    "Action" means the above-captioned action, *Lisa Morris, et al., v. Bank of America, N.A.*, 3:18-cv-157-RJC-DSC pending in United States District Court for the Western District of

9

North Carolina, Charlotte Division, including all actions consolidated thereunder or that may be consolidated thereunder in the future.

1.2.     "<u>Attorneys' Fees</u>" means the attorneys' fees and costs related to this Settlement Agreement that Class Counsel intend to seek under Section 10 of this Settlement Agreement.

1.3.     "<u>BANA</u>" means Defendant Bank of America, N.A.

1.4.     "<u>BANA's Counsel</u>" or "<u>Defendant's Counsel</u>" means Brian A. Kahn, Carolee A. Hoover, and Jasmine K. Gardner of McGuireWoods LLP, and James W. McGarry and Laura A. Stoll of Goodwin Procter LLP.

1.5.     "<u>CAFA Notice</u>" means notice of this proposed settlement to the United States Attorney General and appropriate state Attorneys General, as provided by the Class Action Fairness Act of 2005, 28 U.S.C. § 1715.

1.6.     "<u>Class Counsel</u>" means David M. Wilkerson and Larry McDevitt of The Van Winkle Law Firm, Jeffrey D. Kaliel and Sophia Gold of Kaliel Gold PLLC, and James J. Pizzirusso of Hausfeld LLP.

1.7.     "<u>Class Fees</u>" means Retry Transaction Fees, Intrabank Transaction Fees and/or Fee Accrual Claim Fees (*see* Section 3.1).

1.8.     "<u>Class Notice</u>" means the notice of this Settlement and Final Approval Hearing, which is to be sent to the Settlement Class substantially in the manner set forth in this Agreement and approved by the Court, consistent with the requirements of Due Process and Rule 23, and substantially in the form of Exhibits A (Email Notice), B (Postcard Notice), and C (Long Form Notice), attached hereto.

1.9.     "<u>Class Period</u>" means the period beginning on July 1, 2014 and ending on the date on which the Court enters Preliminary Approval Order of the Settlement.

10

**1.10.** "<u>Class Representatives</u>" means Plaintiffs Lisa Morris, Michael Bui, Tumika Williams, Albert Edge, and Kristen Valperga.

**1.11.** "<u>Court</u>" means the United States District Court for the Western District of North Carolina, Charlotte Division.

**1.12.** "<u>Effective Date</u>" shall mean the next business day following the last date on which a notice of appeal directed to the entry of the Final Approval Order and Judgment could have been timely filed but with no notice of appeal having been filed; or, should a notice of appeal be filed, it shall mean the next business day after the Final Approval Order and Judgment is affirmed, all appeals are dismissed, and no further appeal is permitted.

**1.13.** "<u>Fee and Expense Award</u>" means the amount of Attorneys' Fees and reimbursement of expenses, if any, awarded by the Court to Class Counsel pursuant to a motion made under Section 10 herein, which will be paid out of the Settlement Amount.

**1.14.** "<u>Final Approval</u>" means the approval of this Settlement Agreement by the Court at or following the Final Fairness Hearing, and entry of the Final Approval Order on the Court's docket.

**1.15.** "<u>Final Approval Order</u>" means a final order and judgment in which the Court gives Final Approval to the Settlement Agreement and dismisses with prejudice Class Representatives' and Settlement Class Members' claims and enters a judgment according to the terms set forth herein.

**1.16.** "<u>Final Fairness Hearing</u>" means the hearing at which the Court will consider and finally decide whether to approve this Settlement Agreement, enter the Final Approval Order, and make other such rulings contemplated by this Settlement Agreement.

**1.17.** "<u>Fourth Amended Class Action Complaint</u>" means the operative Fourth Amended Complaint filed concurrently with the Motion for Preliminary Approval of the Settlement, which shall be in substantially the same form as Exhibit E, and as further set forth herein in Paragraph 15.3 of this Settlement Agreement.

**1.18.** "<u>Intrabank Transaction</u>" means a Settlement Class Member's attempt to make an Automated Clearing House (ACH) payment from their BANA consumer checking account to another BANA account (e.g., BANA mortgage, BANA home equity line of credit, BANA credit card).

**1.19.** "<u>Intrabank Transaction Fees</u>" means NSF and/or OD fees that a Settlement Class Member paid but were not refunded in connection with an Intrabank Transaction.

**1.20.** "<u>Notice Plan</u>" means the plan for sending notice to members of the proposed Settlement Class, as set forth in Section 5.

**1.21.** "<u>Notice Period</u>" means the period of time running from the date the Settlement Administrator commences the Notice Plan until such Notice Plan is complete. The Notice Period must commence within seven (7) calendar days after the entry the Settlement Class List is finalized, as set forth in Paragraph 5.1 and be completed as soon as is practicable.

**1.22.** "<u>NSF Fee</u>" means insufficient funds fee.

**1.23.** "<u>Opt-Out Deadline</u>" or "<u>Objection Deadline</u>" means the date by which a written objection to this Settlement Agreement or a request for exclusion submitted by a member of the Settlement Class must be postmarked and/or filed with the Court, and mailed to Class Counsel and to BANA's Counsel at the addresses provided in the Class Notice, which shall be designated as 105 days after the Court issues the Preliminary Approval Order.

**1.24.** "<u>OD Fee</u>" means overdraft fee.

**1.25.** "<u>Person</u>" means a natural person, firm, association, organization, partnership, business, trust, limited liability company, corporation, or public entity.

**1.26.** "<u>Practice Change</u>" means BANA's agreement to cease assessing NSF or OD Fees on automated clearinghouse entries labeled by the merchant as a "RETRY PYMT" for a period of at least five (5) years beginning on either February 28, 2022 or 180 calendar days from Final Approval of the Settlement, whichever is later.

**1.27.** "<u>Preliminary Approval</u>" means preliminary approval of the Settlement Agreement by the Court, conditional certification of the Settlement Class, and approval of the method and content of the Class Notice to the Settlement Class Members.

**1.28.** "<u>Preliminary Approval Order</u>" means the Order submitted to the Court granting Preliminary Approval of the Settlement, which shall be substantially in the form of Exhibit D attached hereto.

**1.29.** "<u>Released Claims</u>" means any individual, class, representative, group or collective claim, liability, right, demand, suit, matter, obligation, damage, loss, action or cause of action, of every kind and description, that a Releasing Party has or may have, including assigned claims, whether known or Unknown Claims, contingent or absolute, suspected or unsuspected, disclosed or undisclosed, accrued or un-accrued, latent or patent, contingent or non-contingent, liquidated or un-liquidated, at law or in equity, matured or un-matured, apparent or unapparent, that Class Representatives or Settlement Class Members raised or could have raised in the Action or the Valperga Action, or which they could raise in the future, in any court, tribunal, forum, or proceeding, arising out of or relating in any way to the allegations made in the Action and the Valperga Action, with the sole and limited exception of the MMF Claims, which are not included in the Released Claims. Other than the excluded MMF Claims, the Released Claims described

13

herein include, but are not limited to, claims or defenses concerning Retry Transaction Fees, Intrabank Transaction Fees, and the Fee Accrual Claims, and any violation and/or alleged violation of state and/or federal law, whether common law or statutory, arising from or relating to the conduct, acts, and/or omissions described in this paragraph.

1.30. "Released Parties" refers to BANA and each of its present, former, and future parents, predecessors, successors, assigns, assignees, affiliates, conservators, divisions, departments, subdivisions, owners, partners, principals, trustees, creditors, shareholders, joint ventures, co-venturers, officers, and directors (whether acting in such capacity or individually), attorneys, vendors, accountants, nominees, agents (alleged, apparent, or actual), representatives, employees, managers, administrators, and each person or entity acting or purporting to act for them or on their behalf, including, but not limited to, Bank of America Corporation and all of its subsidiaries and affiliates.

1.31. "Releasing Parties" means Class Representatives and Settlement Class Members, and any Person claiming by or through the Class Representatives and each Settlement Class Member, including their respective past, present and future heirs, children, spouses, beneficiaries, conservators, executors, estates, administrators, assigns, attorney, agents, consultants, and any other representatives of any of these persons and entities.

1.32. "Retry Transaction Fees" means an insufficient fund and/or overdraft Fee in connection with an ACH entry on a consumer checking account that (a) was resubmitted by the merchant or the merchant's bank with a "RETRY PYMT" indicator after the initial request for payment was declined or (b) was preceded by another returned ACH entry submitted by the same merchant in the same amount within the last six calendar days, so long as the merchant did not use

the "RETRY PYMT" indicator on any transaction with any BANA customer within the same calendar year as the second entry.

1.33.   "Service Award" means the total of any monetary award ordered to be paid to one or more of the Class Representatives, inclusive, as set forth in Section 11 herein.

1.34.   "Settlement" means the Agreement between the Class Representatives, on behalf of themselves and as the proposed representatives of the Settlement Class, and BANA to settle and compromise the Class Representatives' and the Settlement Class Members' claims in the Action, as memorialized in this Settlement Agreement and accompanying documents attached hereto.

1.35.   "Settlement Administrator" means the qualified third-party administrator and agent agreed to by the Parties and approved and appointed by the Court in the Preliminary Approval Order to administer the Settlement, including providing the Class Notice. The Parties agree to recommend that the Court appoint Epiq as the notice provider and Settlement Administrator.

1.36.   "Settlement Administration Expenses" means the costs and expenses reasonably and actually incurred in obtaining the services of the Settlement Administrator to facilitate the Settlement, including but not limited to costs of identifying Class Members, printing and mailing the Class Notice, and mailing settlement checks to Class Members, and related services.

1.37.   "Settlement Agreement" means this Settlement Agreement and Release.

1.38.   "Settlement Amount" or "Settlement Fund" means the amount of seventy-five million dollars ($75,000,000.00), which BANA will be obligated to pay to the Settlement Administrator, as set forth in Section 6, and only if all other contingencies outlined in Section 6 are met.

15

**1.39.** "Settlement Class" or "Settlement Classes" means, collectively, the "Retry Transaction Class," the "Intrabank Transaction Class," and the "Fee Accrual Class," as further defined below.

**1.40.** "Settlement Class Member" means any person who falls within the definition of the Settlement Classes and who does not submit a valid request for exclusion from the Settlement Class.

**1.41.** "Settlement Payment(s)" means the payments from the Settlement Amount to be made to Settlement Class Members according to the payment allocation described herein.

**1.42.** "Settlement Website" means the website to be created, launched, and maintained by the Settlement Administrator which shall provide access to relevant case documents including the Notice, the operative complaint, and other relevant documents. The Settlement Website shall remain accessible until at least thirty (30) calendar days after the Effective Date.

**1.43.** "Successful Opt-Out(s)" means the Person or Persons who timely and validly exercised his, her, or their right to be excluded from the Settlement Class by the deadline provided in the Class Notice, to be at least thirty (30) days after completion of the Notice Plan, but shall not include persons whose requests for exclusion are not valid or are otherwise void pursuant to Section 9 below.

**1.44.** "Third Amended Class Action Complaint" means the Third Amended Complaint filed in the Action (ECF No. 64).

**1.45.** "Unknown Claims" means any claim arising out of or related to Retry Transaction Fees, Intrabank Transaction Fees, and the Fee Accrual Process that a Releasing Party does not know or suspect exists in his, her or its favor at the time of the release of the Released Claims as against the Released Parties, including without limitation those which, if known, might have

16

affected the decision to enter into the Settlement. The Settlement is intended to extinguish all Released Claims arising out of Retry Transaction Fees, Intrabank Transaction Fees, and the Fee Accrual Process, and, consistent with such intentions, the Releasing Parties shall waive their rights to the extent permitted by state law, federal law, foreign law or principle of common law, which may have the effect of limiting the release set forth above.  Class Representatives, on behalf of themselves and the Releasing Parties, expressly waive and release any and all provisions, rights, and benefits conferred by California Civil Code Section 1542, and by any law of any other jurisdiction, or principle of common law, that is similar, comparable, or equivalent in effect to California Civil Code Section 1542 with respect to the release of claims.  California Civil Code Section 1542 provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

In making this waiver of rights, the Class Representatives, on behalf of themselves and the Releasing Parties, acknowledge that they and Settlement Class Members may discover facts in addition to or different from those that they now know or believe to be true with respect to the subject matter of this release, but that it is their intention, as Class Representatives and on behalf of the Settlement Class Members, to fully, finally and forever settle and release any and all claims released hereby known or unknown, suspected or unsuspected, which now exist, or heretofore existed, or may hereafter exist, and without regard to the subsequent discovery or existence of such

17

additional or different facts for any potential claims arising out of or related to Retry Transaction Fees, Intrabank Transaction Fees, and the Fee Accrual Claims.  The Class Representatives, and the Settlement Class Members by operation of the judgment, shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of "Released Claims" was separately bargained for, constitutes separate consideration for, and was a key element of the Settlement and was relied upon by the BANA in entering into the Settlement.

1.46. "Valperga Action" means the action entitled, *Kristen Valperga, et al., v. Bank of America, N.A.*, 3:18-cv-06724 in United States District Court for the Northern District of California, San Francisco Division.

1.47. As used herein, the plural of any defined term includes the singular thereof and *vice versa*, except where the context requires otherwise.  All references to days shall be interpreted to mean calendar days, unless otherwise noted.  When a deadline or date falls on a weekend or a legal holiday, the deadline or date shall be extended to the next day that is not a weekend day or legal holiday.

1.48. Other terms are defined in the text of this Settlement Agreement, and shall have the meaning given to those terms in the text.  It is the intent of the Parties in connection with all documents related to the Settlement that defined terms as used in other documents shall have the meaning given to them in this Settlement Agreement.

## 2.  SETTLEMENT CONSIDERATION

2.1.    BANA shall implement the Practice Change.

2.2.    BANA shall pay the Settlement Amount in accordance with Paragraph 6.

2.3.    BANA will update its account disclosures as related to the Practice Change, as well as Intrabank Transfer Fees and fees related to Fee Accrual Claims.

## 3. SETTLEMENT CLASSES

**3.1.** In order to effectuate the Settlement, the Parties agree and consent, for settlement purposes only, that the requirements of Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3) are satisfied, and subject to Court approval, the following Settlement Classes shall be certified:

> **Retry Transaction Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded a Retry Transaction Fee;

> **Intrabank Transaction Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid but were not refunded one or more Intrabank Transaction Fees; and

> **Fee Accrual Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded an OD and/or an NSF Fee on a consumer checking and/or savings account transaction that would not have been assessed if BANA had delayed the posting of previously assessed NSF/OD fees until the posting of a deposit that was sufficient to cover those fees, all outstanding debit transactions and any additional debit transactions made that day ("Fee Accrual Class Fees").

**3.2.** The Parties' agreement as to certification of the Settlement Classes is solely for purposes of effectuating a settlement and for no other purpose. BANA retains all of its objections, arguments, and defenses with respect to class certification, and reserves all rights to contest class certification, if the Settlement set forth in this Settlement Agreement does not receive the Court's final approval, if the Court's approval is reversed or vacated on appeal, if this Settlement Agreement is terminated as provided herein, or if the settlement set forth in this Settlement Agreement otherwise fails to become effective. The Parties acknowledge that there has been no stipulation to any classes or certification of any classes for any purpose other than effectuating the Settlement, and that if the Settlement set forth in this Settlement Agreement does not receive the Court's final approval, if the Court's approval is reversed or vacated on appeal, if this Settlement Agreement is terminated as provided herein, or if the settlement set forth in this Settlement

Agreement otherwise fails to become effective, this agreement as to certification of the Settlement Classes becomes null and void ab initio, and this Settlement Agreement or any other Settlement-related statement may not be cited regarding certification of the Settlement Classes, or in support of an argument for certifying a class for any purpose related to this or any other proceeding.

3.3.     The Parties agree that the following Class Representatives are adequate representatives of the Settlement Classes as follows: (1) Retry Transaction Class: Lisa Morris, Michael Bui, Albert Edge and Kristen Valperga; (2) Intrabank Transaction Class: Lisa Morris; (3) Accrual Fee Class: Tumika Williams.

## 4.  MOTION FOR PRELIMINARY APPROVAL

4.1.     **Filing of Motion for Preliminary Approval**. On or before April 28, 2021, Class Counsel shall file this Settlement Agreement with the Court together with a Motion for Preliminary Approval, which will seek: (i) certification of the Settlement Classes solely for settlement purposes, pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3); (ii) Preliminary Approval of the Settlement set forth in this Settlement Agreement as fair, reasonable, and adequate within the meaning of Fed. R. Civ. P. 23; (iii) appointment of Class Representatives as representatives of their respective classes; (iv) approval of the proposed Class Notice, which shall be in substantially the same forms as the Class Notices attached hereto as Exhibits A (Email Notice), B (Postcard Notice), and C (Long Form Notice) (collectively, the "Class Notices"), and the Notice Plan set forth in Section 5; and (v) appointment of the Settlement Administrator.

4.2.     **Preliminary Approval Order**. Class Counsel agrees that the proposed Preliminary Approval Order to be filed together with the Motion for Preliminary Approval will be in substantially the same form as Exhibit D.  The Preliminary Approval Order shall (i) preliminarily approve the Settlement memorialized in this Settlement Agreement as fair, reasonable, and

adequate, including the material terms of this Settlement Agreement; (ii) set a date for a Final Fairness Hearing; (iii) state that if final approval of the settlement is not obtained, the settlement is null and void, and the Parties will revert to their positions ex ante without prejudice to their rights, claims, or defenses; (iv) approve the proposed Class Notices in the forms attached hereto as Exhibits A through C, and authorize their dissemination to the Settlement Class; (v) set deadlines consistent with this Settlement Agreement for mailing of the Class Notices, the filing of objections, the filing of motions, and the filing of papers in connection with the Final Fairness Hearing; (vi) appoint and approve the Settlement Administrator; (vii) set deadlines by which Class Counsel shall file their motion for attorneys' fees and Class Representatives shall file their motion(s) for service awards, which shall be at least thirty (30) calendar days prior to the Opt-Out Deadline; (viii) state that any appeal of the Court's order on the motion for attorneys' fees or the motion(s) for service awards shall have no effect on the Court's final approval of the Settlement; and (ix) prohibit and preliminarily enjoin Class Representatives, all Settlement Class Members (excepting those who are Successful Opt-Outs), and Class Counsel from commencing, prosecuting, or assisting in any lawsuit against the Released Parties that asserts or purports to assert matters within the scope of the Release during the time between entry of the Preliminary Approval Order and final determination by the Court regarding whether to finally approve the Settlement. BANA agrees that it will not oppose the entry of the Preliminary Approval Order, provided it is substantially in the form of Exhibit D hereto and consistent with the material terms of the Settlement. Without implication of limitation, BANA's agreement that it will not oppose the entry of the Preliminary Approval Order shall not be an admission or concession by it that a class was appropriate in the Action (other than for purposes of this Settlement) or would be appropriate in

21

any other matter, and/or that any relief was appropriate in the Action, for litigation purposes, or would be appropriate in any other matter.

**4.3.** If Preliminary Approval of the Settlement Agreement is entered by the Court, Class Representatives and Settlement Class Members shall seek, and BANA shall support, entry of a Final Judgment and Order of Dismissal that: (i) certifies the Settlement Classes pursuant to Fed. R. Civ. P. 23(a) and Fed. R. Civ. P. 23(b)(3) solely for the purpose of the settlement; (ii) approves finally the Settlement set forth in this Settlement Agreement and its terms as being a fair, reasonable, and adequate settlement as to Settlement Class Members within the meaning of Fed. R. Civ. P. 23 and directing its consummation according to its terms; (iii) finds that the Class Notices constitute due, adequate, and sufficient notice of the Settlement set forth in this Settlement Agreement and the Final Fairness Hearing and meets the requirements of due process and the Federal Rules of Civil Procedure; (iv) directs that, as to the Released Parties, the Action shall be dismissed with prejudice and, except as provided for in this Settlement Agreement, without award of costs; (v) orders that the Releasing Parties are permanently enjoined and barred from instituting, commencing, or prosecuting any action or other proceeding asserting any Released Claims against any Released Party; (vi) retains with the Court exclusive jurisdiction over the Settlement and this Settlement Agreement, including the administration and consummation of the Settlement; and (vii) determines under Fed. R. Civ. P. 54(b) that there is no just reason for delay and directs that the judgment of dismissal as to BANA shall be final and entered forthwith.

**5. NOTICE PLAN**

    **5.1.**    **<u>Preparation and Production of Settlement Class List</u>**. BANA or its agent shall compile a list of Settlement Class Members and provide to the Settlement Administrator within twenty-one (21) calendar days after the Preliminary Approval Order (the "Class List"), which shall include the total number of Class Fees for each Settlement Class Member, whether the Settlement Class Member is a current accountholder with BANA, as well as all known physical addresses and email addresses in BANA's possession, custody, or control, for the Settlement Class Members. The Settlement Administrator shall use this information for the sole purpose of identifying the current physical addresses and/or email addresses for the Settlement Class Members. Within twenty-one (21) calendar days after the Preliminary Approval Order, BANA will also provide the Class List to Class Counsel for Class Counsel's validation purposes. However, the Class List provided to Class Counsel will not include any personal identifying information related to Class Members. Class Counsel shall have fourteen (14) calendar days therefrom to raise any objections to the Class List.

    **5.2.**    **<u>Dissemination of Class Notice</u>**. For purposes of providing Court-approved class notices and establishing that the best practicable notice has been given, Class Notice will be provided as follows:

23

**5.2.1.** For those Settlement Class Members who are current accountholders of BANA, and have agreed to receive account statements from BANA electronically, the Settlement Administrator shall send the Email Notice to each such Settlement Class Member's last known email address, in a manner that is calculated to avoid being caught and excluded by spam filters or other devices intended to block mass email. For any emails that are returned undeliverable, the Settlement Administrator shall send a Postcard Notice in the manner described below. The Email Notice shall inform Settlement Class Members how they may request a copy of the Long Form Notice.

**5.2.2.** For those Settlement Class members who are current accountholders of BANA who have not agreed to receive account statements electronically, or who are no longer BANA accountholders, the Postcard Notice shall be mailed to these members by first class United States mail to the last known or best available mailing address.

**5.2.3.** The Settlement Administrator shall obtain updates, if any, to the addresses contained therein to any of the following using (i) information reasonably available from a Lexis-Nexis or alternative persons search performed as to each Settlement Class Member, (ii) information reasonably available from the National Change of Address ("NCOA") database maintained by the United States Postal Service ("Postal Service"), or (iii) such additional efforts as the Settlement Administrator reasonably believes are appropriate to identify updated addresses, if any, for each Settlement Class Member and/or as the Court may direct. The resulting list shall be the Class List.

24

**5.2.4.** Within seven (7) business days after the Class Member List is finalized as set forth in Paragraph 5.1, the Settlement Administrator shall begin the process of mailing the Class Notice(s) to each Settlement Class Member using the Class List by first-class U.S. mail, postage prepaid, and shall complete that process as soon as is practicable. The Settlement Administrator shall format the Class Notice(s) and otherwise administer the notice process in a reasonable manner to minimize costs.

**5.2.5.** For up to forty-five (45) calendar days following the last date on which the Settlement Administrator mailed Class Notice under this Section 5, if a Class Notice is returned by the Postal Service as undeliverable, the Settlement Administrator shall re-mail the Class Notice immediately to the forwarding address, if any, provided by the Postal Service on the face of the returned mail. For any Class Notice that is returned as undeliverable without a forwarding address, the Settlement Administrator will use commercially reasonable efforts to obtain updated addresses during the forth-five (45) calendar days following the date the last Class Notice was mailed. Other than as set forth above, BANA and the Settlement Administrator shall have no other obligation to re-mail Class Notices.

**5.2.6.** No later than twenty (20) calendar days before the Final Fairness Hearing, the Settlement Administrator shall cause proof of the Class Notice mailing as set forth herein to be provided to Class Counsel.

**5.2.7.** Neither the Parties nor the Settlement Administrator shall have any further obligation to send notice of the Settlement to proposed Settlement Class Members once these Class Notice provisions have been complied with.

**5.2.8.** **<u>Settlement Website</u>**.

25

**5.2.8.1.** The Settlement Administrator shall establish a website to assist in facilitating notice to the Settlement Class Members. This Settlement Website, www.NSFODFeeSettlement.com, shall be accessible no later than seven (7) calendar days prior to the Class Notice mailing described above. The Settlement Website shall set forth the following information: (i) the full text of this Settlement Agreement; (ii) the Long Form Notice (Exhibit C); (iii) the Preliminary Approval Order; (iv) the method for opting-out of the Settlement; (v) contact information for the Settlement Administrator and Class Counsel, and (vi) if the Settlement is terminated, a notice of such termination, which language shall be approved by the Parties.

**5.2.8.2.** Not later than twenty (20) calendar days before the Final Fairness Hearing, the Settlement Administrator shall cause proof of the establishment and maintenance of the Settlement Website to be provided to Class Counsel. The Settlement Website shall be dismantled 180 days after the mailing of the last Payment Notice or, if the Settlement is terminated, sixty (60) calendar days after such termination.

**5.2.8.3.** **CAFA Notice**. BANA shall send CAFA Notice to the United States Attorney General and appropriate state Attorneys General in accordance with 28 U.S.C. § 1715(a) no later than ten (10) business days after this Settlement Agreement is filed with the Court. BANA shall file with the Court certification of the date on which the CAFA Notice was served.

## 6. PAYMENT OF THE SETTLEMENT AMOUNT

**6.1.** Within ten (10) calendar days following the entry of the Preliminary Approval Order, BANA shall cause to be delivered to the Settlement Administrator the Parties' estimate of the Settlement Administration Expenses that will be necessary prior to the Effective Date and from which the Settlement Administrator will pay such costs of Class Notice and the cost of other settlement administration tasks incurred prior to the Effective Date. BANA shall pay no portion

26

of the Settlement Amount until it has received a properly completed W-9 Form from the Settlement Administrator. The Settlement Amount represents the total extent of BANA's monetary obligations under this Settlement Agreement and includes all sums to be paid under this Settlement Agreement as the consideration to eligible Settlement Class Members who are not Successful Opt-Outs, including Service Award(s), if any, the Attorney Fee and Expense Award, if any, and any Settlement Administration Expenses.

**6.2.** Within twenty (20) business days after the date of entry of the Final Approval Order, the Settlement Administrator shall establish and BANA shall fund an escrow account with funds sufficient for the payment of the remainder of with the $75,000,000 Settlement Amount payment, less any funds previously provided to the Settlement Administrator for the Settlement Administration Expenses, as set forth in Paragraph 6.1. BANA (a) shall have the right to impose any reasonable terms and conditions on the operation and maintenance of the fund, and of any funds it pays in connection with the Settlement, that it deems appropriate to take advantage of the Qualified Settlement Fund provisions of the tax code or to protect the moneys from intentional or unintentional diversion, expenditure, forfeiture, escheat, or other dispersion that is inconsistent with the express terms of the Settlement, and (b) shall inform Class Counsel of any such terms and conditions. In the event BANA desires to have the Settlement Administrator enter into an agreement or undertaking to take advantage of the Qualified Settlement Fund provisions of the tax code or to protect the moneys in accordance with this paragraph, or to obtain any order from the Court in connection with this paragraph, Class Representatives agree not to object to such requested agreement or order other than on the grounds that the terms or relief sought, in whole or in part, is inconsistent with the express terms of the Settlement. BANA shall pay no portion of the Settlement Amount until it has received a properly completed W-9 Form from the Settlement

27

Administrator.

**6.3.** The Settlement Amount shall be applied as follows:

> to pay all Settlement Administration Expenses; to pay any other Court-approved fees and expenses; to distribute the balance of the Settlement Amount to Settlement Class Members for each Settlement Class as allowed by the Court pursuant to the Preliminary Approval Order; and to pay the Attorney Fee and Expense Award, as well as the Service Award(s), if any, and to the extent allowed by the Court.

**6.4.** As set forth above, BANA shall be responsible for paying the total Settlement Amount of $75,000,000.00. BANA shall have no responsibility for any other costs, including, as further detailed in this Settlement Agreement, any Attorneys' Fees, expenses, and costs, including any taxes or tax-related costs relating to the Settlement Amount but all such fees, expenses, and costs shall be paid out of the Settlement Amount as approved by the Court.

**6.5.** Any interest earned on the Settlement Amount shall be for the benefit of the Settlement Class.

**6.6.** <u>Use and Disbursal of Settlement Amount</u>

**6.6.1. Purpose and Use**. The Settlement Amount shall be used only in the manner and for the purposes set forth in this Settlement Agreement. No portion of the Settlement Amount shall be disbursed except as expressly set forth herein. The Settlement Amount shall be used only for payments to Settlement Class Members, Settlement Administration Expenses, Attorneys' Fees and Expenses (described in Section 10), and the Service Award(s) (described in Section 11).

**6.6.2. Settlement Class Member Payments.**

**6.6.2.1.** Within seven (7) calendar days after the Effective Date, BANA shall determine whether the Class List needs to be updated with respect to which Settlement Class Members are current accountholders with BANA and if necessary, will provide an updated Class

28

List to the Settlement Administrator.

**6.6.2.2.** Within fifteen (15) days of the Effective Date, the Settlement Administrator shall deduct the total amount of Settlement Payments to be deposited into Settlement Class Members' BANA accounts from the Qualified Settlement Fund and remit to that amount to BANA.

**6.6.2.3.** Within thirty (30) calendar days after the Effective Date, BANA shall directly deposit the Settlement Payments to those Settlement Class Members who are current accountholders with BANA as of the Effective Date into the Settlement Class Member's primary consumer deposit account.

**6.6.2.4.** Within thirty (30) calendar days after the Effective Date, the Settlement Administrator shall mail Payment Notices and Settlement Payments, in the form of checks, as determined in the payment allocation for Settlement Class Members described herein who are not, as of the date of Final Approval, current accountholders with BANA. The Settlement Checks and Payment Notices shall include the appropriate release text.

**6.6.3.** The Payment Notices accompanying the Settlement checks shall notify the recipients that the checks must be cashed within 180 calendar days from the date on the Payment Notice and that the enclosed check shall not be valid after that date.

**6.7. Remaining Funds**. After 210 calendar days from the Effective Date, any excess funds remaining in the Settlement Fund that have not been distributed in accordance with other provisions of this Settlement Agreement shall, if economically feasible, be distributed to the Settlement Class Members who successfully cashed checks or were granted automatic disbursements. If the distribution of remaining funds costs more than the amount to be distributed or is otherwise economically unfeasible, or if additional funds remain after a second distribution,

29

Class Counsel shall petition the Court to distribute any remaining funds to a consumer protection or financial services charity.

## 7. SETTLEMENT BENEFITS

### 7.1. <u>Amounts of Payments</u>.

**7.1.1. Amounts of Payment**. Settlement Class Members are entitled to payment by distributing the proceeds from the Settlement Amount to the Settlement Class Members depending upon what Settlement Class the Settlement Class Members belong to and depending on the total number of Class Fees the Settlement Class Member was assessed in connection with the transactions at issue in each Settlement Class during the Class Period. Payments from the Settlement Amount to each Settlement Class Member shall be distributed on a *pro rata* basis and calculated as follows:

> (Net Settlement Amount divided by the total number of Class Fees the Settlement Class Members collectively were assessed in connection with the transactions at issue);

> Multiplied by;

> Total number of Class Fees the Settlement Class Member was charged and paid in connection with the transactions at issue.

**7.1.2. <u>All Payments Come From The Settlement Amount</u>**. All payments to Settlement Class Members shall be funded by the Settlement Amount.

### 7.2. <u>Settlement Check Language</u>. Each Settlement check and Payment E-Mail Notice shall state: "This payment is tendered to you as a class member in *Morris, et al. v. Bank of America, N.A.*, 3:18-cv-157-RJC-DSC (W.D.N.C.) in consideration for your release from liability of Defendant and other Released Parties as set forth in the Settlement Agreement and Release." Each Settlement Check will disclose that it is invalid if it is not cashed within 180 calendar days. Payment pursuant to this Settlement Agreement shall be deemed final and conclusive as against

all Settlement Class Members. If any Settlement Check is returned as undeliverable, the Settlement Administrator will attempt to notify the Settlement Class Member, including by attempting to obtain a new mailing address as practical in the same manner as set forth in Paragraph 5.2.3 (with any costs incurred treated as Settlement Administration Expenses). If, after a second attempt, such Settlement Check is again returned as undeliverable, no further efforts need to be taken by the Settlement Administrator. All Settlement Class Members who do not cash their checks within 180 calendar days otherwise shall be bound by all of the terms of this Settlement Agreement and the Settlement, including the terms of the Final Judgment and Order of Dismissal to be entered in the Action and the releases provided for herein, and will be barred from bringing any action or proceeding against the Released Parties concerning the Released Claims.

7.3.      All proceedings with respect to the notice, administration and processing of payments and the determination of all controversies relating thereto shall be subject to the jurisdiction of the Court.

7.4.      The Settlement Amount shall be distributed by the Settlement Administrator to Settlement Class Members only after the Effective Date and after: (i) all timely objections have been resolved by the Court, and all appeals therefrom have been resolved or the time therefor has expired; (ii) all matters with respect to Class Counsel's Attorneys' Fee and Expense Application discussed at Section 10 herein, have been resolved by the Court, and all appeals therefrom have been resolved or the time therefor has expired; and (iii) all Settlement Administration Expenses incurred as of that date have been paid.

7.5.      Class Representatives and Settlement Class Members shall look solely to the Settlement Amount as full, final, and complete satisfaction of all Released Claims. Except as set forth herein, BANA shall have no obligation under this Settlement Agreement or the Settlement

31

to pay or cause to be paid any amount of money, and BANA shall have no obligation to pay or reimburse any fees, expenses, costs, liability, losses, taxes, or damages whatsoever alleged or incurred by Class Representatives, by any Settlement Class Member, or by any Releasing Parties, including but not limited to their attorneys, experts, advisors, agents, or representatives, with respect to the Action and Released Claims. Class Representatives and Settlement Class Members acknowledge that as of the Effective Date, the releases given herein shall become effective immediately by operation of the Final Judgment and Order of Dismissal and shall be permanent, absolute, and unconditional.

    **7.6.**        BANA shall not have a reversionary interest in the Settlement Amount.  If there is a balance remaining of the Settlement Amount after eight (8) months from the date of distribution of the Settlement Amount (whether by reason of tax refunds, uncashed checks or otherwise), or reasonably soon thereafter, the Settlement Administrator shall distribute the remaining balance as ordered by the Court and as further set forth in Paragraph 6.7.

## 8. TERMINATION OF THE SETTLEMENT

    **8.1.**        This Settlement is contingent upon Court approval. If the Court fails to grant final approval the Settlement in any material respect, the Settlement will be subject to termination by the Party adversely affected by such failure.  Notwithstanding this paragraph, the Court's determination as to the Attorney Fee and Expense Application and/or any plan of distribution, or any determination on appeal from any such order, shall not provide grounds for termination of this Settlement Agreement or Settlement.

    **8.2.**        The Settlement Administrator shall provide Class Counsel and BANA's Counsel a list of Successful Opt-Outs within five (5) business days of the Opt-Out Deadline.

    **8.3.**        If this Settlement Agreement is terminated, then the Settlement and the relevant

portions of this Stipulation shall be canceled and terminated without prejudice, and this Settlement Agreement shall be null and void and shall have no further force or effect.

**8.4.**     Except as otherwise provided herein, in the event the Settlement Agreement is terminated in accordance herewith, is vacated, is not approved, or the Effective Date fails to occur for any reason, then the Parties to this Settlement Agreement shall be deemed to have reverted to their respective status in the Action as of December 20, 2020. BANA retains all rights regarding any defenses on the statute of limitations that it had as of December 20, 2020. Indeed, the Parties agree that, if this Settlement Agreement is terminated, then Class Representatives will be able to refile their complaint on behalf of their respective classes as previously filed as of December 20, 2020. In such circumstances, the Parties shall thereafter work together to arrive at a mutually agreeable schedule for resuming the Action.

**8.5.**     Except as otherwise expressly provided herein, in the event the Settlement Agreement is terminated in accordance herewith, is vacated, nor approved, or the Effective Date fails to occur for any reason, the Parties shall proceed in all respects as if this Settlement Agreement and any related orders had not been entered, and any portion of the Settlement Amount previously paid by or on behalf of BANA, together with any interest earned thereon (and, if applicable, re-payment of any Attorney Fee and Expense Award, if any, with respect to such income) shall be returned to BANA within ten (10) business days from the date of the event causing such termination.

**8.6.**     No Party hereto or its counsel shall directly, or indirectly, solicit or encourage any Person to request exclusion from the Settlement Class.

**9.  PROCEDURES FOR OPT-OUTS AND OBJECTIONS**

  **9.1. <u>Out-Out Procedures</u>**.

33

**9.1.1.** The Class Notice shall inform proposed Settlement Class Members how they may opt out of the Settlement and shall explain the potential implications of doing so, including the possibility that opting out may preclude later participation in any later class action against the Released Parties.

**9.1.2.** A proposed Settlement Class Member may request to be excluded from the Settlement Class by sending a written, printed request for exclusion, addressed to "Exclusion Requests: Bank of America Account Fee Class Action" at the Settlement Administrator's address as shown in the Class Notice. The proposed Settlement Class Member's opt-out request must contain his or her original signature, current postal address, and a specific affirmative statement that the proposed Settlement Class Member wishes to be excluded from the Settlement Class. Opt-Out requests must be postmarked no later than forty-five (45) calendar days after the completion of the Notice Plan (the Opt-Out Deadline).

**9.1.3.** Persons who purport to opt-out of the Settlement Class as a group, aggregate, or class involving more than one purported class member shall **not** be considered to have validly opted out.

**9.2.** <u>List of Successful Opt-Outs</u>. Not later than seven (7) calendar days after the Opt-Out Deadline, the Settlement Administrator shall provide Class Counsel and BANA's Counsel a complete list of the Successful Opt-Outs, together with all opt-out requests.

**9.3.** <u>Representation of Opt-Outs</u>. Class Counsel agree that this Settlement Agreement is fair, reasonable, and in the Settlement Class Members' best interests. Class Counsel furthermore agree that potential Settlement Class Members who seek to opt out should be represented by counsel who believe the Settlement Agreement is not fair, reasonable, and not in the Settlement Class Members' best interests. Accordingly, Class Counsel shall not solicit Settlement Class

34

Members who opt out for purposes of legal representation and, if contacted, shall refer any such persons to the applicable referral service maintained by the bar association in those persons' respective jurisdictions for any subsequent representation.

**9.4. <u>Objections from Settlement Class Members</u>**.

**9.4.1.** Any Settlement Class Member who does not opt-out but instead wishes to object to the Settlement or any matters described in the Class Notice may do so by filing with the Court a notice of his or her intention to object.

**9.4.2.** Each Settlement Class Member desiring to object to the Settlement Agreement or to the attorneys' fees, costs and expenses, shall submit a timely written notice of his or her objection. Such notice shall state: (i) the objector's full name, address, telephone number, and e-mail address (if any); (ii) information identifying the objector as a Settlement Class Member, including evidence that the objector is a member of the Settlement Class; (iii) a written statement of all grounds for the objection, accompanied by any legal support for the objection the objector believes applicable; (iv) the identity of all counsel representing or assisting the objector, if any; (v) the identity of all counsel representing the objector who will appear at the Final Fairness Hearing, if any; (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection, if any; (vii) a statement confirming whether the objector intends to personally appear and/or testify at the Final Fairness Hearing; (viii) the objector's signature and the signature of the objector's duly authorized attorney or other duly authorized representative (along with documentation setting forth such representation), if any; (ix) a list, by case name, court, and docket number, of all other cases in which the objector (directly or through counsel) has filed an objection to any proposed class action settlement within the last three (3) years; (x) a list, by case name, court, and docket number, of all other cases in which the objector's counsel (on behalf of any

35

person or entity) has filed an objection to any proposed class action settlement within the last 3 years; and (xi) a list, by case name, court, and docket number, of all other cases in which the objector has been a named plaintiff in any class action or served as a lead plaintiff or class representative. To be timely, written notice of an objection in the appropriate form must be filed with the Settlement Administrator by the date certain as ordered by the Court in the Preliminary Approval Order, and served concurrently therewith upon Class Counsel and BANA's Counsel.

**9.4.3.** If the objection is made by or through an attorney, the written objection must also include: (1) the identity and number of the Settlement Class Members represented by objector's counsel; (2) the number of such represented Settlement Class Members who have opted out of the Settlement Class; and (3) the number of such represented Settlement Class Members who have remained in the Settlement Class and have not objected. If the attorney intends to seek fees and expenses from anyone other than the objectors he or she represents, the attorney shall also file with the Court and serve upon Class Counsel and BANA's Counsel, not later than fifteen (15) calendar days before the Final Fairness Hearing or as the Court may otherwise direct, a document containing the following: (i) the amount of fees sought by the attorney for representing the objector and the factual and legal justification for the fees being sought; (ii) a statement regarding whether the fees being sought were calculated on the basis of a lodestar, contingency, or other method; (iii) the number of hours already spent by the attorney and an estimate of the hours to be spent in the future; and (iv) the attorney's hourly rate.

36

**9.4.4.** Any Settlement Class Member who fails to comply with the requirements for objecting set forth herein shall waive and forfeit any and all rights he or she may have to appear separately and/or to object to the Settlement Agreement and shall be bound by all the terms of the Settlement Agreement and by all proceedings, orders and judgments in the Action. The exclusive means for any challenge to the Settlement Agreement shall be through the provisions set forth herein. Without limiting the foregoing, any challenge to the Settlement Agreement, the Final Approval Order and Judgment to be entered upon final approval shall be pursuant to appeal under the Federal Rules of Appellate Procedure and not through a collateral attack.

**9.4.5.** The Settling Parties shall file their responses to Objections, if any, to the settlement no later than ten (10) days prior to the Final Fairness Hearing.

**9.4.6.** By filing an objection, objectors and their counsel submit to the jurisdiction of the Court for all purposes, including but not limited to subpoenas and discovery.

**9.4.7.** Objectors must also make themselves available for deposition by counsel for the Parties between the time the objection is filed and a date no later than five (5) calendar days before the Final Fairness Hearing, and the objection must include the dates when the objector is available for deposition.

**9.4.8.** Any Settlement Class Member who, within forty-five (45) days after the completion of the Notice Plan (the Objection Deadline), files and serves a written objection satisfying the requirements of this section may appear at the Fairness Hearing, either in person or through personal counsel hired at the Settlement Class Member's expense, to object to any aspect of the fairness, reasonableness, or adequacy of the Settlement. Settlement Class members, or their attorneys, intending to make an appearance at the Final Fairness Hearing must deliver to Class Counsel and BANA's Counsel and have file-marked by the Court, no later than thirty (30) calendar

37

days before the Final Fairness Hearing or as the Court otherwise may direct, a Notice of Intent to Appear. The Notice of Intent to Appear must: (i) state how much time the Settlement Class Member anticipates needing to present the objection; (ii) identify, by name, address, and telephone number all witnesses the Settlement Class Member proposes to have testify; (iii) summarize in detail the anticipated testimony of all such witnesses; (iv) identify all exhibits the Settlement Class Member intends to offer in support of the objection; and (v) attach complete copies of all such exhibits.

**9.4.9.** Any Settlement Class Member who fails to timely file such a written statement of his or her intention to object shall be foreclosed from making any objection to the Settlement and shall waive and forfeit any and all rights he or she may have to appear separately and/or object, and shall be bound by all the terms of this Settlement Agreement and by all proceedings, orders and judgments, including but not limited to, the Release contained in this Settlement Agreement.

## 10. ATTORNEYS' FEES AND COSTS

**10.1.** Class Counsel will move for approval of an award of Attorneys' Fees and reimbursement of the expenses of this Action at least thirty (30) calendar days prior to the Opt-Out and Objection Deadline, which motion shall be separate and apart from the Motion for Preliminary Approval and the Motion for Final Approval. The Motion for Attorneys' Fees and Costs shall include a proposed order on said Motion.

**10.2.** BANA agrees that Class Counsel shall be entitled to an award of reasonable Attorneys' Fees, to be determined by the Court.

**10.3.** BANA agrees not to object to Class Counsel's request for attorneys' fees not to exceed one-third (1/3) of the Settlement Amount. Based upon the total Settlement Amount of $75,000,000, BANA will not object to a request for Attorneys' Fees of up to $25,000,000.

38

However, BANA reserves its rights to object or oppose any request for Attorneys' Fees by Class Counsel over and above that amount.

10.4.     In addition, BANA will not object to Class Counsel's additional request for reimbursement of expenses and costs in prosecuting this matter. These amounts shall be subtracted from the Settlement Amount.

10.5.     The Attorney Fee and Expense Award shall be paid from the Settlement Amount, with no further obligation by BANA.

10.6.     Any Attorneys' Fees and Expense Award shall be available to be distributed from the Qualified Settlement Fund for distribution to Class Counsel in accordance with this Agreement within three (3) business days after any entry of the Final Approval Order subject to the conditions below. Any Attorneys' Fees and Expense Award shall be paid from the Qualified Settlement Fund to Class Counsel immediately after the three (3) day period, notwithstanding the existence of any timely filed objections thereto, or potential for appeal therefrom, or collateral attack on the Settlement or any part thereof, subject to each Class Counsel's obligation to repay its share of those amounts to the Qualified Settlement Fund, plus accrued interest at the same net rate as is earned by the Qualified Settlement Fund, if and when, as a result of any appeal and/or further proceedings on remand, or successful collateral attack, the Attorneys' Fees and Expense Award is reduced or reversed, or return of the Qualified Settlement Fund is required consistent with the provisions of this Agreement. In order for a particular Class Counsel firm to receive any Attorneys' Fees and Expense Award after the Final Approval Order and prior to the Effective Date, such Class Counsel must provide to BANA either (1) an irrevocable letter of credit from a bank securing the amount of its share of the award or (2) in the absence of a letter of credit, such other information or repayment agreement acceptable to BANA in its sole and absolute discretion. If any Attorneys'

39

Fees and Expense Award is reduced or reversed, each Class Counsel firm receiving Attorneys'
Fees and Expenses pursuant to this Paragraph shall, within ten (10) business days from the event
which requires repayment of the Attorneys' Fees and Expense Award, refund to the Qualified
Settlement Fund the reduced or reversed amount of the Attorneys' Fees and Expense Award paid
to such firm plus any interest at the same rate as was earned by the Qualified Settlement Fund. To
the extent that any Class Counsel firm receives such Attorneys' Fees and Expenses that are not
secured by an irrevocable letter of credit as set forth at (1) above, all Class Counsel firms agree
that they are jointly, severally and unconditionally liable to BANA for any and all such Attorneys'
Fees and Expenses and will pay to BANA when and if due, the amount of such Attorneys' Fees
and Expense as may be required to be refunded hereunder, including, without limitation, all
interest.

**10.7.** If Class Counsel seek attorneys' fees over and above one-third (1/3) of the
Settlement Amount, and such request is not granted by the Court, Class Counsel, Plaintiffs and/or
Class Representatives shall be allowed to appeal that order on the Motion for Attorneys' Fees only
if such appeal has no effect on the Final Approval of the Settlement.

**10.8.** If the award of Attorneys' Fees is reduced or reversed on appeal, Class Counsel
shall make all necessary refunds and repayments into the Settlement Amount no later than thirty
(30) calendar days after the Court notifies Class Counsel. Such refunds shall be distributed by the
Settlement Administrator to the Settlement Class in the manner provided by the Final Approval
Order.

## 11. SERVICE AWARD TO CLASS REPRESENTATIVES

**11.1.** **Application for Service Award**. Class Counsel shall apply to the Court for a
service award to be paid from the Settlement Amount to the Class Representatives for serving as

class representative in support of the Settlement at least thirty (30) calendar days prior to the Opt-Out Deadline, which motion shall be separate and apart from the Motion for Preliminary Approval and the Motion for Final Approval. BANA will not oppose such a request of $10,000 total for each set of Class Representatives who provided discovery and were deposed and a request of $5,000 total for each set of Class Representatives who provided discovery but were not deposed, and $1,000 for each Class Representative who did not provide discovery. In total, this amounts to total "Service Award" for all Class Representatives of $31,000.

**11.2.** __No Additional Obligation by BANA__. BANA shall have no other responsibility for or liability with respect to the payment of a service award to the Class Representatives beyond the amount stated above for resolution of the Released Claims herein. Specifically excluded from this section are any individual claims that have been separately settled and are not part of this Settlement.

**11.3.** __Source of Payment__. A Service Award in the amount approved by the Court shall be paid through distribution from the Settlement Amount as set forth above.

**11.4.** If Class Representatives seek service awards above the amounts listed in Section 11.1, and such request is not granted by the Court, Class Representatives shall be allowed to appeal that order on the Motion for Service Awards only if such appeal has no effect on the Final Approval of the Settlement.

**11.5.** If a Service Award is reduced or reversed on appeal, Class Representatives shall make all necessary refunds and repayments into the Settlement Amount no later than thirty (30) calendar days after the Court notifies Class Counsel. Such refunds shall be distributed by the Settlement Administrator to the Settlement Class in the manner provided by the Final Approval Order.

41

## 12. FINAL FAIRNESS HEARING AND FINAL APPROVAL

**12.1.** **<u>Final Fairness Hearing</u>**. The Parties will jointly request that the Court hold the Final Fairness Hearing to consider approval of the settlement of the Action as provided for herein approximately one hundred and twenty (120) calendar days after Preliminary Approval but in no event fewer than ninety (90) calendar days after the CAFA Notice is served. At least ten (10) calendar days before the Final Fairness Hearing, Class Counsel shall file a motion for entry of the Final Approval Order. The Parties agree that the Final Approval Order constitutes a final judgment dismissing the Action with prejudice.

**12.2.** **<u>Final Approval</u>**. All relief contemplated by this Settlement Agreement is expressly contingent upon the Court's Final Approval.

## 13. RELEASE OF CLAIMS

**13.1.** **<u>Release of BANA and Released Parties</u>**. Upon the Effective Date, in exchange for the relief described herein, Class Representatives and each Settlement Class Member who does not validly opt out of the Settlement, and each of their respective heirs, executors, administrators, trustees, guardians, agents, successors, and assigns, and all those acting or purporting to act on their behalf, fully and finally release and discharge the Released Parties of and from the Released Claims. This Release shall be included as part of any judgment, so that all released claims and rights shall be barred by principles of *res judicata*, collateral estoppel, and claim and issue preclusion. Subject to the Court's approval, this Settlement Agreement shall bind all Settlement Class Members, and all Released Claims shall be dismissed with prejudice and released as against the Released Parties. The Released Claims are released regardless of whether these claims are known or Unknown Claims, actual or contingent, liquidated or unliquidated.

**13.2.** **<u>Covenant Not To Sue</u>**. The Class Representatives, on behalf of themselves and

the Settlement Class Members, covenant and agree: (i) not to file, commence, prosecute, intervene in, or participate in (as class members or otherwise) any action in any jurisdiction based on or relating to any of the Released Claims, or the facts and circumstances relating thereto, against any of the Released Parties; (ii) not to organize or solicit the participation of Settlement Class Members, or persons who would otherwise fall within the definition of the Settlement Class but who requested to be excluded from the Settlement Class, in a separate class for purposes of pursuing any action (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action in any jurisdiction) based on or relating to any of the Released Claims or the facts and circumstances relating thereto, against any of the Released Parties; and (iii) that the foregoing covenants and this Settlement Agreement shall be a complete defense to any of the Released Claims against any of the Released Parties.

## 14. DISPUTES RELATING TO THE SETTLEMENT

**14.1.**     The Parties shall work in good faith to resolve any disputes that may arise in connection with the Settlement.

**14.2.**     Until and unless this Agreement is dissolved or becomes null and void by its own terms, or unless otherwise ordered by the Court, or if Final Approval is not achieved, Class Representatives, BANA, Class Counsel and BANA's Counsel represent and warrant that they shall take all appropriate steps in the Action necessary to preserve the jurisdiction of the Court, use their best efforts to cause the Court to grant Preliminary and Final Approval of this Settlement Agreement as promptly as possible, and take or join in such other steps as may be necessary to implement this Settlement Agreement and to effectuate the Settlement.

## 15. MISCELLANEOUS PROVISIONS

**15.1.**     <u>Non-Disparagement</u>: Class Representatives, Class Counsel, BANA, and BANA's

43

Counsel shall not issue, or otherwise cause to be issued, any press release, advertisement, or Internet posting which (a) disparages any of the Class Representatives, Class Counsel, BANA, or BANA's Counsel with respect to any matters or issues alleged or asserted in the Action or relating to this Settlement; or (b) includes evidence or information protected from disclosure by the Protective Order in the Action.

**15.2.** **No Admission.** Nothing herein shall constitute any admission as to any assertion, claim, or allegation made by any party, or as to the scope of liability. BANA specifically denies any wrongdoing or liability and specifically denies that a class could or should be certified in the Action for litigation purposes. This Settlement Agreement is entered into to resolve all claims amicably, and to avoid the risk and expense of additional litigation, and does not imply or suggest in any way fault or wrongdoing. The Parties hereto agree that this Settlement Agreement and its Exhibits, and any and all associated negotiations, documents, discussions, shall not be deemed or construed by anyone to be an admission or evidence of any violation of any statute or law, or of any liability or wrongdoing by BANA.

**15.3.** **Fourth Amended Complaint**: Prior to, or concurrent with the filing of the Motion for Preliminary Approval, Plaintiffs shall file a Fourth Amended Complaint, substantially in the form of Exhibit E attached hereto, which shall become the operative complaint in the Action, adding Class Representative, Kristen Valperga, as plaintiff and as a proposed Class Representative for the Retry Transaction Class, and removing the MMF Claims, and which shall not substantively change the complaint in any way except as set forth herein.

**15.4.** **Admissibility of Settlement Agreement**. This Settlement Agreement shall not be offered nor shall be admissible as evidence in any action or proceeding except (i) the hearings necessary to obtain and implement Court approval of this Settlement; and (ii) any hearing to

44

enforce the terms of this Settlement Agreement or related order by the Court. This Settlement Agreement, whether or not consummated, any proceedings relating to the Settlement, and any of the terms of the Settlement, whether or not consummated, shall in no event be construed as, or deemed to be evidence of, an admission or concession on the part of BANA with respect to any fact or matter alleged in the Action, or any fault or liability or wrongdoing or damage whatsoever, or any infirmity in any defense that has been or could have been asserted.

15.5. **Successors and Assigns**. This Settlement Agreement's terms shall apply to and bind the Parties and their heirs, successors, and assigns.

15.6. **No Assignments.** Class Representatives and Class Counsel represent, covenant, and warrant that they have not directly or indirectly assigned, transferred, encumbered, or purported to assign, transfer, or encumber any portion of any Released Claim except as set forth herein, and that there are no Persons having any interest in any award of attorneys' fees, expenses, or litigation costs in connection with the Action. Class Counsel agrees to indemnify and hold BANA and its counsel harmless as to (a) any breach of the representation and warranty contained in the prior sentence; and (b) any claim by any other Person against BANA or its counsel for such an award of attorneys' fees, expenses or litigation costs.

15.7. **No Tax Advice**. BANA may be required to file certain 1099 or other information reports with the United States Internal Revenue Service or other government agencies as required indicating its payments to the Settlement Class Members. No representations or advice regarding the tax consequences of this Settlement Agreement have been made by anyone. The Parties further understand and agree that each Party, each Settlement Class Member and each of Class Counsel shall be responsible for his, her, its, or their own taxes, if any, resulting from this Settlement Agreement and any payments made pursuant to this Settlement Agreement.

45

**15.8.** **Communications with Parties Relating to Settlement Agreement**.  All notices, requests for consent, and other formal communications under this Settlement Agreement shall be in writing and sent by mail and e-mail to counsel for the Party to whom notice is directed at all of the addresses below.  Any Party may change its designated recipient(s) or notice address(es) by written notice to all other Parties

<table>
<tr><td><b>If to Class Representatives:</b></td><td><b>If to Defendants:</b></td></tr>
<tr><td>

Larry McDevitt (NC Bar No. 5032)
David M. Wilkerson (NC Bar No. 35742)
The Van Winkle Law Firm
11 North Market Street
Asheville, NC 28801
(828)258-2991
dwilkerson@vwlawfirm.com
lmcdevitt@vwlawfirm.com

Jeffrey D. Kaliel (*pro hac vice*)
Sophia Gold (*pro hac vice*)
KALIEL GOLD PLLC
1100 15th St. NW, 4th Floor
Washington, D.C. 20005
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

James J. Pizzirusso (*pro hac vice*)
HAUSFELD LLP
888 16th St., NW, Suite 300
Washington, DC  20006
(202) 540-7200
jpizzirusso@hausfeld.com

</td><td>

Brian A. Kahn (NC Bar No. 29291)
Jasmine K. Gardner (NC Bar No. 47853)
MCGUIREWOODS LLP
201 N. Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: (704) 343-2000
Fax: (704) 343-2300
bkahn@mcguirewoods.com
jgardner@mcguirewoods.com

Carolee A. Hoover (*pro hac vice*)
MCGUIREWOODS LLP
2 Embarcadero Center, Suite 1300
San Francisco, CA 94111-3821
(415)844-1791
choover@mcguirewoods.com

</td></tr>
</table>

**15.9.** **Entire and Voluntary Agreement**.

**15.9.1.** **Knowing and Voluntary Assent**.  The Parties agree that the Settlement Agreement is voluntary and that its terms were negotiated at arm's length.  The Parties agree that they were represented by competent and experienced counsel.

46

**15.9.2.** **Entire Agreement**.  The Parties intend the Settlement Agreement to be a complete and final resolution to the Action.  This Settlement Agreement contains the Parties' entire agreement on and understanding of the subject-matter at issue in the Action.  This Settlement Agreement merges with and supersedes all prior negotiations and proposals, whether written or oral.

**15.10.** **Headings and Titles**.  The headings and titles in this Settlement Agreement are for the reader's convenience only and shall not affect or alter the meaning of the Settlement Agreement's terms.

**15.11.** **Settlement Agreement Controls Over Exhibits**.  All exhibits attached to this Settlement Agreement are hereby incorporated into this Settlement Agreement as though fully set forth herein.  If there is any conflict between the terms of the Settlement Agreement and the attached exhibits, the Settlement Agreement shall control.

**15.12.** **Amendments and Modifications**.  This Settlement Agreement may be amended or modified only by a written instrument signed by the Parties or by the respective attorneys, or their respective successors-in-interest.

**15.13.** **Authorization of Counsel**.  Class Representatives and Settlement Class Members expressly authorize Class Counsel to take all appropriate action required or permitted to be taken by the Settlement Class pursuant to the Settlement Agreement to effectuate its terms. Class Counsel are furthermore expressly authorized to enter into any modifications or amendments to the Settlement Agreement on behalf of the Settlement Class Members that they deem necessary or appropriate. Each attorney or other person executing the Settlement Agreement on behalf of a Party hereto warrants that such attorney or other person has full authority to do so. The undersigned representatives of BANA represent that they are fully authorized to enter into and execute this

47

Settlement Agreement on behalf of BANA. Class Counsel represent that they are fully authorized to conduct settlement negotiations with BANA's Counsel on behalf of Class Representatives and to enter into and execute this Settlement Agreement on behalf of Class Representatives and the putative Settlement Classes, subject to approval by the Court.

15.14. **Computation of Time.** Except as expressly set forth herein, in computing any period of time prescribed or allowed by this Settlement Agreement, the provisions of Federal Rule of Civil Procedure 6 shall govern.

15.15. **Continuing Jurisdiction and Exclusive Venue.** Each of the Parties, each Settlement Class Member, and each of the Releasing Parties that are otherwise subject to the jurisdiction of a United States court hereby irrevocably submits to the exclusive jurisdiction and venue of the United States District Court for the Western District of North Carolina for any suit, action, proceeding, case, controversy, or dispute arising from or related to this Agreement and/or Exhibits hereto and the negotiation, performance, or breach of same.

15.16. **Construction and Interpretation of Terms.** The Parties have cooperated in drafting and preparing this Settlement Agreement. There shall therefore be no presumption for or against any Party because that Party initially drafted a particular section or subsection. Before declaring any provision invalid, a court should first attempt to construe the provision as valid, consistent with the Settlement Agreement's purposes, and consistent with applicable precedent.

15.17. **No Claims Arising from this Settlement Agreement**. No person shall have any claim against any of the Released Parties, against Class Representative, against counsel for any Party, based on distribution of benefits made substantially in accordance with this Settlement Agreement or related order(s) of the Court.

15.18. **Standing of Released Parties**. The Released Parties who are not signatories hereto

48

shall be third-party beneficiaries under this Settlement Agreement and shall be entitled to enforce this Settlement Agreement in accordance with its terms. Aside from the Released Parties, it is not the intention of the Parties to confer third-party beneficiary rights or remedies upon any other person or entity.

15.19.    **Applicable Law**. This Settlement Agreement shall be interpreted under and governed by federal law. To the extent state law applies, the laws of the State of North Carolina shall apply, without regard to choice of law principals. All judicial proceedings regarding this Settlement Agreement shall be brought only in this Court. Any time period set forth in this Settlement Agreement shall be calculated pursuant to the Federal Rules of Civil Procedure and the Civil Rules of Practice and Procedure for the Western District of North Carolina.

15.20.    **Counterparts**. This Settlement Agreement may be executed in one or more counterparts and by facsimile. All executed counterparts shall be deemed to be one and the same instrument. Counsel for the Parties shall exchange among themselves signed counterparts. A complete set of executed Counterparts shall be filed with the Court.

15.21.    **Efforts to Support Settlement**. The Parties and their counsel agree to cooperate fully in seeking timely Court approval for this Settlement Agreement and to use reasonable efforts to effect consummation of the Settlement and effectuate its terms.

IN WITNESS THEREOF, the Parties have caused this Settlement -- and Release to be executed by their duly authorized representatives.

APPROVED BY SETTLEMENT CLASS COUNSEL

DocuSigned by:

*Jeffrey kaliel*
F817F468E0B1427

Date: _____  5/11/2021

Jeffrey D. Kaliel
Sophia Gold
KALIEL GOLD PLLC

_____     Date: _5/12/2021_
David Wilkerson
Larry McDevitt
The Van Winkle Law Firm

_____     Date: _5.11.21_
Jamie J. Pizzirusso
HAUSFELD LLC

APPROVED BY DEFENDANT AND COUNSEL FOR DEFENDANT


_____     Date: _____
On behalf of Bank of America, N.A.



_____     Date: _____
Brian A. Kahn
Jasmine K. Gardner
McGuireWoods LLP

50

_____                Date: _____

David Wilkerson
Larry McDevitt
The Van Winkle Law Firm


_____                Date: _____

Jamie J. Pizzirusso
HAUSFELD LLC

APPROVED BY DEFENDANT AND COUNSEL FOR DEFENDANT

*John T. Livaditis*
_____                Date:  5/11/2021
John Livaditis
Senior Vice President
On behalf of Bank of America, N.A.


_____                Date:  5/12/21
Brian A. Kahn
Jasmine K. Gardner
McGuireWoods LLP

50

# EXHIBIT A

FROM: [EMAIL ADDRESS]
TO: [EMAIL ADDRESS]
RE: LEGAL NOTICE OF CLASS ACTION SETTLEMENT

IF YOU HAD A CHECKING AND/OR SAVINGS ACCOUNT WITH BANK OF AMERICA, N.A., AND YOU WERE ASSESSED A RETRY TRANSACTION FEE, INTRABANK TRANSACTION FEE, OR AN OVERDRAFT FEE OR NSF FEE AS A RESULT OF FEE TIMING PRACTICES, BETWEEN JULY 1, 2014 AND MONTH DD, YYYY YOU MAY BE ENTITLED TO A PAYMENT FROM A CLASS ACTION SETTLEMENT.

**The District Court for the Western District of North Carolina has authorized this Notice. It is not a solicitation from a lawyer.**

**PLEASE READ THIS NOTICE FULLY AND CAREFULLY; THE PROPOSED SETTLEMENT MAY AFFECT YOUR RIGHTS**

*For more information, including a more detailed description of your rights and options, please click here or visit www.NSFODSettlement.com.*

A Settlement has been reached with Bank of America, N.A ("BANA") in a class action lawsuit about fees related to certain transaction types that were charged on accounts from July 1, 2014, through Month DD, YYYY

**Who is included?** BANA records indicate that you are a "**Settlement Class Member**" in this Settlement because you are in one or more of the following Settlement Classes. The first Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded a Retry Transaction Fee. Retry Transaction Fees are insufficient fund ("NSF") and/or overdraft ("OD") fees that were assessed on an automated clearinghouse ("ACH") transaction from a consumer checking account that was resubmitted to BANA by the merchant (company to whom the Settlement Class Member made his/or ACH payment) after the merchant's first request for payment was declined. In other words, you are in the first Settlement Class if you paid more than one NSF or OD fee for the same attempted ACH payment based on a merchant's request for that payment more than once. The second Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded one or more NSF or OD fees on an ACH payment from their consumer checking account to another BANA account, like a mortgage or credit card. These are referred to as Intrabank Transaction Fees. The third Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded an NSF and/or OD fee on a consumer checking and/or savings account transaction that would not have been assessed if BANA had delayed the posting of previously assessed NSF/OD fees. These are referred to as Fee Accrual Claim Fees.

**What does the Settlement provide?** BANA will create a $75,000,000 Settlement Fund. After deducting attorneys' fees and costs, service awards to the Class Representatives, and the costs to administer the Settlement the balance of the Settlement Fund will be divided *pro rata* among all Settlement Class Members. In addition, BANA has agreed, for a period of at least five years, to change certain practices and stop assessing fees on Retry Transactions. BANA will implement changes to its consumer account disclosures.

**What are my options?** If you do nothing and the Settlement is approved and becomes final, you will automatically receive a Settlement Payment and your rights will be affected. If you do not want to be legally bound by the Settlement or receive a Settlement Payment, you must exclude yourself from it by Month DD, YYYY. Unless you exclude yourself, you will not be able to sue or continue to sue BANA for any claim made in this lawsuit or released by the Settlement Agreement. If you stay in the Settlement (and do not exclude yourself), you may object to it by Month DD, YYYY.

**The Court's Fairness Hearing.** The Court will hold a Final Fairness Hearing on Month DD, YYYY. At this hearing, the Court will decide whether to approve: (1) the Settlement; (2) Class Counsel's request for attorneys' fees (up to 33 1/3% of the Settlement Fund) and expenses; and (3) service awards totaling of between $1000 and $10,000 to the Class Representatives. You or your lawyer may appear at the hearing at your own expense, but you don't have to.

*For more information, visit www.NSFODSettlement.com or call 1-855-654-0890.*

# EXHIBIT B

Morris v. Bank of America, N.A. Settlement
P.O. Box 5645
Portland, OR 97228-5645

BARCODE
NO-PRINT
ZONE

FIRST-CLASS MAIL
U.S. POSTAGE
PAID
Portland, OR
PERMIT NO. 2882

LEGAL NOTICE

**If you had a checking and/or savings account with Bank of America, N.A., and you were assessed a Retry Transaction fee, Intrabank Transaction fee, or an Overdraft fee or NSF fee as a result of fee timing practices, between July 1, 2014 and Month DD, YYYY you may be entitled to a payment from a class action settlement.**

1-855-654-0890
**www.NSFODSettlement.com**

<<MAIL ID>>
<<NAME 1>>
<<NAME 2>>
<<ADDRESS LINE 1>>
<<ADDRESS LINE 2>>
<<ADDRESS LINE 3>>
<<ADDRESS LINE 4>>
<<ADDRESS LINE 5>>
<<CITY, STATE ZIP>>
<<COUNTRY>>

A Settlement has been reached with Bank of America, N.A ("BANA") in a class action lawsuit about fees related to certain transaction types that were charged on accounts from July 1, 2014, through Month DD, YYYY.

**Who is included?** BANA records indicate that you are a "Settlement Class Member" in this Settlement **because you are in one or more of the following Settlement Classes**. The first Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded a Retry Transaction Fee. Retry Transaction Fees are insufficient fund ("NSF") and/or overdraft ("OD") fees that were assessed on an automated clearinghouse ("ACH") transaction from a consumer checking account that was resubmitted to BANA by the merchant (company to whom the Settlement Class Member made his/or ACH payment) after the merchant's first request for payment was declined. In other words, you are in the first Settlement Class if you paid more than one NSF or OD fee for the same attempted ACH payment based on a merchant's request for that payment more than once. The second Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded one or more NSF or OD fees on an ACH payment from their consumer checking account to another BANA account, like a mortgage or credit card. These are referred to as Intrabank Transaction Fees. The third Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded an NSF and/or OD fee on a consumer checking and/or savings account transaction that would not have been assessed if BANA had delayed the posting of previously assessed NSF/OD fees. These are referred to as Fee Accrual Claim Fees.

**What does the Settlement provide?** BANA will create a $75,000,000 Settlement Fund. After deducting attorneys' fees and costs, service awards to the Class Representatives, and the costs to administer the Settlement the balance of the Settlement Fund will be divided pro rata among all Settlement Class Members. In addition, BANA has agreed, for a period of at least five years, to change certain practices and stop assessing fees on Retry Transactions. BANA will implement changes to its consumer account disclosures.

**What are my options?** If you do nothing and the Settlement is approved and becomes final, you will automatically receive a Settlement Payment and your rights will be affected. If you do not want to be legally bound by the Settlement or receive a Settlement Payment, you must exclude yourself from it by Month DD, YYYY. Unless you exclude yourself, you will not be able to sue or continue to sue BANA for any claim made in this lawsuit or released by the Settlement Agreement. If you stay in the Settlement (and do not exclude yourself), you may object to it by Month DD, YYYY.

**The Court's Fairness Hearing**. The Court will hold a Final Fairness Hearing on Month DD, YYYY. At this hearing, the Court will decide whether to approve: (1) the Settlement; (2) Class Counsel's request for attorneys' fees up to 30% of the Settlement Fund and expenses.

**More information, including the Long Form Notice and Settlement Agreement are available at www.NSFODSettlement.com or by calling 1-855-654-0890.**

# EXHIBIT C

Lisa Morris, et al.
v.
Bank of America, N.A.

**NOTICE OF PENDING CLASS ACTION AND PROPOSED SETTLEMENT**

**READ THIS NOTICE FULLY AND CAREFULLY; THE PROPOSED SETTLEMENT MAY AFFECT YOUR RIGHTS**

**IF YOU HAD A CHECKING AND/OR SAVINGS ACCOUNT WITH BANK OF AMERICA, N.A. ("BANA") AND YOU WERE ASSESSED A RETRY TRANSACTION FEE, INTRABANK TRANSACTION FEE, OR AN OVERDRAFT FEE OR NSF FEE AS A RESULT OF FEE TIMING PRACTICES, BETWEEN JULY 1, 2014 AND MONTH DD, YYYY, THEN YOU MAY BE ENTITLED TO A PAYMENT FROM A CLASS ACTION SETTLEMENT.**

The District Court for the Western District of North Carolina has authorized this Notice; it is not a solicitation from a lawyer.

| SUMMARY OF YOUR OPTIONS AND THE LEGAL EFFECT OF EACH OPTION | |
|---|---|
| **DO NOTHING** | If you were assessed, paid and were not refunded the types of fees that are being challenged in this case, then you will receive a payment from the Settlement Fund so long as you do not exclude yourself (described in the next box). |
| **EXCLUDE YOURSELF FROM THE SETTLEMENT; RECEIVE NO PAYMENT BUT RELEASE NO CLAIMS** | You can choose to exclude yourself from the Settlement or "opt out." This means you choose not to participate in the Settlement. You will keep your individual claims against BANA, but you will not receive a payment. The deadline to "opt out" of the Settlement is Month DD, YYYY. If you opt out but still want to recover against BANA, then you will have to file a separate lawsuit or claim. |
| **OBJECT TO THE SETTLEMENT** | If you do not opt-out but instead wish to object to the Settlement or any matters described in the Class Notice, you may do so by filing with the Court a notice of your intention to object. The deadline to object to the Settlement is Month DD, YYYY. |

These rights and options—*and the deadlines to exercise them*—along with the material terms of the settlement are explained in this Class Notice.

## BASIC INFORMATION

| 1. What is this lawsuit about? |
|---|

The lawsuit that is being settled is entitled *Lisa Morris, et al. v. Bank of America, N.A*., (Civil Action No. 3:18-cv-157-RJC-DSC). The persons who sued are called the "Class Representatives or "Plaintiffs". The Defendant is "BANA". The case is a "class action." That means that the Class Representatives are acting on behalf of the three Settlement Classes. The transactions at issue occurred between July 1, 2014 and Month DD, YYYY.

The first Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded a Retry Transaction Fee. Retry Transaction Fees are insufficient fund ("NSF") and/or overdraft ("OD") fees that were assessed on an automated clearinghouse ("ACH") transaction from a consumer checking account that was resubmitted to BANA by the merchant (company to whom the Settlement Class Member made his/or ACH payment) after the merchant's first request for payment was declined. In other words, you are in the first Settlement Class if you paid more than one NSF or OD fee for the same attempted ACH payment based on a merchant's request for that payment more than once.

The second Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded one or more NSF or OD fees on an ACH payment from their consumer checking account to another BANA account, like a mortgage or credit card. These are referred to as Intrabank Transaction Fees.

The third Settlement Class consists of all holders of a BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded an NSF and/or OD fee on a consumer checking and/or savings account transaction that would not have been assessed if BANA had delayed the posting of previously assessed NSF/OD fees. These are referred to as Fee Accrual Claim Fees.

BANA denies all wrongdoing and liability and denies that Plaintiffs' claims entitle them or the Settlement Class Members to any relief and deny that anyone was harmed by the conduct that the Plaintiffs allege.

| 2. Why did I receive Notice of this lawsuit? |
|---|

You received the Class Notice because BANA's records indicate that you are in one or more of Settlement Classes that were alleged to have been charged one or more of the fees at issue. The Court directed that the Class Notice be sent to all Settlement Class Members because each Settlement Class Member has a right to know about the proposed settlement and the options available to him or her before the Court decides whether to approve the settlement.

| **3.** | **Why did the parties settle?** |

In any lawsuit, there are risks and potential benefits that come with a trial versus settling at an earlier stage. It is the Class Representative's lawyers' job to identify when a proposed settlement offer is good enough that it justifies recommending settling the case instead of continuing to trial. In a class action, these lawyers, known as Class Counsel, make this recommendation to the Class Representatives. The Class Representatives have the duty to act in the best interests of the class as a whole and, in this case, it is their belief, as well as Class Counsel's opinion, that this settlement is in the best interest of all Settlement Class Members for at least the following reasons:

There is legal uncertainty about whether a judge or a jury will find that BANA breached its agreements with customers or otherwise acted improperly by assessing the OD and NSF fees that are the subject of this case. There is also uncertainty about whether the Class Representatives' claims are subject to other defenses that might result in no or less recovery to Settlement Class Members. Even if the Class Representative were to win at trial, there is no assurance that the Settlement Class Members would be awarded more than the current settlement amount, and it may take years of litigation before any payments would be made. By settling, the Settlement Class Members will avoid these, and other risks, and the delays associated with continued litigation.

While BANA disputes Plaintiffs' claims, it has agreed to settle to avoid the costs, distractions and risks of litigation. Thus, even though BANA denies that it did anything improper, it believes the Settlement is in its best interest and in the best interests of all of its customers.

<u>**WHO IS IN THE SETTLEMENT**</u>

| **4.** | **How do I know if I am part of the Settlement?** |

If you received the Class Notice, then BANA's records indicate that you a Settlement Class Member who is entitled to receive a payment.

<u>**YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT**</u>

| **5.** | **What options do I have with respect to the Settlement?** |

You have three options: (1) do nothing and you will receive a payment according to the terms of this Settlement but you give up your rights to sue BANA separately about the same legal claims in this lawsuit; (2) exclude yourself from the Settlement ("opt out" of it) and you will not receive any settlement payment; or (3) participate in the Settlement but object to it. Each of these options is described in a separate section below.

| **6.** | **What are the critical deadlines?** |

If you do nothing, you will receive a Settlement Payment.

The deadline for sending a letter to exclude yourself from or opt out of the settlement is <mark>Month DD, YYYY</mark>.

The deadline to file an objection with the Court is <mark>Month DD, YYYY</mark>.

| 7. | How do I decide which option to choose? |
|---|---|

If you do not like the Settlement and you believe that you could receive more money by pursuing your claims on your own (with or without an attorney that you could hire) and you are comfortable with the risk that you might lose your case or get less than you would in this Settlement, then you may want to consider opting out.

If you believe the Settlement is unreasonable, unfair, or inadequate and the Court should reject the Settlement, you can object to the Settlement terms. The Court will decide if your objection is valid. If the Court agrees with you, then the Settlement will not be approved, and no payments will be made to you or any other Settlement Class Member. If your objection (and any other objection) is overruled, and the Settlement is approved, then you will still get a payment.

| 8. | What must happen for the Settlement to be approved? |
|---|---|

The Court must decide that the Settlement is fair, reasonable, and adequate before it will approve it. The Court already has decided to provide preliminary approval of the Settlement, which is why you received the Class Notice. The Court will make a final decision regarding the Settlement at a "Final Fairness Hearing," which is currently scheduled for Month DD, YYYY.

## THE SETTLEMENT PAYMENT

| 9. | How much is the Settlement? |
|---|---|

BANA has agreed to create a Settlement Fund of $75,000,000.00 (the "Settlement Amount"). As discussed separately below, attorneys' fees, expenses, service awards to the Class Representatives, and costs to administer the Settlement will be paid out of this amount. Subject to Court approval, the balance of the Settlement Fund will be divided among all Settlement Class Members on a *pro rata* basis. Additionally, because of this lawsuit, BANA has agreed, for a period of at least five years, to change certain of its practice and stop assessing fees on Retry Transactions. In addition, BANA will implement changes to its consumer account disclosures.

| 10. | How much of the Settlement Fund will be used to pay for attorney fees and costs? |
|---|---|

Class Counsel will request that the Court award up to one-third (33–1/3%) of the Settlement Amount as attorneys' fees plus reimbursement of litigation costs incurred in prosecuting the case. The Court will decide the amount of the attorneys' fees based on a number of factors, including the risk associated with bringing the case, the amount of time spent on the case, the amount of costs incurred to prosecute the case, the quality of the work, and the outcome of the case.

| 11. | How much of the Settlement Fund will be used to pay the Class Representatives a Service Award? |
|---|---|

Class Counsel, on behalf of the Class Representatives, will request Service Awards of between $1,000 and $10,000 to be paid to each of the Class Representatives.

| 12. | How much will my payment be? |
|---|---|

Subject to Court approval, the balance of the Settlement Amount after attorneys' fees and costs, the Service Awards, and the Settlement Administrator's fees, also known as the Net Settlement

Fund, will be divided among all Settlement Class Members entitled to Settlement Payments in accordance with the formulas outlined in the Settlement Agreement found at www.NSFODSettlement.com. Current customers of BANA will receive a credit to their BANA accounts for the amount they are entitled to receive. Former customers of BANA shall receive a check from the Settlement Administrator.

| **13.** | **Do I have to do anything if I want to participate in the Settlement?** |
|---|---|

No. Any amount you are entitled to under the terms of the Settlement will be distributed to you unless you choose to exclude yourself from the Settlement, or "opt out." Excluding yourself from the Settlement means you choose not to participate in the Settlement. You will keep your individual claims against BANA, but you will not receive a payment. In that case, if you choose to seek recovery against BANA, then you will have to file a separate lawsuit or claim.

| **14.** | **When will I receive my payment?** |
|---|---|

The Court will hold a Final Fairness Hearing on Month DD, YYYY, to consider whether the Settlement should be approved. If there are no objections and the Court approves the Settlement, then payments should be made within approximately 30 days after the Settlement's Effective Date. The Effective Date is either the date on which the time to appeal the Final Approval Order passes and no appeals have been filed or the date on which the Final Approval Order is affirmed, all appeals are dismissed and no further appeal is permitted. However, if someone objects to the Settlement, and the objection is sustained, then there is no Settlement. Even if all objections are overruled and the Court approves the Settlement, an objector could appeal, and it might take months or even years to have the appeal resolved, which would delay any payment.

## EXCLUDING YOURSELF FROM THE SETTLEMENT

| **15.** | **How do I exclude myself from the Settlement?** |
|---|---|

If you do not want to receive a payment, or if you want to keep any right you may have to sue BANA for the claims alleged in this lawsuit, then you must exclude yourself, or "opt out."

To opt out, you **must** send a letter to the Settlement Administrator that you want to be excluded. Your letter can simply say "'I hereby elect to be excluded from the Settlement in the *Lisa Morris, et al v Bank of America, N.A.* class action." Be sure to include your name, your address, and your signature. Your exclusion or opt out request must be **postmarked by Month DD, YYYY**, and send to the following address:

Morris v. Bank of America, N.A. Settlement
Exclusions
P.O. Box 5645
Portland, OR 97228-5645

| **16.** | **What happens if I opt out of the Settlement?** |
|---|---|

If you opt out of the Settlement, you will preserve and not give up any of your rights to sue BANA for the claims alleged in this case. However, you will not be entitled to receive a payment from

this Settlement. Opting out may preclude later participation in any later class action against the Released Parties.

| 17. | If I exclude myself, can I obtain a payment? |
|---|---|

No. If you exclude yourself, you will not be entitled to a payment.

## OBJECTING TO THE SETTLEMENT

| 18. | How do I notify the Court that I do not like the Settlement? |
|---|---|

You can object to the Settlement or any part of it that you do not like **IF** you do not exclude yourself, or opt out, from the Settlement. (Settlement Class Members who exclude themselves from the Settlement have no right to object to how other Settlement Class Members are treated.) To object, you may do so by filing with the Court a notice of your intention to object. Your objection must include the following:

- A statement of your intention to object to the Settlement in the *Lisa Morris, et al v Bank of America, N.A.* class action;

- Your name, address, telephone number, and the contact information for any attorney you have retained in connection with this case;

- A statement of the factual and legal basis for each objection and any exhibits you wish the Court to consider in connection with the objection;

- A statement as to whether you intend to appear at the Final Approval Hearing, either in person or through an attorney, and, if through an attorney, identifying the attorney by name, address, and telephone number; and

- Your signature.

Be advised that if you object to the Settlement and retain an attorney for purposes of objecting, you are solely responsible for paying that attorney's fees and costs.

If you fail to comply with the provisions herein, you will waive and forfeit any and all rights to appear and/or object separately, and will be bound by the terms of the Settlement Agreement and the orders and judgments of the Court.

To be timely, written notice of an objection must be filed or received by Month DD, YYYY, to the following addresses:

| CLERK OF COURT | CLASS COUNSEL | DEFENDANT'S COUNSEL |
|---|---|---|
| United States Courthouse<br>401 West Trade Street<br>Room 1301<br>Charlotte, NC 28202 | Larry McDevitt<br>David M. Wilkerson<br>The Van Winkle Law Firm<br>11 North Market Street<br>Asheville, NC 28801 | Brian A. Kahn<br>Jasmine K. Gardner<br>MCGUIREWOODS LLP<br>201 N. Tryon Street, Suite 3000<br>Charlotte, NC 28202 |

| **19.** | **What is the difference between objecting and requesting exclusion from the Settlement?** |
|---|---|

Objecting is telling the Court that you do not believe the Settlement is fair, reasonable, and adequate for the class, and asking the Court to reject it. You can object only if you do not opt out of the Settlement. If you object to the Settlement and do not opt out, then you are entitled to a payment if the Settlement is approved, but you will release claims you might have against BANA. Excluding yourself or opting out is telling the Court that you do not want to be part of the Settlement, and do not want to receive a payment or release claims you might have against BANA for the claims alleged in this lawsuit.

| **20.** | **What happens if I object to the Settlement?** |
|---|---|

If the Court sustains your objection, or the objection of any other Settlement Class Member, then there is no Settlement. If you object, but the Court overrules your objection and any other objection(s), then you will be part of the Settlement.

## THE COURT'S FAIRNESS HEARING

| **21.** | **When and where will the Court decide whether to approve the Settlement?** |
|---|---|

The Court will hold a Final Fairness Hearing ==Month DD, YYYY==. At this hearing, the Court will consider whether the Settlement is fair, reasonable, and adequate. If there are objections, the Court will consider them. The Court may also decide how much to award Class Counsel for attorneys' fees and expenses and how much the Class Representative should get as a "Service Award" for acting as the class representatives.

| **22.** | **Do I have to come to the hearing?** |
|---|---|

No. Class Counsel will answer any questions the Court may have. You or your lawyer may appear at the hearing at your own expense if you desire to do so, but you do not have to. If you have submitted an objection, then you may want to attend.

| **23.** | **May I speak at the hearing?** |
|---|---|

If you have objected, you may ask the Court for permission to speak at the Final Approval Hearing. To do so, you must include with your objection, described in Question 18 above, the statement, "I hereby give notice that I intend to appear at the Final Fairness Hearing." You must include the following:

- State how much time the Settlement Class Member anticipates needing to present the objection.

- Identify, by name, address, and telephone number all witnesses the Settlement Class Member proposes to have testify.

- Summarize in detail the anticipated testimony of all such witnesses.

- Identify all exhibits the Settlement Class Member intends to offer in support of the objection.

- Attach complete copies of all such exhibits.

## IF YOU DO NOTHING

| 24. | What happens if I do nothing at all? |
|---|---|

If you do nothing at all, and if the Settlement is approved, then you may receive a payment that represents your share of the Settlement Fund net of attorneys' fees, Settlement Administrator expenses, and the Class Representative Service Award. You will be considered a part of the class, and you will give up claims against BANA for the conduct identified in the Settlement. You will not give up any other claims you might have against BANA that are not released in this Settlement.

## THE LAWYERS REPRESENTING YOU

| 25. | Do I have a lawyer in this case? |
|---|---|

The Court ordered that the lawyers and their law firms referred to in this Notice as "Class Counsel" will represent you and the other Settlement Class Members. You may hire your own attorney, at your own expense if you desire to do so, but you do not have to.

| 26. | Do I have to pay the lawyer for accomplishing this result? |
|---|---|

No. Class Counsel will be paid directly from the Settlement Fund.

| 27. | Who determines what the attorneys' fees will be? |
|---|---|

The Court will be asked to approve the amount of attorneys' fees at the Fairness Hearing. Class Counsel will file an application for fees and costs and will specify the amount being sought as discussed above. You may review a physical copy of the fee application at the website established by the Settlement Administrator, www.NSFODSettlement.com.

## GETTING MORE INFORMATION

This Class Notice only summarizes the proposed Settlement. For additional information about the Settlement and/or to obtain copies of the Settlement Agreement, the pleadings in this case or to change your address for purposes of receiving a payment, you should contact the Settlement Administrator as follows:

Morris v. Bank of America Settlement
P.O. Box 5645
Portland, OR 97228-5645
(855)-654-0890
www.NSFODSettlement.com


***PLEASE DO NOT CONTACT THE COURT OR ANY REPRESENTATIVE OF BANA CONCERNING THIS NOTICE OR THE SETTLEMENT.***

# EXHIBIT D

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH
CAROLINA CHARLOTTE DIVISION**

LISA MORRIS, MICHAEL BUI, TUMIKA
WILLIAMS, ALBERT EDGE and KRISTEN
VALPERGA on behalf of themselves and all
others similarly situated,

      Plaintiffs,

      vs.

BANK OF AMERICA, N.A.,

      Defendant.

CASE NO. 3:18-CV-157-RJC-DSC

**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF SETTLEMENT,
CONDITIONALLY CERTIFYING THE SETTLEMENT CLASS, APPROVING FORM
OF NOTICE, DIRECTING DISSEMINATION OF NOTICE, AND
SCHEDULING FINAL FAIRNESS HEARING**

Upon consideration of the Plaintiffs' Motion for Preliminary Approval of the Settlement

and Certification of the Settlement Class (the "Motion") and pursuant to Federal Rule of Civil

Procedure 23,

IT IS HEREBY ORDERED THAT:

1.    The Settlement Agreement ("Settlement")[1] is preliminarily approved as fair,

reasonable, and adequate. The Settlement appears to be the product of arm's-length negotiations

between Class Counsel and counsel for Bank of America, N.A. ("BANA"). The Settlement was

reached after two rounds of mediation facilitated by Judge Layn Phillips, and was preceded by

---

[1] The definitions and capitalized terms in the Settlement Agreement and Memorandum in
Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement and for
Certification of Settlement Class are hereby incorporated as though fully set forth in this Order
and shall have the same meanings attributed to them in those documents.

1

three years of active litigation by both sides, including a heavily contested motion to dismiss. The parties also engaged in extensive discovery, the production of tens of thousands of pages of documents and the depositions of witnesses by both sides, and third-party discovery via numerous subpoenas.

2.      The Court conditionally certifies, for settlement purposes only, the following Settlement Classes:

> **Retry Transaction Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded a Retry Transaction Fee;

> **Intrabank Transaction Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded one or more Intrabank Transaction Fees; and

> **Fee Accrual Class**: All holders of BANA consumer checking and/or savings accounts who, during the Class Period, paid and were not refunded an OD and/or an NSF Fee on a consumer checking and/or savings account transaction that would not have been assessed if BANA had delayed the posting of previously assessed NSF/OD fees until the posting of a deposit that was sufficient to cover those fees, all outstanding debit transactions and any additional debit transactions made that day.

The class period is July 1, 2014 through the date of this Order.

3.      The Court finds, with respect to the Settlement, that the requirements of Rule 23 have been satisfied. In particular, the Court finds that under the Settlement: (a) members of the settlement classes are so numerous that joinder would be impracticable; (b) there are questions of law and fact common to the classes; (c) the claims of the Plaintiffs are typical of the claims of the Settlement Class they seek to represent; (d) Plaintiffs have fairly and adequately represented the interests of the Settlement Classes and will continue to do so under the guidance of experienced counsel; (e) common questions of law and fact predominate over questions affecting individual Settlement Class members; and (f) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. Because this action is being settled rather than

2

litigated, the Court concludes that the manageability issues that might arise in a trial of a nationwide class action are not presented here. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

4.      For the purposes of the Settlement and pursuant to Rule 23(a)(1), the Court finds that Plaintiffs Lisa Morris, Michael Bui, Tumika Williams, Albert Edge, and Kristen Valperga will fairly and adequately represent the interests of their respective Settlement Classes. The Class Representatives for each Settlement Class are as follows:

> **Retry Payment Class**: Morris, Bui, Edge, and Valperga
> **Intrabank Transaction Class**: Morris
> **Fee Accrual Class:** Williams

The Court appoints these Plaintiffs as Class Representatives for their respective Settlement Classes for the purpose of settlement.

5.      For the purposes of the Settlement and pursuant to Rule 23(a)(1), the Court appoints David M. Wilkerson of The Van Winkle Law Firm, Jeffrey D. Kaliel of Kaliel Gold PLLC, and James J. Pizzirusso of Hausfeld LLP as co-lead counsel, and  Larry McDevitt of The Van Winkle Law Firm as liaison counsel.

6.      The Court designates Epiq as Settlement Administrator to oversee the Settlement notice procedures. The Settlement Administrator shall abide by the terms and conditions of the Settlement that pertain to the Settlement Administrator.

7.      Pursuant to Rule 23(e), the Court preliminarily approves the Settlement as (a) fair, reasonable, and adequate in light of the relevant factual, legal, practical, and procedural considerations; (b) free of collusion; and (c) within the range of possible final judicial approval, subject to further consideration at the Final Approval Hearing.

8.      The Court approves, as to form and content, the Settlement Class Notice attached hereto as Exhibit __ for the purpose of notifying the Settlement Classes as to the proposed Settlement, the Final Approval Hearing, and the rights of potential class members. The Court finds that the Settlement Class Notice is reasonable; constitute due, adequate, and sufficient notice to all persons entitled to receive notice; and that it meets the requirements of due process and Rule 23. Specifically, the Court finds that the Settlement Class Notice complies with Rule 23(e) as it is a reasonable manner of providing notice to Settlement Class members who would be bound by the Settlement. The Court also finds that the manner of dissemination of notice complies with Rule 23(c)(2), as it is the most practicable notice under the circumstances, provides individual notice to all Settlement Class members who can be identified through a reasonable effort, and is reasonably calculated under the circumstances to apprise Settlement Class members of the pendency of this Action, the terms of the Settlement, and their right to object to the Settlement or exclude themselves from the Settlement Classes.

9.      As soon as possible after the entry of this order, but no later than 60  days after entry of this order, the Settlement Administrator will complete notice to the Settlement Classes as provided in the Settlement.

10.      The Settlement Class Notices shall be updated by Plaintiffs and/or the Settlement Administrator to identify the Opt-Out and Objection Deadlines of 105 days after the entry of this Order, as well as the date and time of the Final Approval Hearing as set forth below.

11.      Any person falling within the definition of any of the Settlement Classes may, upon request, be excluded from the Settlement by submitting to the Settlement Administrator at the physical address listed in the Notices, a written, signed, and dated statement that he or she is opting-out of the Settlement and understands that he or she will receive no money from the Settlement of

this Action. To be effective, this opt-out statement (i) must be postmarked no later than the Opt-Out Deadline; (ii) include the Settlement Class member's name address, telephone number, and BANA account number(s); and (iii) be personally signed and dated by the Settlement Class member. All persons who timely submit properly completed requests for exclusion shall have no rights under the Settlement and shall not share in the benefits of the Settlement and shall not be bound by the Settlement. Any members of the Settlement Classes who fail to submit a valid and timely opt-out request shall be bound by all terms of the Settlement and the Final Approval Order, regardless of whether they have requested to be opted-out from the Settlement.

12.     Any person falling within the definitions of the Settlement Classes, and who does not opt-out from the Settlement, may object to the terms of the proposed Settlement as reflected in the Settlement, the certification of the Settlement Class, the entry of the Final Approval Order, the amount of attorneys' fees and expenses requested by Class Counsel, and/or the amount of the Service Awards requested by the Plaintiffs. To be valid and considered by the Court, an objection must (i) be postmarked no later than the Objection Deadline; (ii) be sent to the Clerk of Court and the Settlement Administrator, by first class mail and postmarked no later than the Objection Deadline; (iii) include the case name and case number and the objector's name, address, telephone number, and signature; (iv) contain an explanation of the nature of the objection and citation to any relevant legal authority; (v) indicate the number of times the objector has objected to a class action settlement in the past 5 years and the caption for any such case(s) and a copy of any orders related to or ruling upon the objector's prior objections issued by the trial and appellate courts in each case; (vi) identify any counsel representing the objector; (vii) identify the number of times in which the objector's counsel and/or counsel's law firm have objected to a class action settlement within the five (5) years preceding the date of the filed objection (including the caption of each

case and a copy of any orders related to or ruling upon counsel's or counsel's law firm's prior objections within the preceding five (5) years)); (viii) indicate whether the objector (whether pro se or through representation) intends to testify at the Final Approval Hearing.

13.     Plaintiffs and BANA may file responses to any objections that are submitted. Any Settlement Class Member who timely files and serves an objection in accordance with this order may appear at the Final Approval Hearing, either in person or through an attorney. Failure to adhere to the requirements of this section will bar a Settlement Class Member from being heard at the Final Approval Hearing, either individually or through an attorney, unless the Court otherwise orders.

14.     Any Settlement Class Member who does not make his or her objections in the manner and by the date set forth above of this Order shall be deemed to have waived any objections, and shall be forever barred from raising such objections in this or any other action or proceeding, absent further order of the Court.

15.     All pretrial proceedings in this action are stayed and suspended until further order of this Court, except such actions as may be necessary to implement the Agreement and this Preliminary Approval Order.

16.     Upon the entry of this Order, the Class Representatives and Settlement Class members shall be provisionally enjoined and barred from asserting any claims against BANA arising out of, relating to, or in connection with the Released Claims prior to the Court's decision as to whether to grant Final Approval of the Settlement.

17.     This Settlement, and any and all negotiations, statements, documents, and/or proceedings in connection with the Settlement, shall not be construed or deemed to be evidence of an admission or concession by BANA of any liability or wrongdoing by BANA or any of its

6

affiliates, agents, representatives, vendors, or any other person or entity acting on its behalf with respect to the assessment of NSF or OD Fees or that the case was properly brought as a class action, and shall not be construed or deemed to be evidence of an admission or concession that any person suffered compensable harm or is entitled to any relief with respect to BANA's assessment of NSF or OD Fees. BABA may file the Settlement in any action or proceeding that may be brought against it in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

18.    The Settlement will not become effective unless the Court enters a Final Approval Order. If the Settlement does not receive Final Approval or the Effective Date does not come to pass, BANA shall have the right to terminate the Settlement and will have no further obligations under the Settlement unless BANA waives in writing its right to terminate the Settlement under this section. In addition, if the Settlement becomes null and void, BANA shall not be prejudiced in any way from opposing class certification in the Actions, and Plaintiffs and the Settlement Class members shall not use anything in the Settlement, in any terms sheet, or in the Preliminary Approval Order or Final Approval Order to support a motion for class certification or as evidence of any wrongdoing by BANA. No Party shall be deemed to have waived any claims, objections, rights or defenses, or legal arguments or positions, including but not limited to, claims or objections to class certification, or claims or defenses on the merits. Each Party reserves the right to prosecute or defend the Actions in the event that this Settlement does not become final and binding.

19.    The dates of performance contained herein may be extended by order of the Court, for good cause shown, without further notice to the Settlement Classes.

20.     Plaintiffs' Motion for Final Approval of the Settlement must include the required and customary filings. In addition, the motion papers shall include:

a.     A declaration evidencing BANA's compliance with the Class Action Fairness Act notice requirement under 28 U.S.C. § 1715, including responses from any government officials to the notice.

b.     A declaration from the Settlement Administrator regarding compliance with its duties under the Settlement and this Order; a copy of the actual Notices (Email, Postcard, and Long Form) sent to the class; and a report on (1) the number of Settlement Class members to whom Email Notice was sent, (2) the number of returned undelivered email notices, (3) the number of Settlement Class members to whom Postcard Notices were initially sent, (4) an explanation of efforts to locate correct addresses for returned undelivered Postcard Notices after the first mailing, (5) the number of notices sent to the updated addresses in a second mailing, and (6) the number of such notices returned undelivered.

21.     For the benefit of the Settlement Class and to protect this Court's jurisdiction, this Court retains continuing jurisdiction over the Settlement proceedings to ensure the effectuation thereof in accordance with the Settlement preliminarily approved herein and the related orders of this Court.

22.     Class Counsel and BANA Counsel are hereby authorized to use all reasonable procedures in connection with approval and administration of the Settlement that are not materially inconsistent with this Order or the Settlement, including making, without further approval of the Court, minor changes to the form or content of the Settlement Class Notices, and other exhibits that they jointly agree are reasonable or necessary.

8

23.     The Final Approval Hearing will be conducted at the U.S. District Court for the Western District of North Carolina, located at 401 West Trade Street, Charlotte , NC 28202 on _____, 2021, at _____ am to determine: (a) whether the Settlement should be approved as fair, reasonable, and adequate to the Settlement Classes; (b) whether the Final Approval Order should be entered in materially the same form as the Parties propose; (c) whether to approve any motion for attorneys' fees and costs and expenses and/or any application for Class Representative Service Awards; and (d) any other matters that may properly be brought before the Court in connection with the Settlement. The Final Approval Hearing is subject to continuation or adjournment by the Court without further notice to the Settlement Classes. The Court may approve the Settlement with such modifications as the Parties may agree to, if appropriate, without further notice to the Settlement Classes.

24.     The Parties must file all papers in support of Final Approval of the Settlement and in response to objections to the Settlement on or before 105 days after the date of entry of this Order ("Final Approval Motion Deadline"). Any motion for attorneys' fees and costs and expenses and/or any application for Class Representative Service Awards shall be filed within 70 days of entry of this Order.

25.     The Court hereby sets the following schedule of events, all set from the date of this Order:

| Event | Calendar Days After Entry of This Order | Date |
|---|---|---|
| Notice Complete | 60 days | |
| Motion for Class Representatives' Service Awards and Attorneys' Fee and Expense Awards | 75 days | |

9

| | | |
|---|---|---|
| Opt-Out Deadline | 105 days | |
| Objection Deadline | 105 days | |
| Motion for Final Approval | 135 days | |
| Final Approval Hearing | 165days (or when convenient for the Court) | |

Dated: _____     _____

                                                Hon. Robert J. Conrad, Jr.
                                                United States District Judge

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

LISA MORRIS, MICHAEL BUI, TUMIKA
WILLIAMS, ALBERT EDGE and KRISTEN
VALPERGA on behalf of themselves and all
others similarly situated,

     Plaintiffs,

     vs.

BANK OF AMERICA, N.A.,

     Defendant.

CASE NO. 3:18-CV-157-RJC-DSC

**FOURTH AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

## FOURTH AMENDED CLASS ACTION COMPLAINT

Plaintiffs Lisa Morris, Michael Bui, Tumika Williams, Albert Edge and Kristen Valperga ("Plaintiffs"), on behalf of themselves and all persons similarly situated, alleges the following based on personal knowledge as to allegations regarding the Plaintiffs and on information and belief as to other allegations.

## INTRODUCTION

1. While Defendant may generally assess contracted for bank fees in any number, amount, or method it desires, it may not assess such fees in violation of its binding contracts with its accountholders. Unfortunately, Bank of America's contract documents and disclosures did not keep up with its efforts to devise new and obscure methods to increase the number and amount of fees it could assess on its accountholders in order to greatly increase profits.

2. Plaintiffs bring this action on behalf of themselves and a class of all similarly situated consumers against Defendant Bank of America, N.A. ("BofA" or "Bank"), arising from a

systematic, multi-pronged effort by the Bank to extract unearned fees from the checking and savings accounts of unwitting consumers via several related and illegal practices that breach the Bank's contracts; that are deceptive and misleading; and that are designed to unfairly and illegally increase the Bank's fee revenue, including, but not limited to:

> a) the undisclosed and improper assessment of multiple Non-Sufficient Funds Fees ("NSF Fees") on the *same* electronic transaction and/or multiple Overdraft Fees ("OD Fees") and NSF Fees on the *same* electronic transaction ("Multiple Single Transaction Fees");

> b) the undisclosed and improper assessment of OD Fees and/or NSF Fees on transfers to other BofA accounts, a practice that assesses $35 fees for supposedly "overdrawing" or attempting to overdraw one BofA account in order to put an accountholder's funds into another BofA account ("Intra BofA Transfer Transaction Fees");

> c) the undisclosed and improper *premature* deduction of OD Fees and/or NSF Fees from consumers' checking accounts, which in turn directly causes even more OD Fees and NSF Fees ("Premature Fees"); and

3. Together, these fee practices work in concert to increase Defendant's revenues while catching accountholders in a cycle of deceptive and improper fees and charges.

4. Bank of America charges accountholders the following fees relevant to these allegations: (1) a $35 NSF fee when there are insufficient funds to pay a transaction and it *rejects* the charge; and (2) a $35 OD Fee when there are insufficient funds to pay a requested transaction and it *accepts* the charge. Collectively, these fees are referred to herein as "BofA Account Fees."

5. Through the imposition of these and other BofA Account Fees, BofA makes several billion dollars a year. These punitive fees are, by definition, most impactful on consumers who

already have minimal funds in their accounts. As described herein, the illegal fee practices at issue in this litigation, and that make up a significant part of BofA's multi-billion-dollar fee revenue stream, are charged improperly and in violation of BofA's contracts, other state law, and consumer protection law.

6. As discussed more fully below, it is a breach of both the Bank's contracts and reasonable consumer expectations for the Bank to charge more than one $35 NSF Fee on the *same transaction*, since the contract explicitly states—and reasonable consumers understand—that the same transaction can only incur a *single* NSF Fee. Similarly, it is a breach of both the Bank's contract and of reasonable consumer expectations for the Bank to charge both a $35 NSF *and* a $35 OD Fee on the *same transaction*, since the contract explicitly states—and reasonable consumers understand—that the same transaction cannot incur both types of fees.

7. As discussed more fully below, it is an illogical and unconscionable breach of both the Bank's contracts and reasonable consumer expectations for the Bank to charge OD Fees— which are a fee for the extension of credit—when that credit is extended for the bank to *pay itself* or transfer funds to another BofA account. In other words, BofA cannot charge a customer OD Fees on a loan *from itself, to itself*. Similarly, it is an illogical and unconscionable breach of the Bank's contract for it to charge *NSF Fees*—which are a charge putatively to compensate the bank for the "trouble" of sending back a transaction for which there are insufficient funds—for the privilege of rejecting a transaction to itself, when it knows that the effort will be futile before it even undertakes the transaction.

8. As discussed more fully below, it is an illogical and unconscionable breach of the Bank's contract and reasonable consumer expectation for BofA to prematurely deduct OD Fees and NSF Fees from already-empty accounts, when it knows the consumer does not have funds to

3

pay those OD and NSF Fees. This early deduction of OD and NSF Fees has harmful consequences, depleting an already-empty account even further, and ensuring that subsequent deposits are used *first* to pay the BofA Account Fees instead of consumers' purchases and debits. BofA's decision to pay itself first for OD and NSF Fees *before* consumer purchases means that any additional consumer purchases incur yet *more* OD and NSF Fees.

9. Plaintiffs, and other BofA customers, have been injured by BofA's improper practices. On behalf of themselves and the Class, Plaintiffs seek damages, restitution and injunctive relief for BofA's breach of contract, conversion, unjust enrichment, and violation of state consumer protection laws.

## JURISDICTION AND VENUE

10. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than BofA.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because BofA is subject to personal jurisdiction here and regularly conducts business and is headquartered in the North Carolina, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## PARTIES

12. Plaintiff Morris is a citizen and resident of Oklahoma. Plaintiff maintains checking

4

and savings accounts at Bank of America. At all times relevant, Plaintiff patronized a BofA banking center located in Tulsa, Oklahoma.

13. Plaintiff Bui is a citizen and resident of California. Plaintiff maintains a checking account at Bank of America. At all times relevant, Plaintiff patronized a BofA banking center located in Garden Grove, California.

14. Plaintiff Williams is a citizen and resident of Georgia. Plaintiff maintains checking and savings accounts at Bank of America. At all times relevant, Plaintiff patronized a BofA banking center located in Georgia.

15. Plaintiff Edge is a citizen and resident of North Carolina. Plaintiff maintains a checking account at Bank of America. At all times relevant, Plaintiff patronized a BofA banking center located in North Carolina.

16. Plaintiff Valperga is a citizen and resident of California. Plaintiff maintains a checking account at Bank of America. At all times relevant, Plaintiff patronized a BofA banking center located in California.

17. Defendant BofA is a national bank with its headquarters and principal place of business located in Charlotte, NC. Among other things, BofA is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative classes.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

18. When a BofA checking account consumer attempts a transaction but has insufficient funds in the account to cover that transaction, BofA either approves the transaction into overdraft (and charges a $35 OD Fee) or rejects the transaction (and charges a $35 NSF Fee).

19. These fees and how and when they are to be charged are discussed in BofA's

contracts with customers.

20. The practices described herein violate various contract terms, and are part of a multifaceted strategy to increase fee revenue improperly, illegally, and deceptively at the expense of accountholders. These practices feed off each other: once BofA ensnares an accountholder with one improper fee, it becomes that much more likely that the same accountholder will fall victim to other of the improper fee practices, as his or her financial position erodes due to the first and subsequent levy of improper fees.

**I.** **MULTIPLE SINGLE TRANSACTION FEES - BOFA ASSESSES MULTIPLE NSF FEES ON THE SAME TRANSACTION IN BREACH OF ITS AGREEMENTS**

    **A.**     **Plaintiffs' Experiences**

21. On June 19, 2017, Ms. Morris attempted to make on online bill payment of $60 towards her Citibank credit card bill through her BofA checking account. Because Ms. Morris had insufficient funds in her checking account, BofA rejected that payment request and charged Ms. Morris, a $35 NSF Fee for doing so. Unbeknownst to Plaintiff, that very same transaction was processed again by BofA three days later, on June 22, 2017. Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so. Then, yet again on June 27, 2017, the very same transaction was processed by BofA another time. This time, BofA paid the transaction and charged Plaintiff a $35 OD Fee for doing so. In sum, *BofA charged Plaintiff $105 in NSF ($70) and OD ($35) fees to process a single $60 credit card payment.*

22. On a separate occasion, on September 7, 2017, Ms. Morris initiated a $27 bill payment to her Comenity credit card account from her BofA checking account. BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so. Unbeknownst to Plaintiff, that very same transaction was processed again by BofA the next day, on September 8, 2017. Again, BofA rejected that payment attempt and again charged Ms. Morris a $35 NSF Fee

for doing so.  In sum, *BofA charged Plaintiff $70 in fees to attempt to process a single $27 credit card payment.*

23.    On a separate occasion, on November 15, 2017, Plaintiff initiated a $20 bill payment to her Citibank credit card account.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so.  Unbeknownst to Plaintiff, that very same transaction was processed by BofA again five days later, on November 20, 2017.  Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so.  Then, yet again on November 24, 2017, the very same transaction was processed again. BofA again rejected the transaction and again charged Plaintiff a $35 NSF Fee for doing so.  In sum, *BofA charged Plaintiff $115 in NSF fees to attempt to process a single $20 credit card payment.*

24.    Plaintiff understood her bill payments to be single transactions as is laid out in BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee.  BofA itself also understood the transactions to be single transactions, and its systems categorized them as such. Indeed, on Ms. Morris' bank statements, BofA described subsequent attempts to debit each transaction as a "***RETRY*** PAYMENT" (emphasis added).

25.    Ms. Morris took no affirmative action to reinitiate or resubmit any of the  transactions, which were resubmitted for payment automatically and solely by BofA.

26.    Similarly, on November 30, 2017, Plaintiff Bui initiated a $150 bill payment to his insurance company.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee  for doing so.  Unbeknownst to Plaintiff, that very same transaction was processed by BofA again   a few days later, on December 6, 2017.  Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so.  In sum, *BofA charged Plaintiff $70 in NSF fees to attempt to process a single $150 bill payment transaction that it never actually paid.*

27.    Plaintiff understood his bill payments to be single transactions as is laid out in BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee.  BofA itself also understood the transactions to be single transactions, and its systems categorized them as such.  Indeed, on Mr. Bui's bank statements, BofA described subsequent attempts to debit each transaction as a "***RETRY*** PAYMENT" (emphasis added).

28.    Mr. Bui took no affirmative action to reinitiate or resubmit any of the transactions, which were resubmitted for payment automatically and solely by BofA.

29.    Similarly, on February 21, 2018, Plaintiff Edge initiated a bill payment to his insurance company of $409.79.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so.  Unbeknownst to Plaintiff, that very same transaction was processed by BofA again a few days later, on February 28, 2018.  Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so.  Then, yet again on March 6, 2018, the very same transaction was processed again. This time, BofA paid the transaction and charged Plaintiff a $35 OD Fee for doing so.  In sum, *BofA charged Plaintiff $105 in NSF ($70) and OD ($35) fees to process a single insurance payment.*

30.    Plaintiff understood his bill payments to be single transactions as is laid out in  BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee.  BofA itself also  understood the transactions to be single transactions, and its systems categorized them as such.   Indeed, on Mr. Edge's bank statements, BofA described subsequent attempts to debit each  transaction as a "***RETRY*** PAYMENT" (emphasis added).

31.    Mr. Edge took no affirmative action to reinitiate or resubmit any of the transactions, which were resubmitted for payment automatically and solely by BofA.

32.    Similarly, on August 23, 2016, Plaintiff Valperga initiated an online bill payment to AT&T of $136.55.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for

doing so. Unbeknownst to Plaintiff, that very same transaction was processed by BofA again a few days later, on August 26, 2016. Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so. Then, yet again on August 31, 2016, the very same transaction was processed again. Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so. In sum, *BofA charged Plaintiff $105 in NSF fees to attempt to process a single $136.55 bill payment transaction that it never actually paid.*

33.    Plaintiff understood her bill payment to be single transaction as is laid out in BofA's contract, capable at most of receiving a *single* NSF *or* OD Fee. BofA itself also understood the transactions to be single transactions, and its systems categorized them as such. Indeed, on Ms. Valperga's bank statements, BofA described subsequent attempts to debit each transaction as a "***RETRY*** PAYMENT" (emphasis added).

34.    Ms. Valperga took no affirmative action to reinitiate or resubmit any of the transactions, which were resubmitted for payment automatically and solely by BofA.

### B.    BofA's Processing Practice

35.    BofA maintains two separate and simultaneous transaction systems, as well as a third separate system that is used to assess OD fees.

36.    An "intraday" transaction processing system at BofA maintains an account's available balance in real time, increasing and decreasing during the day based on an accountholder's activity.

37.    A second transaction processing system is the "nightly batch processing" system. It is in this system that transaction posting actually occurs at BofA.

38.    This two-system processing means that BofA has the capability—which it uses routinely—to withhold processing transactions it knows will be futile, especially transactions to itself (in the form of payments to itself or transfers to other BofA accounts).

9

39.     For example, BofA offers a checking account feature called "Keep the Change," in which debit card purchase amounts are "rounded up" to the nearest dollar amount, and the "round-ups from your debit card purchases are accumulated and transferred daily from your checking account to your [BofA] savings account." When the checking account balance is too low to support the round-up transfer, BofA simply cancels the automatic transfer, rather than attempting a transfer that would be futile or forcing through a transfer that would cause an overdraft.

40.     In short, when BofA knows the processing of a given electronic transaction will be futile—that is, will serve no other purpose than to create bank fees—BofA has the technological capability not to make the transfer.

41.     In short, BofA can easily code transactions it considers "overdrawn" to not incur OD/NSF Fees.

42.     Upon information and belief, BofA's systems are programmed to recognize a single transaction featuring the same dollar amount and merchant when that single transaction is submitted for payment multiple times and to charge additional NSF Fees on that single transaction when BofA resubmits it for payment.

43.     At least one of BofA's competitors, JP Morgan Chase, N.A.—the country's largest consumer bank—does not undertake these types of practices. Instead, it charges only one NSF fee even if it makes multiple attempts to obtain payment on the charge.

44.     Based on the promises and disclosures made in BofA's account disclosures, BofA accountholders can have no reasonable expectation that BofA will undertake such practices that are eschewed by other major banks and against industry standards or otherwise reasonably disclosed.

C.      **BofA's Relevant Account Disclosures**

45.     Bill pay transactions and transfers between BofA accounts are governed by the

Bank's "Online Banking and Transfers Outside Bank of America Service Agreement and Electronic Disclosure" ("Online Banking Agreement") and its Deposit Agreement. All three documents promise that only one NSF Fee or OD Fee will be charged *per transaction transfer or payment*, and indicate BofA will not intentionally create NSF or OD Fees on transfers to other BofA accounts.

46.     According to the Online Banking Agreement:

**Transfer/Payment Authorization and Sufficient Available Funds**

- You authorize Bank of America to withdraw, debit or charge the necessary funds from your designated account in order to complete all of your designated transfers and payments.
- You agree that you will instruct us to make a withdrawal only when a sufficient balance is or will be available in your accounts at the time of the withdrawal.
- The completion of a transfer or payment is subject to the availability of sufficient funds (including any overdraft protection plans) at the time the transaction is posted. **If enough funds to complete the transfer or payment are not available, we may either (i) complete the transaction and overdraw the account or (ii) refuse to complete the transaction. In either case, we may charge [\*\*]a[\*\*] non-sufficient funds (NSF), returned item, overdraft, or similar fee.** Transfers or payments from SafeBalance Banking® accounts will not be completed if there are not sufficient funds on the date of the scheduled transfer or payment. Please refer to the applicable account agreement and fee schedule for details. If you schedule a payment from an account maintained at another financial institution and there are insufficient funds in that account, you may be charged a fee by that financial institution.
- **At our option, we may make [\*\*]a[\*\*] further attempt to issue the payment or process the transfer request.**
- Bank of America is under no obligation to inform you if it does not complete a payment or transfer because there are non-sufficient funds or credit in your account to process the transaction. In this case, you are responsible for making alternate arrangements or rescheduling the payment or transfer within Online Banking.

    […]

    **[\*\*]An[\*\*] NSF-fee, returned item, overdraft or similar fee may also apply if you schedule payments or transfers and your available balance is not sufficient to process the transaction on the date scheduled or, in the case of a personal check, on the date when the check is presented to us for payment.**

(emphases added).

47.     BofA's Deposit Agreement states:

"Item" means "all orders and instructions for the payment, transfer or withdrawal of funds from an account. As examples, item includes: a check, substitute check, purported substitute check, electronic transaction (including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image, or a photocopy of any of the foregoing.

[…]

When we determine that you do not have enough available funds in your account to cover a check or other item, then we consider the check or other item an insufficient funds item…without notice to you, **we either authorize or pay the insufficient funds item and overdraw your account (an overdraft item) or we decline or return the insufficient funds item without payment (a returned item).**

(emphases added).

48.    BofA's Debit Card Agreement states:

When you do not have enough available funds in your account…to cover everyday non-recurring debit card purchases or ATM withdrawals, we will decline the transaction and you will not be subject to overdraft fees. For check, ACH, recurring debit card transaction and online bill payments, we may decline or return the transaction unpaid or complete it and overdraw your account.

**D.    BofA May Not Charge More Than One NSF Fee on a Single Transaction that is Submitted for Payment Multiple Times, and It May Not Charge Both OD and NSF Fees on a Single Transaction**

49.    Consistent with BofA's express representations in its contracts, Plaintiffs and reasonable consumers understand that any given instruction by them for payment to be one, singular transaction and one "item" as that term is used in BofA's contract documents.

12

50.     BofA's contract documents bar BofA from assessing multiple NSF Fees on the same instruction for payment. As BofA expressly promises: "*An* NSF-fee, returned item, overdraft or similar fee may also apply if you schedule payments or transfers and your available balance is not sufficient to process the transaction on the date scheduled." This provision expressly states "an" (singular) NSF or OD Fee may be assessed, not multiple fees. And the Bank also states that *a* fee "may" be charged if there are insufficient funds "on the date scheduled," but *not* on later dates when re-processing is attempted by the Bank at its sole discretion.

51.     The Online Banking Agreement provides BofA the authority to charge only one NSF or OD Fee per item or instruction for payment. While that Agreement states that the bank "may" attempt again to process the transaction *a* single additional time, the Agreement does not state that such a single re-attempt will incur an additional NSF or OD Fee.

52.     The Online Banking Agreement states that a single NSF or OD Fee will be charged if "you schedule payments of transfers" for which there are insufficient funds. But, as alleged herein, Plaintiffs only scheduled their payments or transfers *once*, and took no action to request re-processing of their transactions. Because Plaintiffs only scheduled a given payment once, BofA was only entitled to charge one OD or NSF on each payment. In other words, when a transaction is returned for insufficient funds, it cannot be the basis for another NSF or OD Fee without an additional action from the accountholder to again seek payment for the item. Any other interpretation would permit BofA to process a transaction repeatedly throughout the day, thus conceivably racking up myriad NSF or OD fees at its sole discretion.

53.     Moreover, the Online Banking Agreement's terms are starkly binary: for a given transaction, the Bank may either pay *or* return it, but it cannot do both for the same transaction, and it cannot do the same thing more than once.

54.     The Deposit Agreement makes similar representations. It defines "item" to

encompass all submissions for payment of the same transaction. "Item" cannot mean each re-submission of the same transaction because it is defined to mean "**all orders and instructions** for the payment, transfer or withdrawal of funds" and there is no *new* order or instruction for payment of a re-submitted item. It is simply another attempt at the original order or instruction. Again, Plaintiff never took any action to re-submit or renew her original instructions for payments on her credit card accounts.

55.     The Deposit Agreement's terms also are also starkly binary: for a given transaction, the Bank may pay *or* return an item, but it cannot do both for the same transaction, and it cannot do the same thing more than once.  And because NSF or OD Fees are charged on "items," the Bank is not authorized to charge multiple fees on additional iterations of the same "item."

56.     The Debit Card Agreement makes a similarly binary promise: "For check, ACH, recurring debit card transaction and online bill payments, we may decline or return the transaction unpaid or complete it and overdraw your account."

57.     In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies, by employing the following practices:

a)  *First*, the Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer expectations.  BofA uses its contractual discretion to choose a meaning of that term which directly causes more NSF Fees or OD Fees—in Plaintiff Morris' case, for example, to assess *$111 in bank fees on a $20 credit card payment*; and

b)  *Second*, the Bank maintains it has huge amount of discretion not to charge or "deduct" NSF Fees on given transactions. Presumably, each separate time BofA exercises its

14

option to reprocess a check or other payment or transfer, it views each reprocessing as a separate "transaction" entitling it to another bite at the NSF/OD fee apple. By charging more than one NSF Fee on a given transaction, BofA engages in bad faith and contradicts reasonable consumer expectations.

58.     For the same reasons, the contract documents also bar BofA from assessing both NSF Fees and OD Fees on the same item or transaction.

59.     This practice is not universal in the banking industry. Major banks like Chase— the largest consumer bank in the country—do not engage in the practice of charging more than one NSF or OD Fee on the same item when it is processed for payment multiple times.

60.     Banks like BofA that employ this abusive practice know how to plainly and  clearly disclose it.  Indeed, other banks that do engage in this abusive practice disclose it  expressly to their accountholders—something Defendant here never did.

61.     For example, First Citizens Bank, a major institution in the Carolinas, engages in  the same abusive practice as BofA, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**.  All fees are charged during evening posting.  When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

(emphasis added).

62.     First Hawaiian Bank engages in the same abusive practices as Bank of America, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

> YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A RETURNED ITEM FOR PAYMENT AND THAT **MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION**.

(emphasis added).

63.     Klein Bank similarly states in its Online Banking Agreement:

15

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment
> (electronic or check) is submitted to us for payment from your Bill Payment
> Account when, at the time of posting, your Bill Payment Account is overdrawn,
> would be overdrawn if we paid the item (whether or not we in fact pay it) or does
> not have sufficient available funds; or (2) we return, reverse, or decline to pay an
> item for any other reason authorized by the terms and conditions governing your
> Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this
> section regardless of the number of times an item is submitted or resubmitted to us
> for payment, and regardless of whether we pay the item or return, reverse, or
> decline to pay the bill payment.

64. BofA intentionally provides no such disclosure, in an effort to deceive its accountholders.

    E.    **Even if BofA Could Charge More Than One NSF or OD Fee on a Single Transaction that is Submitted for Payment Multiple Times, It Cannot Attempt to Process a Payment More Than Twice**

65. BofA's Online Banking Agreement, which governs electronic transactions like the ones at issue in this case, expressly states: "At our option, we may make *a* [single] further attempt to issue the payment or process the transfer request."

66. But, as occurred with Plaintiff Morris, BofA often makes three attempts and charges fees ***each time***, both in violation of the contract.

## II.    BOFA TRANSFER TRANSACTION FEES: BOFA ASSESSESS OD AND NSF FEES ON TRANSFERS TO OTHER BofA ACCOUNTS AND ON PAYMENTS TO ITSELF

    A.    **Plaintiff's Experience**

67. BofA charges overdraft and NSF Fees—sometimes numerous fees for the same transactions—when it knows or is chargeable with knowing, that an accountholder's payment or transfer from a BofA checking account to *another BofA account* may cause the first account to become overdrawn. In other words, BofA charges its accountholders $35 NSF or OD Fees to attempt to pay or transfer funds to *itself*, or to reject a payment or transfer to *itself*, when it knows, or is chargeable with knowing, that the transferable account is or will be in an insufficient or overdrawn state if the payment or transfer is honored.

16

68.     This result is absurd, undisclosed, and violative of the contract.

69.     For example, Plaintiff Morris makes payments from her BofA checking account to a BofA home equity line of credit ("HELOC").

70.     On May 4, 2016, a payment to the HELOC was attempted on Plaintiff Morris' account.  BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so. The Bank resubmitted that very same transaction the next day, on May 5, 2016.  Again, BofA rejected that payment attempt and again charged Plaintiff Morris a $35 NSF Fee for doing so. In sum, *BofA charged Plaintiff $70 in fees to attempt and fail to process a single payment to itself, even though it knew each payment attempt would be futile before it initiated them.*

71.     Since there is no contractual basis which permits BofA to attempt to pay *itself* from an account that has insufficient funds to do so, this technique is both illegal and beyond reasonable consumer expectations.

72.     On July 5, 2016, a payment to the HELOC was attempted on Plaintiff Morris' account. BofA rejected that payment attempt and charged Plaintiff a $35 NSF Fee for doing so. The Bank resubmitted that very same transaction the next day, on July 6, 2016.  Again, BofA rejected that payment attempt and again charged Plaintiff a $35 NSF Fee for doing so.  In sum, *BofA charged Plaintiff $70 in fees to attempt and fail to process a single payment to itself, even though it knew each payment attempt would be futile before it initiated them.*

73.     Rather than cancelling or delaying the transfer to the HELOC account, based on its actual or chargeable knowledge of Plaintiff Morris' account balances, BofA pushed it through then forced Plaintiff Morris to pay repeatedly for an attempted transaction that was unauthorized and costless to the Bank, all to the Plaintiff's detriment.

74.     In short, for pushing through attempts for payment to *itself* that it knew, or should have known, would be futile, BofA charged Plaintiff Morris multiple $35 NSF Fees.

75. This is true even though BofA had the ability to check account balances before submitting transactions for payment to itself, using its bird's-eye view of all BofA accounts.

76. BofA has the contractual discretion to reject transfer attempts. There is no authorization or justification for BofA to attempt a transaction to itself that it knows will fail. Its motivation and rationale for doing so is not unique among financial institutions. It can be characterized by one obvious word, which need not be repeated here.

**B.** **The Purpose and Nature of OD and NSF Fees**

77. When a bank rejects an attempted transaction submitted by a different bank on a checking account due to insufficient funds, it sends an electronic notification back to the merchant stating that the transaction was not approved. BofA charges a $35 NSF Fee when it performs this action. Because rejection is essentially cost-free, the $35 NSF is pure profit – particularly when the rejected payment is to itself.

78. The rejection of an attempted transaction submitted by another bank provides zero benefit to the accountholder, as the CFPB has noted:

> An important consumer outcome of any overdraft program is the percentage of negative transactions that are paid (i.e., result in overdrafts) or returned unpaid (i.e., were NSFs). **Paying overdraft transactions may confer some benefit (in exchange for the associated fees and other costs) to consumers by helping them make timely payments and avoid late penalty fees and/or interest charges from a merchant or biller. In contrast, returning an item generally confers little benefit to the consumer (other than perhaps deterring future overdrafting and any subsequent consequences) and can result in an NSF fee as well as additional related fees, such as a returned check fee charged by the institution to whom the check was presented or a late fee charged by the entity to whom payment was due**. At the median, study banks paid into overdraft 83% of transactions that exceeded the available balance in 2011 and returned 17%.

*CFPB Study of Overdraft Programs*, CFPB (June 2013), at 26 (emphasis added), available at https://files.consumerfinance.gov/f/201306_cfpb_whitepaper_overdraft-practices.pdf.

79. When bank approves a transaction submitted by a different bank for an account

with insufficient funds, it pays the transaction and charges a $35 OD Fee for the service of extending credit for that transaction.

80.     When a bank pays an overdraft, it is extending credit. It is very expensive credit, indeed, according to the FDIC:

> For almost all study population banks operating an automated overdraft program, the main fee associated with the program was an NSF usage fee. Usage fees reported by these banks ranged from $10 to $38; the median fee was $27, charged on a per-transaction basis in almost all cases. In this context, a $27 fee charged for a single advance of $60 that was repaid in two weeks **roughly translated into an APR of 1,173 percent.** Many surveyed banks (24.6 percent) assessed additional fees on accounts that remained in negative balance status in the form of flat fees or interest charged on a percentage basis.

FDIC Study of Bank Overdraft Programs, 2008 (emphasis added).

81.     In a normal situation, when BofA is making an approve or reject decision on a transaction submitted by another bank for payment, BofA usually has little or no insight into the nature of the transaction or the costs and benefits of paying or returning that transaction. As such, for those transactions BofA relies exclusively on an automated, internal program that makes pay or return decisions based on an accountholder's credit risk, past overdraft behavior, and account balance history:

> As automated processes are necessary for institutions that choose to authorize or decline ATM and POS transactions that will overdraw an account, many institutions—including study banks—use these same processes to make pay-return decisions for check and ACH transactions. These institutions generally run programs that assign to each account a limit as to the amount of overdraft coverage the institution is willing to extend. For accounts that have opted in to ATM and POS debit overdraft coverage, when a request for authorization is received that exceeds the available funds, the bank will determine whether to authorize the transaction by reviewing it against the assigned overdraft coverage limit. Similarly, in nightly (or intra-day) posting, the bank will review potential NSF and overdraft items against the assigned overdraft coverage limit. Items processed during nightly (and intra-day) posting will generally be paid up to the coverage limit; once the

19

account's limit is reached, subsequent items will be returned
unpaid.

*CFPB Study of Overdraft Programs*, at 49.

82.     But when BofA is deciding whether to submit, approve or reject transactions that transfer money to *other BofA* accounts or that *pay itself*, BofA is both the submitting Bank *and* the merchant being paid.  This provides BofA will unique insight into, and control over,  whether and how transactions to pay or transfer money to itself are processed.

83.     Thanks to an aggressive "cross-selling" effort by BofA, there are hundreds of thousands of BofA checking accountholders who also regularly pay BofA or transfer funds to BofA, because they also hold BofA savings accounts, lines of credit, credit cards, and  mortgages.

**C.     BofA Has Made a Major Effort to Cross-Sell Its Products, Promising Convenience and Efficiency but Also Providing It With a Bird's-Eye View of Its Accountholders' Financial Details**

84.     Banks like BofA have made a major effort to "cross-sell" products.  Consumers may have a checking account, but also a credit card, line of credit, and/or savings account, etc.

85.     This allows for assessment of additional fee revenue.

86.     Selling additional products to existing customers has long been a key priority for many banks with the explicit goal of improving the bottom line.

87.     As one industry publication put it: "Cross-selling comes with its advantages, of course. It considerably reduces customer acquisition costs, servicing, and marketing and communication costs and thereby substantially increases spread for banks. It is well understood and key finding that greater the number of products held by customer leads to an increased probability of retention." *Cross Selling at Banks: Adopting the Right Strategy for a Healthy Bottom Line*, Customer Think (Jan. 2010), available at http://customerthink.com/ cross_selling_at_banks_adopting_right_strategy_for_health_bottom_line/.

88.     It continues: "The more relationships a bank has with a customer, the more loyal

20

the customer will be and the bank gets to know the customer through several relationships, thus the assessment of the credit quality of the customer can be bettered. At the end it will be a win-win situation for both the bank and customer as it is cheaper and easier to get customer from one's own data base than going out for getting new customers. Banks should be careful in exploiting this situation and see that the bottom line along with the top line goes up and not just cross sell of products."

89.     The Bank shares information across accounts, targeting products and services, as it tracks in intimate detail various consumer accounts at once, giving the bank unique access to the complete financial picture of a consumer on an hour to hour basis.

90.     BofA routinely and systematically shares detailed information across accounts, and informs consumers this is so: "We may share information that we have about you and your accounts among the Bank of America family of companies." Deposit Agreement.

91.     In some cases, the cross-selling and information gathering is used solely to charge consumers with fees and increase fee revenue.

     **D.**    **BofA's Relevant Account Disclosures**

92.     The Deposit Agreement states:

> "Sending Funds Transfers"
>
> This Sending Funds Transfers section applies to wire transfers…and **transfers we make between your Bank of America accounts.**
>
> We **may reject payment orders**.  We notify you of any rejection orally, electronically, or in writing.

(emphasis added).

93.     BofA's Deposit Agreement also states:

> "Item" means "all orders and instructions for the payment, transfer  or withdrawal of funds from an account.  As examples, item  includes: a check, substitute check, purported substitute check,  electronic transaction

21

(including an ACH transaction, ATM withdrawal or transfer, or point of sale transaction), draft, demand draft, remotely created check, remotely created consumer check, image replacement document, indemnified copy, preauthorized draft, preauthorized payment, automatic transfer, telephone-initiated transfer, Online Banking transfer or bill payment instruction, withdrawal slip, in-person transfer or withdrawal, cash ticket, deposit adjustment, or other order of instruction for the payment, transfer, or withdrawal of funds, or an image, digital image, or a photocopy of any of the foregoing.

[…]

[W]e may authorize and pay overdrafts for other types of transactions. Other types of transactions include checks and other transactions made using your checking account number, recurring debit card transactions, ACH transactions, preauthorized payments, and automatic and online bill payments.

[…]

We may debit your account for a check or other item drawn on your account either on the day it is **presented to us for payment**, by electronic or other means, or on the day we receive notice that the item has been **deposited for collection at another financial institution**---whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account.

We **may determine your balance** and make our decision on an insufficient funds item at any time between **our receipt of the item or notice and the time we must return the item**. We are required to determine your account balance only once during this time period.

[…]

If we decide not to pay a check or other item drawn on your account, we may return the original, an image or a copy of the item or we may send an electronic notice of return….If we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item.

[…]

(emphases added).

### E. BofA May Not Charge OD or NSF Fees on Transfers or Payments to Itself

94.    The "Sending Funds Transfers" section of the Deposit Agreement governs *all* transfers to other BofA accounts.

95.    The "Sending Funds Transfers" section provides no authorization for BofA to charge OD or NSF on such transactions—indeed, unlike other sections of the contract, it never mentions such fees once.

96.    Consistent with express representations in the contract, reasonable consumers understand that the Bank may "reject" payment orders and transfers to other BofA accounts. It can do so without even submitting them unnecessarily. Read reasonably and in good faith, the contract indicates BofA will not bother submitting a transaction when it knows attempted payment will be futile.

97.    Reasonable consumers are entitled to understand that BofA will not use the intimate, detailed financial information regarding various BofA accounts held by the same person as a tool to maximize NSF and OD Fees charged to them.

98.    Reasonable consumers believe the Bank would reject transfers to itself, or to other BofA accounts, when such transfers would cause an NSF or OD Fee to be charged. There is no reason to try a transaction over and over when the bank knows or should know it would be an entirely futile effort.

99. With the exception of the "Sending Funds Transfers" section, all the contract provisions excerpted above that purport to authorize the assessment of OD and NSF Fees are written only for the common situation in which BofA is transferring checking account funds to an entity that is not itself.

100. One provision expressly states that reality: "BofA states that "[w]e may debit your account for a check or other item drawn on your account either on the day it is **presented to us for payment**, by electronic or other means, or on the day we receive notice that the item has been **deposited for collection at *another* financial institution**—whichever is earlier. If you do not have sufficient available funds to cover the item, we decide whether to return it or to pay it and overdraw your account." BofA cannot present an item to itself for payment, nor are transfers or payments to BofA "deposited for collection at another financial institution"—the funds are deposited where they started out, at BofA.

101. Other contract provisions are nonsensical when a BofA account is both the payee and the payor, and thus have little or no applicability to the situation at issue in this Action:

- BofA states that it "when it determines" there are insufficient funds for an item, it will either pay or return the item. But for transfers or payments to itself, it makes this "determination" even before submitting the item to itself.
- BofA states that "[w]e **may determine your balance** and make our decision on an insufficient funds item at any time between **our receipt of the item or notice and the time we must return the item**." But it does not "receive" the item (since it already has it) and it has no "time" to return the item (since it already has it). No reasonable understanding of English term "receive" can indicate one entity or person giving something to itself.
- BofA also states that "[i]f we send an electronic notice of return, you agree that any person who receives that electronic notice may use it to make a claim against you to the same extent and with the same effect as if we had returned the original item." But of course, BofA does not need "electronic notice" of its own rejection.

102.    Even if provisions of the Deposit Agreement other than the "Sending Funds Transfers" section had any applicability to payments or transfers from a BofA checking account to other BofA accounts, those provisions also indicate BofA will not charge NSF or OD Fees on such transactions to itself.

103.    Reasonable consumers understand that transfers to BofA accounts or payments to BofA do not count as "items" subject to NSF or OD Fees, since BofA has the right to protect its interests (and assess fees, if necessary) on the accounts that a consumer is attempting to transfer to or make a payment on. For example, if a consumer attempts a bill payment to a BofA line of credit or credit card on insufficient funds, BofA can charge a late fee in that circumstance. No reasonable consumer expects it will also charge NSF Fees on the originating account.

104.    Neither the Deposit Agreement or any other account document ever states that transfers to other BofA accounts or payments to other BofA accounts will incur NSF or OD Fees.

105.    The Deposit Agreement does not state that BofA will attempt to push through a transfer or payment to itself, even where it knows, or should know, that it will instantly decline that same transaction.

106.    In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of accountholders and breaches its duty of good faith and fair dealing when it applies these policies, by employing the following practices:

> a) *First*, the Bank uses its discretion to define the meaning of "item" in an unreasonable way that violates common sense and reasonable consumer

expectations. BofA uses its contractual discretion to choose a meaning or that term which directly causes more NSF Fees and OD Fees.

The contract documents never state that BofA will attempt to push through a transfer or payment to itself, even where it knows full well that the transaction will decline—this totally futile payment submission has no purpose, except a bad faith purpose to create more account fees.

b) *Second*, even if it were proper to push through a futile attempt, the Bank maintains it has discretion not to charge or "deduct" NSF Fees on given transactions. By charging both NSF Fees and OD Fees on a given transaction, BofA engages in bad faith and contradicts reasonable consumer expectations.

That is especially true because when items such as a bounced check are returned, a payee can then turn to other means to recoup its payment. When BofA returns a payment to itself, it of course has many other means to try to seek payment. It could assess a late fee on the account itself (and does, it many cases). Or, it could check the balance again before trying to debit.

c) *Third*, no reasonable consumer believes the Bank would knowingly submit transactions it has the express power to reject. Consistent with express representations in the contract, reasonable consumers understand that the Bank may "reject" payment orders and transfers to other BofA accounts. It can do so without even submitting them unnecessarily. Good faith performance of the contract requires BofA will not submit a transaction when it knows attempted payment will be futile.

107.     BofA violates the covenant of good faith and fair dealing when it authorizes transactions for payment or transfer to itself that it knows will be declined.

## III.     PREMATURE FEES: BOFA DEDUCTS OD AND NSF FEES FROM ALREADY-EMPTY CHECKING ACCOUNTS IN BREACH OF ITS AGREEMENTS

### A.     Background

108.     The reason an OD or NSF Fee is assessed on an account is because that account does not have sufficient funds to cover a given transaction.  At the moment a fee is assessed, then, there are by definition no funds in the account to immediately pay the OD or NSF Fee (or else there generally would not have been an OD or NSF Fee in the first place).

109.     This claim does not concern whether such OD or NSF are properly assessed, but rather challenges *when* such fees are to be deducted from a consumer's account.

110.     BofA promises it will pay NSF or OD Fees that it is owed from accountholders' "next deposits"—that is, after new funds are deposited to the account that are sufficient to pay the owed fees. And this makes good common sense: for neither type of fee does it make sense to deduct them from a bank account before there are funds to pay it, and reasonable consumers do not expect the Bank will undertake such a practice. Indeed, otherwise it would just be deducting such fees while only incurring new fees in an unending cycle of fees.

111.     Some of BofA's competitors understand this, and hold fees in suspense until funds exist in the account to pay them.

112.     If, on the other hand, bank fees are prematurely deducted from an empty account, that means there is a great likelihood that the next deposit made by the accountholder will be immediately consumed (at least in part) by the bank fees, *before* any other transactions can be paid. Subsequent consumer transactions are thus much more likely to be paid into overdraft, causing even *more* fees that perpetuate the cycle.

113.     When BofA prematurely deducts its own bank fees from an already-empty account, it merely performs an accounting trick.  It is a sleight of hand that serves no purpose whatsoever—except to ensure that its bank fees have *priority* from any future deposit, and thus to ensure it captures even more OD and NSF Fee revenue when actual purchases are drawn on insufficient funds. Unfortunately, the Bank never informs consumers it will undertake this fee-maximizing policy.

114.     The effect of doing so is devastating, and directly causes more fees, as occurred with Plaintiff Williams.  Worse, the contract never authorizes the immediate deduction of fees from an empty account, and in fact states that BofA will do the *opposite* and "**use deposits you…make to your account to pay overdrafts, fees and other amounts you owe us.**"

B.     **Plaintiff's Experience**

115.     During 2017 alone, BofA has charged Plaintiff Williams nearly $1500 in OD and NSF Fees—a crushing financial burden. As described herein, numerous of those OD and NSF Fees were assessed as a direct result of BofA's policy of immediately deducting OD and NSF Fees from an already-empty account. In other words, many of the OD and NSF Fees assessed to Ms. Williams were caused by other OD and NSF Fees, with BofA's undisclosed decision to pay itself for OD and NSF Fees first.

116.     On October 24, 2017, Plaintiff Williams ended the day with a balance of $-228.52 (of which $35 were fees deducted from an empty account)

117.     Her principal balance outstanding was thus only $-193.52 at the end of October 24.

118.     No further activity occurred on the account until October 31, when BofA charged an OD Fee of $35, deducted a $250.70 bill pay transaction that it also rejected later that day, and also charged a $35 NSF Fee for that rejection.

119.    At the end of the day on October 31, then Plaintiff Williams ended the day at $-549.22, (of which $105 were OD or NSF Fees prematurely deducted from her already-empty account)

120.    Plaintiff's total principal balance outstanding was thus $-444.22 at the end of October 31.

121.    On November 1, 2017, no activity occurred except that BofA recredited the $250.70 transaction it had earlier deducted but then rejected.  At the end of the day on November 1, 2017, Plaintiff ended the day at $-298.42 (of which $105 were NSF or OD Fees prematurely deducted from an empty account).

122.    Plaintiff's total principal balance outstanding was thus $-193.42 at the end of November 1.

123.    Then, on November 2, 2017, several things happened.  A deposit of $628.73 posted, debits of $45.77 and $248 also posted, and BofA also rejected a $40 bill pay transaction, upon which BofA charged a $35 NSF Fee.

124.    Crucially, the only reason the $40 bill pay transaction was returned for insufficient funds and assessed a $35 NSF Fee is because of the $105 in NSF and OD Fees had been prematurely deducted by the Bank from an empty account before all debits on that day were deducted, as BofA promised.

125.    If BofA had, as it promised, started with the account's principal balance on November 2 and deducted OD and NSF Fees last (as it promised), the $40 bill pay transaction would not have incurred an NSF Fee.

126.    How BofA processed the charges:

    Account Balance on 11.1 (including NSF/OD Fees):    $-298.42
    Deposit Payment 11.2:                               $628.73

| | |
|---|---|
| Remainder after NSF/OD Fees: | $330.31 |
| Remainder after 1st two debits: | $36.54 |
| Insufficient Funds for $40 charge: | $-3.46 |
| NSF Fee assessed ($35): | $-38.46 |

127.   Here is how BofA should have processed the charges:

| | |
|---|---|
| Account Balance on 11.1: | $-193.42 |
| Deposit Payment 11.2: | $628.73 |
| Remainder after 1st two debits: | $141.54 |
| Remainder after $40 charge: | $101.54 |
| Pending NSF/OD Fees: | $-105 |
| Remainder after old OD/NSF Fees: | $-3.46 |

128.   This pattern occurred repeatedly with Plaintiff, as it has with many other BofA accountholders.

### C.  **BofA's Breaches of Relevant Account Disclosures**

129.   The premature deduction of NSF and OD Fees results in the further assessment of even more NSF and OD Fees via a complex interaction between BofA's transaction posting order and the time of deduction of OD and NSF Fees.

130.   With respect to transaction posting order, BofA promises on any given banking day to determine insufficient funds transactions (for which OD and NSF Fees are charged) only *after* it has posted credits to an account, and only *after* it has deducted and paid all consumer debit transactions for which there are sufficient funds. Only then, promises BofA, are bank fees like OD and NSF Fees deducted and paid from an account.  When a deposit of new funds arrives in the account, BofA promises that it will be used to pay for consumer purchases before it is used to pay the Bank for its own fees.

131.   With respect to the timing of deduction of OD and NSF Fees, BofA promises the deduction only occurs from the next deposit, which could be days in the future. By withdrawing OD and NSF Fees from already-empty accounts, **prior** to the deposit of new account funds by an

accountholder, BofA eviscerates its posting order promise to always deduct bank fees *last* on any given day. BofA's premature deduction of bank fees ensures that new deposits are first used up to pay bank fees, *instead of* to pay purchases—the direct opposite of what it has promised.

132.    With respect to Ms. Williams, BofA deducted OD and NSF Fees from an already-empty account.  It did so to ensure that future deposits would be eaten up by those fees, making it more likely that Ms. Williams purchases would incur more OD and NSF Fees.  And that is exactly what happened. When Ms. Williams made a deposit, that deposit was used to pay those OD and NSF Fees first, leaving insufficient funds to pay her purchases, and resulting in more OD and NSF Fees on transactions that should not have received them.

133.    BofA's contract essentially means that it will hold OD and NSF Fees and other bank fees in suspense until such time as deposits post to an account. It also promises that when deposits post to an account, those new funds will be used to pay account debits *before* they are used to pay bank fees.

134.    According to its contract, the Bank may only deduct fees once an account is replenished by a new deposit, but not before, and even then it must pay consumer debits and purchases before paying itself back for its bank fees:

> **Fees**
>
> You agree to pay for our services in accordance with the fees that apply to your account and your deposit relationship with us.
>
> […]
>
> **Charging an Account**
>
> We may deduct fees, overdrafts and other amounts you owe us under this Agreement from your accounts with us[.] We may make these deductions at any time without prior notice to you or request from you.  If there are not enough funds in your account to cover the amounts you owe us, we may overdraw your account, without being liable to you.  You agree to pay immediately all fees, overdrafts and other amounts you owe us.

31

We **may use deposits** you or others make to your account…**to pay fees**, overdrafts or other amounts that you owe us.

[…]

Insufficient Funds—Overdrafts and Returned Items

If we overdraw your account, you agree to repay us immediately, without notice or demand from us. **We ordinarily use deposits you or others make to your account to pay overdrafts, fees and other amounts you owe us.**

[…]

**Posting Orders**

This section summarizes how we generally post some common transactions to your account [on a given banking day].

[…]

- We add deposits and other credits to your balance.
- Then, we subtract from your balance in date and time order the types of debits listed in this paragraph, when our systems receive date and time information[.]

[…]

- **[Lastly], we subtract from your balance most fees** (such as monthly maintenance fees, overdraft item fees, returned item fees, and ATM fees) in order from highest to lowest dollar amount. Some fees may show as "processing" until the next day.

135. The Agreement states that BofA will "ordinarily" "use deposits…to pay fees"—an express promise that OD and NSF Fees will not be deducted until a subsequent deposit occurs.

136. The Agreement thus states that consumers agree to "re*pay* immediately" any fees, but such "repayment" cannot occur until positive funds exist in the account, which must occur when a deposit happens.

137. The Agreement never states that BofA will use deposits to pay itself for bank fees *first* and never describes when it will break from its "ordinary" posting order.

138.    The Agreement never states that BofA will use bank fees to cause other transactions to incur more bank fees.

139.    Consistent with express representations in the contract, reasonable consumers understand that *assessment* of bank fees is de-linked from *deduction* of those fees from accounts—that bank fees are "ordinarily" not immediately deducted from accounts where there are no funds to pay them. Obviously, consumers are obligated to *pay* owed bank fees, but they cannot pay owed OD and NSF Fees until they are able to make a new deposit. It serves no purpose to deduct fees before a consumer can pay, other than to make an end-run around BofA's promise to use new deposits to pay consumer debits before its own bank fees.

140.    BofA knew how to disclose this practice consumers, but chose to do the opposite. BofA's competitors in the banking industry who engage in this conduct disclose the practice clearly and expressly to their accountholders—something BofA never does in an attempt to deceive its accountholders.

141.    For example, Fifth Third Bank, a major bank in the Midwest, expressly states in its deposit agreement that it will *not* wait until a deposit is made, will deduct fees immediately, and use bank fees to drive accounts further into the red:

> These are the ways a debit (-) may be handled when there is not enough money in your account:
> • If you choose to enroll, Overdraft Protection may be used to pay the debit (-) (using funds from another Fifth Third account).
> • Overdraft Coverage may be applied by the Bank, at the Bank's discretion, to pay the debit (-), resulting in a negative balance in your account. • Your debit (-) may be returned unpaid
> If you are charged overdraft or returned item fees, the fees will be an additional debit (-) to your account and **will further increase the negative balance in your account if a deposit is not made on time.**

(emphasis added).

142.     Similarly, First Citizens Bank, a major bank in the Carolinas, expressly tells accountholders its fee timing and tells accountholders in its deposit agreement that it will use bank fees to drive accounts further into the red:

> Because we may charge a service fee for an NSF item each time it is presented, we may charge you more than one service fee for any given item. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.

143.     And BB&T, another Bank of America competitor, states in its deposit agreement:

> DEDUCTION OF FEES. Maintenance and activity fees and fees for returned deposited checks, returned items, overdrafts, stop payment orders, charges for check printing, and other service charges made in accordance with the rules of the Bank in effect at the time of such charge **shall be deducted from your account and may be posted prior to other debits.** The Bank shall not be liable for refusing to honor items presented for payment because of insufficient funds as a result of deducting such fees. Any fees (or portions thereof) that were not posted due to insufficient funds at the time of posting may be collected at a later date without prior notice when sufficient funds are available in the account.

(emphasis added).

144.     But instead of clearly disclosing its abusive practice like its competitors, BofA chose to conceal its true practice.

145.     In the alternative, to the extent the account documents do not explicitly bar the polices described above, Bank of America exploits contractual discretion to the detriment of accountholders and breaches good faith and fair dealing when it uses these policies.

146.     Specifically, the Bank uses its discretion to deduct fees by prematurely deducting them, in violation of other contract promises regarding its "ordinary" practice, and at a time that serves no purpose other than to maximize the number of OD and NSF Fees assessed.

147.     The Bank abuses its discretion to determine when and how it will deduct fees and when and how it will "use deposits" to pay fees, by adopting an undisclosed practice that deducts fees prematurely, when the Bank already knows there are no funds in the account to pay them.

## CLASS ALLEGATIONS

148.   Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

149.   The proposed classes are defined as:

**Class 1 – Multiple Single Transaction Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF Fees on the same transaction and/or NSF and OD Fees on the same transaction.  (the "Nationwide Multiple Single Transactions Fees Class").
Proposed Class Representatives: Morris, Bui, and Edge

> Alternative State Subclass of Oklahoma residents
> Proposed Class Representative: Morris
>
> Alternative State Subclass of California residents
> Proposed Class Representative: Bui
>
> Alternative State Subclass of North Carolina residents
> Proposed Class Representative: Edge

**Class 2 – Intra BofA Transfer Transaction Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged multiple NSF or OD Fees on transfers to other BofA accounts (the "Nationwide Intra BofA Transfer Transaction Fees Class").
Proposed Class Representative: Morris

> Alternative State Subclass of Oklahoma residents
> Proposed Class Representative: Morris

**Class 3 – Premature Fees Class**
All Bank of America checking account holders in the United States who, during the applicable statute of limitations, were charged OD and NSF Fees because bank fees were deducted from a newly-

35

posted deposit of funds prior to the deduction of consumer debits. (the "Nationwide Premature Fees Class").
Proposed Class Representative: Williams

Alternative State Subclass of Georgia residents
Proposed Class Representative: Williams

150.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

151.     Excluded from the Classes are BofA, its parents, subsidiaries, affiliates, officers and directors, any entity in which BofA has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

152.     The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BofA's records.

153.     The claims of the representative Plaintiffs are typical of the claims of the Classes they seek to represent in that the representative Plaintiffs, like all Class members, were charged improper and deceptive fees as alleged herein. The representative Plaintiffs, like all Class members, have been damaged by BofA's misconduct in that they have been assessed unfair and unconscionable BofA Account Fees.  Furthermore, the factual basis of BofA's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

154.     There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

155.     Among the questions of law and fact common to the Classes are whether BofA:

a.     Violated contract provisions by charging various unauthorized BofA

36

Account Fees;

b.  Breached its covenant of good faith and fair dealing with Plaintiffs and other members of the Classes through its BofA Account Fee policies and practices;

c.  Converted money belonging to Plaintiffs and other members of the Classes through its BofA Account Fee policies and practices;

d.  Was unjustly enriched through its BofA Account Fee policies and practices; and

e.  Violated the consumer protection acts of certain states through its BofA Account Fee policies and practices.

f.  The proper method or methods by which to measure damages, and

g.  The declaratory relief to which the Classes are entitled.

156. Plaintiffs' claims are typical of the claims of other Class members, in that they arise out of the same wrongful BofA Account fee policies and practices of BofA's Account Agreement and other related documents. Plaintiffs have suffered the harm alleged and have no interests antagonistic to the interests of any other Class member.

157. Plaintiffs are committed to the vigorous prosecution of this action and have retained

competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions. Accordingly, Plaintiffs are adequate representatives and will fairly and adequately protect the interests of the Classes.

158. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BofA, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and BofA's misconduct will proceed without remedy.

159. Even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

160. The State of North Carolina has a significant interest in regulating the conduct of businesses operating within its borders. North Carolina, which seeks to protect the rights and interests of North Carolina and all residents and citizens of the United States against a company headquartered and doing business in North Carolina, has a greater interest in the Plaintiffs' claims than any other state and is most intimately concerned with the claims and outcome of this litigation.

161. The principal place of business of BofA in Charlotte, North Carolina is the "nerve center" of its business activities—the place where its high-level officers direct, control, and

coordinate the corporation's activities, including account and major policy, financial, and legal decisions related to BofA Account Fees.

162.    BofA's corporate decisions regarding how to treat Account Fees were made from and in North Carolina.

163.    BofA's tortious conduct emanated from North Carolina.

164.    Application of North Carolina law to the Class with respect to Plaintiffs' and Class members' claims is neither arbitrary nor fundamentally unfair because North Carolina has significant contacts and a significant aggregation of contacts that create a state interest in the claims of Plaintiffs and the Nationwide Classes.

165.    Under North Carolina's choice of law principles, which are applicable to this action, the common law of North Carolina applies to the nationwide common law claims of all Class members. Additionally, given North Carolina's significant interest in regulating the conduct of businesses operating within its borders, North Carolina's consumer protection statutes may be applied to non-resident consumer plaintiffs.

166.    In the alternative, Plaintiffs assert that common elements of the fifty states' laws can be grouped and tried on a common basis or that state specific Subclasses (as outlined *supra*) can be certified and tried on a common basis.

## FIRST CLAIM FOR RELIEF[1]
### Breach of Contract
### (On Behalf of Plaintiffs and the Classes)

167.    Plaintiffs repeat paragraphs 1 through 166 above.

---

[1] By omitting from this Fourth Amended Complaint Plaintiffs' claims under the Oklahoma Consumer Protection Act, 15 Okla. Stat. § 751, and Georgia Fair Business Practices Act, Ga. Code Ann. § 10-1-390, Plaintiffs do not waive their right to appeal the Court's dismissal of these claims when a final judgment is entered. *See Young v. City of Mount Ranier*, 238 F.3d 567, 572 (4th Cir. 2001) ("[I]t is needlessly formalistic to require a plaintiff to replead claims already dismissed

168.   Plaintiffs and BofA have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in BofA's Account Agreement and related documentation.

169.   No contract provision authorizes BofA to charge: (1) multiple NSF fees on a single transaction; (2) NSF and OD fees on the same transaction; (3) NSF or OD fees on a transaction with a BofA related entity.

170.   In addition, no contract provision authorizes BofA to deduct bank service fees first out of new deposits and thereby cause additional OD and NSF Fees.

171.   Therefore, BofA breached the terms of its Account Agreement by charging these fees.

172.    Additionally, Under the laws of North Carolina and the states where BofA does business, good faith is an element of every contract pertaining to the assessment of Account Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.  Evading the spirit

_____

without leave to amend in order to preserve the right to appeal the dismissal.").

of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

173. BofA has breached the covenant of good faith and fair dealing in the Account Agreement through its BofA Account Fee policies and practices as alleged herein.

174. Plaintiffs and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the Account Agreement.

175. Plaintiffs and members of the Classes have sustained damages as a result of BofA's breaches of the account contract.

**SECOND CLAIM FOR RELIEF**
**North Carolina Consumer Protection Law**
**(On Behalf of Plaintiffs and the Classes)**

176. Plaintiffs repeat paragraphs 1 through 175 above.

177. As described herein, BofA's unconscionable and unfair actions regarding the assessment of BoA Account Fees, including NSF and OD Fees, constitute unfair competition and unfair and deceptive trade practices as defined by the laws of the United States of America and the State of North Carolina, including but not limited to N.C.G.S. § 75.1-1 *et seq.*

178. As described herein, the assessments are both unfair and deceptive, as they violate industry standards and offend public policy, and they deceive customers who do not expect the charges.

179. BoA's actions affected commerce in North Carolina, as many of its North Carolina customers were charged these unfair and deceptive fees.

180. Plaintiff relied upon Bank of America's representations that it would not charge multiple NSF and OD fees; would not charge such fees to itself; and would not deduct fees before other

charges.  This reliance was reasonable, as it was  based upon both BoA's account agreements, industry practice, and common sense.

181.    Plaintiffs have been actually damaged as the direct and proximate result of BofA's unfair competition and unfair and deceptive trade practices by overcharges on their account.

182.    Plaintiffs are entitled to recovery of treble damages and, in the discretion of the Court, reasonable attorneys' fees and costs by virtue of BofA's unfair and deceptive trade practices.

**THIRD CLAIM FOR RELIEF**
<u>**California Unfair Competition Law**</u>
<u>**Deceptive Prong Business and Professions Code § 17200**</u>
**(On behalf of Bui, Valperga, and the Alternative California Subclass)**

183.    Plaintiffs repeat paragraphs 1 through 182 above.

184.    BofA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, et seq.

185.    The UCL prohibits, and provides civil remedies for, unfair competition.  Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

186.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

187.    BofA committed fraudulent business acts and practices in violation of Cal. Bus. & Prof. Code § 17200, et seq., when affirmatively and knowingly misrepresenting its NSF Fee

practices. Such representations are likely to mislead the public.

188.    As a result of Defendants' violations of the UCL's "deceptive" prong, Plaintiff Bui and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services, in particular multiple NSFs, and thereby have suffered and will continue to suffer actual damages. In addition, Plaintiff Bui requests an injunction on behalf of the general public to prevent BofA from continuing to misrepresent its NSF fees.

## FOURTH CLAIM FOR RELIEF
### <u>California Unfair Competition Law</u>
### <u>Unfair Prong Business and Professions Code § 17200</u>
### (On behalf Bui, Valperga, and the alternative California Subclass)

189.    Plaintiffs repeat paragraphs 1 through 188 above.

190.    BofA's conduct described herein violates the Unfair Competition Law (the "UCL"), codified at California Business and Professions Code section 17200, et seq.

191.    The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

192.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

193.    BofA's conduct violates the UCL's "unfair" prong in the following respects, among others: Defendant misrepresented its true NSF Fee practices and that consumers would be charged

multiple NSF fees on the same item.

194.   BofA's conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendant's conduct on members of the general public was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

195.   The harm to Plaintiff Bui and the California Subclass members arising from BofA's unfair practices relating to the imposition of multiple NSF fees outweighs the utility, if any, of those practices.

196.   BofA's unfair business practices are immoral, unethical, oppressive, unscrupulous, unconscionable and/or substantially injurious to Plaintiff Bui and members of the California Subclass.

197.   BofA's conduct was substantially injurious to consumers in that they have been forced to endure multiple NSF Fees with misleading and/or inadequate disclosure.

198.   As a result of BofA's violations of the UCL's "unfair" prong, Plaintiff Bui and members of the California Subclass have paid, and/or will continue to pay, unreasonably excessive amounts of money for banking services and thereby have suffered and will continue to suffer actual damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Classes demand a jury trial on all claims so triable and judgment as follows:

1.   Declaring BofA's Account Fee policies and practices described herein to be wrongful, unfair and unconscionable;

2.   Restitution of all BofA Account fees paid to BofA by Plaintiffs and the Classes, as a result of the wrongs alleged herein in an amount to be determined at trial;

3.   Disgorgement of the ill-gotten gains derived by BofA from its misconduct;

4. Actual damages in an amount according to proof;

5. Punitive and exemplary damages;

6. Pre-judgment interest at the maximum rate permitted by applicable law;

7. Treble damages and attorneys' fees as provided by law;

8. Costs and disbursements assessed by Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

9. Such other relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated: May 12, 2021   Respectfully submitted,

By: s/ David M. Wilkerson
Larry McDevitt
NC State Bar No. 5032
David M. Wilkerson
NC State Bar No. 35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
*dwilkerson@vwlawfirm.com*
*lmcdevitt@vwlawfirm.com*

Jeffrey D. Kaliel*
Sophia Gold*
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielpllc.com*

James J. Pizzirusso*
HAUSFELD LLP
888 16th St., NW, Ste 300
Washington, DC 20006
(202) 540-7154
*jpizzirusso@hausfeld.com*

Hassan A. Zavareei*
Andrea R. Gold*
TYCKO & ZAVAREEI LLP
1828 L Street NW, Ste 1000
Washington, DC 20036
(202) 973-0900
*hzavareei@tzlegal.com*
*agold@tzlegal.com*

Jeffrey M. Ostrow*
KOPELOWITZ OSTROW
FERGUSON WEISELBERG GILBERT
One West Las Olas Blvd., Ste. 500
Fort Lauderdale, FL 33301
(954) 525-4100
*ostrow@kolawyers.com*

Attorneys for Plaintiffs and the Putative Class
* Admitted Pro Hac Vice