# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
### CASE NO. 3:18-CV-157-RJC-DSC

**LISA MORRIS, MICHAEL BUI, TUMIKA**

**WILLIAMS, ALBERT EDGE and**
**KRISTEN VALPERGA on behalf of**
**themselves and all others similarly situated,**


     **Plaintiffs**

     **, vs.**

**BANK OF AMERICA, N.A.,**


     **Defendant.**


## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
## ATTORNEYS' FEES, COSTS, AND CLASS REPRESENTATIVE SERVICE AWARDS

**INTRODUCTION**

After several years of discovery and hard-fought litigation, Plaintiffs Lisa Morris, Michael Bui, Tumika Williams, Albert Edge, and Kristen Valperga and Class Counsel[1] successfully negotiated a settlement in this matter including a common fund of $75,000,000, as well as business practice changes that will yield an estimated $318,000,000 in savings to the Class and future Bank of America account holders—a total value of $393,000,000. As such, pursuant to the Settlement Agreement and as the Notice informed class members, Plaintiffs bring this Motion seeking attorneys' fees of one third of the common fund (in the amount of $25,000,000), costs of $**226,863.13**, and Service Awards to the Class Representatives which collectively total $31,000.

Only after Plaintiffs largely prevailed against Defendant Bank of America, N.A.'s ("Defendant" or "BANA") Motion to Dismiss, and only after conducting significant discovery and two failed mediations with a well-respected neutral, did the Parties ultimately reach a settlement of these novel claims regarding BANA's assessment of certain overdraft ("OD") and insufficient funds ("NSF") fees on consumer accounts. Notably, unlike most consumer settlements, the $75,000,000 cash portion of the Settlement will automatically be distributed to Settlement Class Members without the requirement for a claims process or any reversion to BANA. As another important Settlement benefit, BANA also agreed to significantly reduce notice and administration costs associated with the Settlement by conducting a laborious review of its banking data in order to identify Settlement Class members and relevant fees—difficult data analysis work that is commonly performed by experts for plaintiffs, at great expense to the settlement class. Perhaps most importantly, a key term of the settlement requires BANA, the second largest bank in the

---

[1] All capitalized terms have the meaning set forth in the Settlement Agreement, attached to Dkt. No. 86.

United States with total assets of over $2.8 trillion, to completely revamp how it charges NSF and OD fees in the future. This precedent-setting change will result in estimated cost savings to the Class and future account holders of at least $318,000,000 over the next five years alone according to the Bank's projections. Joint Decl., ¶15. Additionally, BANA has agreed to update its disclosures to better inform customers of the other fee practices at issue in this case, helping Settlement Class Members and other customers avoid future bank fees.

Class Counsel obtained these benefits for the Settlement Class with hard work and creativity, investing thousands of hours of time in this matter—including a significant amount of innovative investigation that for the first time uncovered a "retry" fee assessment practice. When this case was filed, no other case in the country had ever challenged the assessment of more than one NSF or OD Fee on the same "item," the central practice at issue in this case, and one that Plaintiffs alleged skims funds from the most vulnerable consumers' accounts. With no precedent upon which to rely and an untested legal theory involving an arcane area of consumer payments through the National Automated Clearinghouse Association, Class Counsel faced significant risks in filing this Action. Without their hard work, and that of the Class Representatives, BANA's alleged practices would have remained shrouded in darkness, without challenge or notice to the Class.

Consistent with Fourth Circuit precedent, the requested attorneys' fee award represents one-third of the common fund. Class Counsel does *not* seek any portion of the value created by Defendant's agreement to cease assessing "retry" fees. This request would be a fair and reasonable fee award, especially when one considers that it represents approximately 6% of the total value of the common fund and the prospective relief combined (not including other intangible benefits). The requested award will compensate Class Counsel for their innovation, for their investment of

time and resources in this case, and most importantly for the excellent results they achieved for the Class despite the uncertainty and novelty of their claims. In support of the reasonableness of the requested award, Professor Brian Fitzpatrick, a scholar in the field of class action litigation,[2] ("Fitzpatrick Decl.") opines in favor of the requested fee award, whether the Court applies the percentage-of-the-fund method alone or uses a lodestar cross-check. Fitzpatrick Decl., ¶¶12-17.

In summary, Plaintiffs respectfully request that this Court grant the Motion and award the requested attorneys' fees and costs to Class Counsel, as well as the requested Service Awards to the class representatives. BANA does not oppose the requested relief.

## I. BACKGROUND

### A. The Litigation[3]

This case has been pending since March 29, 2018. After multiple amendments which perfected the pleadings and added additional Plaintiffs, BANA moved to dismiss on August 27, 2018. On January 8, 2019, United States Magistrate Judge David S. Cayer issued a memorandum opinion and recommendation ("M&R") granting in part and denying in part BANA's motion to dismiss. On March 29, 2019, the Court adopted in part the Magistrate Judge's M&R. *See* ECF No. 42. Following the Court's Order, the remaining claims remaining in the Action were for (1) breach of contract, (2) violation of the UCL, and (3) violation of the NCUDTPA. *Id*.[4]

_____

[2] Professor Fitzpatrick is a professor of law at Vanderbilt University whose research focuses on class action litigation. *Id*. ¶1. He formerly clerked for Judge O'Scannlain of the Ninth Circuit and Justice Scalia of the Supreme Court. *Id*. He is the author of the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published and has been extensively published on the topic of class action settlements. *Id*. ¶3. Professor Fitzpatrick's study has been relied upon by numerous courts, scholars, and testifying experts. *Id*. n.1.
[3] A complete history of the litigation is set forth in Plaintiffs' Motion for Preliminary Approval, which is hereby incorporated by reference. *See* Dkt. No. 86.
[4] At the time of the Court's decision, this was a novel issue having never been decided in another case. Since the time of this Court's order largely denying BANA's Motion to Dismiss, however, nearly twenty state and federal courts have issued opinions denying motions to dismiss in similar

Following the Motion to Dismiss, the Parties began an extensive discovery effort that lasted nearly two years.[5] Plaintiffs served three sets of interrogatories and Requests for Production of Documents, as well as numerous 30(b)(6) deposition notices and subpoenas of third parties. BANA served discovery on Plaintiffs, as well, including interrogatories and Requests for Production and Admissions. Joint Decl., ¶2.

The Parties exchanged tens of thousands of pages of documents and relevant information. BANA produced, and Plaintiffs' Counsel and their experts reviewed, tens of thousands of internal documents related to BANA's NSF/OD practices. *Id*. at ¶4. Plaintiffs took the depositions of several of BANA's corporate representatives. BANA took, and Plaintiffs defended, the depositions of several Class Representatives, as well.[6] *Id*., at ¶5.

Plaintiffs also served subpoenas on five non-party banks, as well as the National Automated Clearing House Association ("NACHA"). BANA served non-party subpoenas on various third-party merchants. *Id*., ¶6. With respect to transactional data produced by BANA, it was necessary for Plaintiffs to engage the services of a well-regarded expert in order to evaluate the data for purposes of ascertaining class members and for estimating the damages at issue in this case. Plaintiffs' expert, Arthur Olsen, analyzed millions of account transactions that occurred

---

cases alleging claims against other banks or credit unions, many of which relied on this Court's reasoned opinion. *See, e.g., McNeil v. Capital One Bank, N.A.*, No. 19-cv-00473-FB-REF, 2020 WL 5802363 (E.D.N.Y. September 29, 2020); *Perks v. TD Bank, N.A.,* No. 18-CV-11176 (VEC), 2020 WL 1272246 (S.D.N.Y. Mar. 17, 2020); *Coleman v. Alaska USA Fed. Credit Union*, No. 3:19-CV-0229-HRH, 2020 WL 110742 (D. Alaska Jan. 9, 2020); *Tannehill v. Simmons Bank*, No. 3:19-CV-140-DPM, 2019 WL 7176777 (E.D. Ark. Oct. 21, 2019).
[5] On November 5, 2018, Plaintiff Kristen Valperga, represented by separate counsel, filed a class action complaint against BANA in the Northern District of California asserting almost identical allegations and claims. Valperga dismissed her Complaint without prejudice on June 6, 2019, and her counsel made appearances in this matter. She has now been added to this action by stipulation and subject to Court approval.
[6] The depositions of some Class Representatives were scheduled, but ultimately cancelled due to the onset of the Covid-19 pandemic.

during the class period. *Id.*, ¶7. Further, in preparation for their motion for class certification, Plaintiffs engaged an expert to opine on the issues of consumer perception of the challenged disclosures and were in the process of preparing various survey evidence when the settlement was finalized. *Id.*, ¶8.

While discovery was ongoing, the Parties participated in a formal mediation session with Judge Layn Phillips (Ret.), as well as several post-mediation telephone conferences. After Plaintiffs' expert analyzed millions of transaction entries provided from BANA's business records in order to estimate the damages at issue in the case, the Parties attended mediation twice, though neither mediation resulted in a settlement. With the ongoing assistance of Judge Phillips, however, the Parties continued to have settlement discussions following the second mediation. *Id.* ¶¶9-10. Judge Phillips made a mediator's proposal as to the common fund, which the Parties ultimately accepted. *Id.*, ¶11. The Parties then proceeded with limited confirmatory discovery related to damages, and worked on finalizing the Settlement Agreement involving several more months of negotiations. The Court granted preliminary approval on July 29, 2021. *See* ECF No. 88.

Following preliminary approval, Class Counsel worked extensively with the notice administrator to make sure notice was disseminated properly. Indeed, since preliminary approval, Epiq has mailed and/or emailed Notice to 4,833,234 Class Members, with Notice to 187,594 unique Class Members currently known to be undeliverable, which is a 96% deliverable rate to the Class, and the Settlement website and phone line have launched. Declaration of Rachel McCown ("McCown Decl."), at ¶¶ 20-24. Class Counsel have been fielding hundreds of phone calls and e-mails from absent class members who are interested in learning more about the Settlement. Joint Decl. ¶15.

**B.    The Settlement**

Under the Settlement Agreement, BANA has agreed to do the following: (1) make a cash payment into a Settlement Fund of ***$75,000,000***; (2) cease assessing certain NSF or OD "retry" Fees at issue in the Action for a period of at least five years, a practice change the parties mutually valued at ***$318,000,000***; and (3) improve its NSF and OD Fee disclosures to eliminate or modify the language at issue. Settlement ¶¶ 1.26, 1.38, 2.

The $75 million Settlement Fund, the largest of its kind in any action asserting similar theories of liability, will be used to pay Settlement Class members, the costs of notice and administration, such attorneys' fees and expenses that the Court may award to Class Counsel, and Service Award to the Class Representatives.

As a result of this litigation, BANA also agreed to cease assessing NSF or OD Fees on automated clearinghouse entries labeled by the merchant as a "RETRY PYMT" for a period of at least five (5) years beginning on either February 28, 2022, or 180 calendar days following Final Approval of the Settlement, whichever is later. *Id.* ¶ 1.26. This element alone is conservatively valued at $318,000,000. Joint Decl. ¶15. Moreover, BANA agreed improve its account disclosures to disclose the circumstances in which accountholders will incur Intrabank Transfer Fees and to explain the Fee Accrual process. *Id.* ¶ 2.3. While it is difficult to place a tangible value on these updated disclosures, this also provides a substantial intangible benefit to the Class and future account holders.

In addition, as another important Settlement benefit, Defendant agreed to significantly reduce notice and administration costs associated with the Settlement by conducting a laborious review of its banking data in order to identify Settlement Class members—difficult data analysis work that is commonly performed by experts for plaintiffs or a claims administrator, at a cost of hundreds of thousands of dollars.

6

Moreover, since Epiq has identified the class members who are current BANA account holders (McCown Decl., at ¶7) and Defendant has agreed to make direct deposits of Settlement proceeds to those class members, approximately 2,500,000 class members will receive settlement proceeds in this manner. This too saves hundreds of thousands of dollars in costs that would otherwise have been borne by the Settlement Class to print and mail checks.

The overwhelming response of Settlement class members has been positive. Though the deadline has not yet lapsed, as of the date of this filing, there have been four opt outs and zero objections. McCown Decl., ¶¶25-16.

## II.  ARGUMENT

It has long been the case that Plaintiff's attorneys in a successful class action lawsuit may petition the court for compensation relating to any benefits to the class that result from the attorneys' efforts. *See, e.g.*, *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980). Rule 23(h) allows for the award of "reasonable attorneys' fees and nontaxable costs that are authorized by law or the parties' agreement." In determining a reasonable fee in a class action, courts generally use two different methods, the "lodestar" method and the "percentage of the fund" method. *In re Microstrategy, Inc.*, 172 F. Supp. 2d 778, 786 (E.D. Va. 2001). The percentage of the fund method awards fees as a percentage of the benefit secured for the Class; the lodestar method awards fees based on the value of Counsel's time spent litigating the claims. *Singleton v. Domino's Pizza, LLC*, 976 F. Supp. 2d 665, 681 No. 11-CV-1823, 2013 WL 5506027, at *10 (D. Md. Oct. 2, 2013).

Although the Fourth Circuit has not specified a preference for the lodestar method or the percentage of the fund method, several district courts in this Circuit have commented that "the percentage-of-recovery approach is the *preferred* approach to determine attorney's fees." *Savani v. URS Prof'l Solutions LLC*, 121 F. Supp. 3d 564, 568-69 (D.S.C. 2015) (citations omitted)

(emphasis added); *see also In re The Mills Corp. Sec. Litig.,* 265 F.R.D. 246, 260 (E.D. Va. 2009) (explaining that "[w]hile the Fourth Circuit has not definitively answered this debate, other districts within this Circuit, and the vast majority of courts in other jurisdictions consistently apply a percentage of the fund method[.]"); *Jones v. Dominion Res. Servs.,* 601 F. Supp. 2d 756, 758-59 (S.D. W. Va. 2009) ("The percentage method has overwhelmingly become the preferred method for calculating attorneys' fees in common fund cases."). The underlying reason for the percentage approach rather than the loadstar method appears to be the proper alignment of the interests of attorney and client through the percentage method according to Professor Fitzpatrick. Fitzpatrick Decl., at ¶11.

Ultimately, "[w]ith either method, the goal is to make sure that counsel is fairly compensated." *Brown v. Transurban USA, Inc*., 318 F.R.D. 560, 575 (E.D. Va. 2016). Importantly to the case at bar, the "most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Carroll v. Wolpoff & Abramson*, 53 F.3d 626, 629 (4th Cir. 1995) (citations and quotations omitted).

Here, as Professor Fitzpatrick explains, the Court should use the percentage of the fund method. The percentage of the fund method is the superior method for awarding attorneys' fees to Class Counsel because the lodestar method does not necessarily align the interests of Class Counsel with those of the Settlement Class. Fitzpatrick Decl., at ¶13. Under the lodestar method, Class Counsel's fee does not depend on how much the Settlement Class recovers, but, rather, on how many hours Class Counsel spent. In contrast, applying the percentage of the fund method aligns Class Counsel's interests with the Settlement Class's interests because the *more* the Settlement Class recovers, the *more* Class Counsel recovers. This is especially true here, where the value of the Settlement is reliably quantified. *Id.* at ¶¶11-12.

While Plaintiffs believe the Court should use the percentage of the fund method, Plaintiffs also demonstrate below that the requested fee award is reasonable under both approaches.

### A. The Fee Request is Reasonable Under the Percentage of the Fund Method

District courts in the Fourth Circuit have acknowledged that "[f]ees awarded under 'the percentage-of-recovery method in settlements under $100 million have ranged from 15% to 40%." *Boyd v. Coventry Health Care Inc*., 299 F.R.D. 451, 465 (D. Md. 2014). "Within the Fourth Circuit, ***contingent fees of roughly 33% are common***." *Earls v. Forga Contracting, Inc*., No. 1:19-CV-00190-MR-WCM, 2020 WL 3063921, at \*4 (W.D.N.C. June 9, 2020) (emphasis added); *Seaman v. Duke Univ.,* No. 1:15-CV-462, 2019 WL 4674758, at \*3 (M.D.N.C. Sept. 25, 2019) ("***Contingent fees of one-third are common*** in this circuit in cases of similar complexity.") (emphasis added); *see also Kelly v. The Johns Hopkins Univ*., No. 1:16-cv-2835-GLR, 2020 WL 434473, at \*3 (D. Md. January 28, 2020) ("***Contingent fees of up to one-third are common*** in [the 4th] circuit.") (emphasis added).  As such, district courts in this Circuit routinely award 33% from a common fund as attorneys' fees.  *See, e.g., In re Celebrex (Celecoxib) Antitrust Litig*., No. 2:14-CV-00361, 2018 WL 2382091, at \*5 (E.D. Va. Apr. 18, 2018) ("Fee awards of one-third of the settlement amount are commonly awarded in cases analogous to this one . . . ." and awarding 33% of $94 million settlement in class action case); *In re Titanium Dioxide Antitrust Litig*., No. 10-CV-00318 RDB, 2013 WL 6577029, at \*1 (D. Md. Dec. 13, 2013) (awarding attorneys' fees of 33% of $163 million settlement). *Myers v. Loomis Armored US, LLC,* 3:18-cv- 00532-FDW-DSC, 2020 WL 1815902, at \*6-7 (W.D.N.C. Apr. 8, 2020) ("Class Counsel's request for one-third of the Gross Maximum Settlement Amount is reasonable."); *Lambert v. Navy Federal Credit Union*, Case No. 1:19-cv-00103-LO-MSN, Dkt. No. 61 (E.D. Va. Apr. 8, 2021) (Granting 33.33% of $16

9

million settlement fund because "Class Counsel's [which included many of same firms representing the Class here] expertise, perseverance, and skill allowed them to obtain an excellent result for the Settlement Class."). In fact, a comprehensive study of attorney's fees in class action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. of Empirical Legal Studies 27, 31, 33 (2004); Fitzpatrick Decl., at ¶ 20.

Although the Fourth Circuit has not designated factors for courts to apply under the "percentage of the fund method," district courts in this Circuit typically use the following seven factors: (1) the results obtained for the class; (2) the quality, skill, and efficiency of the attorneys involved; (3) the risk of nonpayment; (4) objections by members of the class to the settlement terms and/or fees requested by counsel; (5) awards in similar cases; (6) the complexity and duration of the case; and (7) public policy. *Fangman v. Genuine Title, LLC,* No. 14-CV-0081, 2017 WL 86010, at *3-4 (D. Md. Jan. 10, 2017). Here, these factors all support award of the requested fee.

1. Results Obtained for the Class

In the Fourth Circuit, "the most critical factor in calculating a reasonable fee award is the degree of success obtained." *McDonnell v. Miller Oil Co*., 134 F.3d 638, 641 (4th Cir. 1998) (citation and internal quotation omitted). Here, the Settlement provides an excellent result for the Settlement Class. Class Counsel successfully negotiated: (1) a $75,000,000.00 common fund that will provide cash payments directly to Settlement Class Members, without any claims process; (2) BANA's agreement to stop charging fees on "RETRY" payments for at least five years—a practice change valued at $318,000,000; and (3) disclosure improvements. The common fund *alone* (not including the value of the injunctive relief) represents ~17-40% of the total recoverable damages. Joint Decl., at ¶15. Regardless of the percentage used, each represents an excellent result for the

class, that is similar to or better than the results in similar cases. *See* Fitzpatrick Decl. ¶¶ 20-21.

In addition to the common fund cash payment, BANA has agreed to become one of the first major American banks to stop its "retry NSF Fee" practice, and that agreement will save current accountholder Class Members an estimated $318,000,000 over the next five years in OD and NSF Fees that otherwise might have otherwise been assessed, as well as set a significant precedent in the banking industry given that BANA is the second largest bank in the country. When the value of the prospective relief is considered, the Settlement amounts to ***90%-210% of the most probable classwide damages***. Joint Dec., at ¶15.

The significance of the practice change cannot be overstated. As Professor Fitzpatrick explains, only 23% of class actions in his study included non-monetary benefits. Fitzpatrick Decl., at ¶17. This settlement is one of the few that contains an agreement to cease the practice at the heart of the litigation. If the practice change were considered by the Court, fee request of $25,000,000 represents *only* 6.4% of the overall $393,000,000 value of the settlement – far below fee awards in similar cases. Even if it is not considered, the practice change is certainly a factor that the Court should consider in determining a reasonable percentage of the common fund to award. In order to incentivize class counsel to pursue meaningful practice changes, they must be rewarded when they do so. Fitzpatrick Decl., at ¶16. Perhaps for that reason, courts have consistently recognized as much when evaluating the fairness of fee requests. *See Farrell v. Bank of Am. Corp., N.A.*, 827 F. App'x 628, 631 (9th Cir. 2020) (overruling objector in part because the settlement included a practice change which generated benefits far "beyond the cash settlement fund."); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049 (9th Cir. 2002) (discussing non-monetary benefits as partial justification for a larger fee award); *Savani*, 121 F. Supp. 3d at 572 (approving class counsel's request for 39.57% of the cash paid, where the "cash paid represents

approximately 16.88% of the potential $2.24 million current and future value of the recovery");

In sum, the Settlement is excellent by any measure. As a result of the Settlement, Settlement Class Members will receive their monetary distributions without the need to submit a claim. In addition, all of the Settlement Fund will be distributed to Settlement Class Members by way of the first or second round of distributions, or contributed to a *cy pres* recipient if additional distributions are not cost effective. Under the Agreement, there will be no reversion of unclaimed funds to BANA. In short, the Settlement provides significant, direct benefits to Settlement Class Members and will continue to do so for at least five years. Given the significant benefits of the Settlement, Class Counsel's fee request for one-third of the Settlement Fund is reasonable.

2. <u>Quality, Skill, and Efficiency of Attorneys</u>

Class Counsel possesses extensive knowledge of and experience in prosecuting class actions in courts throughout the United States. Joint Decl., at ¶¶ 17-20. Class Counsel has successfully litigated and resolved many other consumer class actions against major corporations, including those against over a hundred financial institutions related to improper fee assessments, recovering hundreds of millions of dollars for those classes. *Id*. Class Counsels' experience, resources, and knowledge—especially in the specialized area of banking litigation—is extensive and formidable. *Id*. Indeed, there are few if any firms in the nation with this expertise.

Here, Class Counsel's combined expertise allowed it to build a novel case that has not been attempted before. *Id*. at ¶¶ 1-16. To even be able to identify the alleged inappropriate fees requires specialized knowledge and skill, as do the theories surrounding the alleged fees, not to mention the specialized knowledge of class action procedure required to achieve certification, let alone settlement. This factor supports granting the requested fee. Because Class Counsel has litigated many complex consumer cases involving financial services, including working extensively with

experts to uncover the methodologies behind the assessment of fees, they were able to successfully litigate and settle this matter. *Id*. Moreover, Class Counsel litigated this action efficiently. Based in no small part on their skill and expertise, Class Counsel were able to negotiate a Settlement prior to a ruling on (and potential appeals related to) class certification, allowing Class Members to receive their settlement benefits now—without the extensive delay entailed by pursuing this case through judgment. The swift resolution of the case benefits the Settlement Class and emphasizes the skill and efficiency of Class Counsel. This factor also weighs in favor of approval.

### 3. Risk of Nonpayment

From the outset, Class Counsel litigated this matter on a contingent fee basis and placed their own resources at risk to do so. Absent this Settlement, the Settlement Class and Class Counsel risked obtaining no recovery at all. The contingent nature of the case therefore favors the award of fees. *See Decohen v. Abbasi, LLC*, 299 F.R.D. 469, 482 (D. Md. 2014) (finding that "public policy favors the requested award" where risk of non-payment exists "because the relevant public policy considerations involve the balancing of the policy goals of encouraging counsel to pursue meritorious … litigation.") (citation and internal quotations omitted).

The Fourth Circuit has recognized the importance of the risk of non-payment in awarding fees. In a 2010 case, the United States Court of Appeals for the Fourth Circuit reversed the district court's "reduction of attorney's fees from thirty-three percent to a mere three percent," noting that "[t]he chief error in the district court's analysis was its failure to recognize the significance of the contingency fee in this case." *Pellegrin v. Nat'l Union Fire Ins. (In re Abrams & Abrams, P.A.)*, 605 F.3d 238, 245, 249 (4th Cir. 2010). The Fourth Circuit noted that "contingency fees provide access to counsel for individuals who would otherwise have difficulty obtaining representation," stating, "[t]he contingency agreement was, as the saying goes, the key to the courthouse door that

allowed [plaintiff] to retain the attorneys who eventually provided for his son's ongoing needs." *Id*. at 245-46. The Fourth Circuit further noted that "contingency fee agreements transfer a significant portion of the risk of loss to the attorneys taking a case," and "[a]ccess to the courts would be difficult to achieve without compensating attorneys for that risk." *Id*. at 246. Stated differently, "plaintiffs may find it difficult to obtain representation if attorneys know their reward for accepting a contingency case is merely payment at the same rate they could obtain risk-free for hourly work, while their downside is no payment whatsoever." *Id*.

In this case, Class Counsel bore a significant risk of nonpayment as "eviden[ced] in the fact that they undertook this action on an entirely contingent fee basis." *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 263 (E.D. Va. 2009). The risk here was only magnified, given the novelty of Plaintiffs' theory of liability. Moreover, while the case was pending, a later case asserting a similar theory in the Eastern District of Virginia was dismissed and appealed to the Fourth Circuit. *See Lambert v. Navy Fed. Credit Union*, No. 1:19-CV-103-LO-MSN, 2019 WL 3843064, at *1 (E.D. Va. Aug. 14, 2019). That meant the road to recovery was far from certain. BANA was sure to challenge class certification and would again raise the issue of liability on summary judgment. Class Counsel's ingenuity and creativity in developing this case—and pursuing it successfully without a financial safety net —ought to be rewarded.

4.  Objections

As of the date of this filing, no objections to Settlement or attorneys' fee request have been filed. Should any timely objections be received after the filing of this motion, Class Counsel will address them in their Motion for Final Approval.

5.  Awards in Similar Cases

Courts approving fee requests in other bank fee settlements have approved awards similar

to the award requested here. Indeed, the requested fee of 33.33% is in line with what has been routinely approved by judges who have ruled on the fairness of settlements in other cases concerning disputed bank fee practices over the last two decades. As Professor Fitzpatrick explains, when evaluating similar bank fee cases, approximately half of the fee awards were for 33% or greater. Fitzpatrick Decl., at ¶20. This was true even though many of the settlements either did <u>not</u> include injunctive relief like that obtained here, or, if they did, the court included the value of the injunctive relief in calculating the fee award. *Id.* Since 2010, numerous courts have awarded percentage of the fund-based fees in overdraft fee class actions. As demonstrated by Professor Fitzpatrick, the requested fee award in this case is less than the fee awards approved in other bank fee class action cases. *Id.* (listing cases and fee awards).

As just one recent example, Judge O'Grady recently awarded an attorneys' fee of 33% of the common fund in a similar bank fee case. *Lambert v. Navy Federal Credit Union*, Case No. 1:19-cv-00103-LO-MSN, Dkt. No. 61 (E.D. Va. Apr. 8, 2021) (Granting 33.33% of $16 million settlement fund because "Class Counsel's [which included many of same firms representing the Class here] expertise, perseverance, and skill allowed them to obtain an excellent result for the Settlement Class."). Notably the fee awarded resulted in a lodestar multiplier of 6.11. and the settlement in that case did not require the defendant to stop the challenged fee assessment practice. *Id.* at Dkt. 52 at 18.

6. <u>Duration and Complexity of the Case</u>

As noted, when this case was filed, it was the first of its kind. Since then, numerous other cases have been filed asserting a similar theory of liability, with mixed success. While most courts have denied motions to dismiss, a handful of others have granted motions to dismiss.[7] While such

---

[7] *See, e.g., Varga v. American Airlines Credit Union*, Case No. 2:20-cv-04380 (C.D. Cal.) (Doc.

dismissals at the pleading stage are in the minority, the existence of contrary authority demonstrates there was a real risk that the Court could have entered summary judgment in favor of BANA, or that a subsequent appeal would leave class members without recompense. Moreover, no similar case has been taken to trial, leaving the Court without a road map for trial.

Because of the continuously developing law around the theory of liability and the uncertainty that existed throughout the litigation, Class Counsel needed a high degree of skill, both to settle the matter and to be prepared to litigate the merits through any potential appeal. Class Counsel's experience handling the most prominent bank fee cases and their understanding of the related legal issues helped them successfully advance this case and procure a beneficial result for the Class. The complex nature of this case warrants approval of the requested fee award.

7. <u>Public Policy</u>

When assessing the reasonableness of a fee award in a class action settlement, the "court must strike the appropriate balance between promoting the important public policy that attorneys continue litigating class action cases that 'vindicate rights that might otherwise go unprotected,' and perpetuating the public perception that 'class action plaintiffs' lawyers are overcompensated

---

34) (Dec. 1, 2020) (denying motion to dismiss in case alleging same theory of liability); *Perks v. TD Bank, N.A.,* No. 18-CV-11176 (VEC), 2020 WL 1272246 (S.D.N.Y. Mar. 17, 2020) (same); *Coleman v. Alaska USA Fed. Credit Union*, No. 3:19-CV-0229-HRH, 2020 WL 110742 (D. Alaska Jan. 9, 2020) (same); *Roy v. ESL Fed. Credit Union*, No. 19-CV-6122-FPG, 2020 WL 5849297 (W.D.N.Y. Sept. 30, 2020) (same); *McNeil v. Capital One Bank, N.A.,* No. 19-CV-00473-FB-RER, 2020 WL 5802363 (E.D.N.Y. Sept. 29, 2020) (same); *Wilkins v. Simmons Bank*, Case No. 3:20-cv-116-DPM (E.D. Arkansas) (December 9, 2020) (same); *Chambers v. HSBC Bank USA, N.A.*, Case No. 1:19-cv-10436-ER (S.D.N.Y. Dec. 10, 2020) (same); *Tannehill v. Simmons Bank*, No. 3:19-cv-140-DPM, 2019 WL 7176777 (E.D. Ark. Oct. 21, 2019) (same); but see *Page v. Alliant Credit Union*, No. 19-cv-5965, 2020 WL 5076690 (N.D. Ill. Aug. 26, 2020) (granting motion to dismiss in case alleging same theory of liability); *Saunders v. Y-12 Fed. Credit Union*, No. E2020-00046-COA-R3-CV, 2020 WL 6499558, at *3-5 (Tenn. Ct. App. Nov. 5, 2020) (affirming the granting of motion to dismiss in similar case); *Lambert v. Navy Fed. Credit Union,* No. 1:19-CV-103-LO-MSN, 2019 WL 3843064 (E.D. Va. Aug. 14, 2019) (same).

for the work that they do.'" *Fangman*, 2017 WL 86010, at *6 (quoting *Singleton*, 976 F. Supp. 2d at 687). The settlement of this case and the attorneys' fees requested do not raise serious public policy concerns, and no Settlement Class Members have presently objected to the requested fee. Accordingly, this factor supports approval of the requested award.

In sum, the seven factors that the Fourth Circuit uses to assess the reasonableness of a fee award all weigh in favor of approving the requested award.

### B. The Fee Award Is Reasonable Based on the Lodestar Method.

Although the Court is not required to review counsel's lodestar to cross-check a requested fee amount, should the Court exercise its discretion to perform a lodestar cross-check here, the requested fee award is reasonable under that metric, as well. *See Boyd*, 299 F.R.D. at 467 ("The purpose of a lodestar cross-check is to determine whether a proposed fee award is excessive relative to the hours reportedly worked by counsel, or whether the fee is within some reasonable multiplier of the lodestar") (citation omitted); Fitzpatrick Decl., ¶¶28-29. After examining the time and labor required, the Court may apply a multiplier to the lodestar. *Berry v. Schulman,* 807 F.3d 600, 617 n.9 (4th Cir. 2015) (noting that using the lodestar method, "the district court multiplies the number of hours worked by a reasonable hourly rate. And it can then "adjust the lodestar figure using a 'multiplier' derived from a number of factors, such as the benefit achieved for the class and the complexity of the case.'").

Under the lodestar method, the Court's analysis begins by calculating counsel's lodestar—reasonable hourly rates multiplied by hours reasonably expended in the litigation. *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008). In the Fourth Circuit, twelve factors guide the Court's "reasonableness" analysis when evaluating fee awards on a lodestar basis:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the

attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Barber v. Kimbrell's, Inc*., 577 F.2d 216, 226 n.28 (4th Cir. 1978).

The Court does not need to address all twelve factors independently "because such considerations are usually subsumed within the initial calculation of hours reasonably expended at a reasonable hourly rate." *MTU Am. Inc. v. Swiftships Shipbuilders LLC*, No. 1:14-CV-773 LMB/TCB, 2015 WL 4139176, at *3 (E.D. Va. July 8, 2015) (internal quotation omitted). Of the factors, "the results obtained" is typically considered the most important. *Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 190 (4th Cir. 2007). Here, all of the factors counsel towards approval of the requested fee award.

1. <u>Class Counsel's Lodestar Reflects the Time, Labor, and Skill Reasonably Required to Prosecute this Complex Action.</u>

Here, Class Counsel reasonably expended 5,072.65 total hours litigating this Action, including a reasonable amount of estimated time that will be spent from the date of this Motion forward, including to respond to a large number of class member inquiries, draft and prepare a final approval motion, prepare for and attend the final approval hearing, and supervise the calculation and distribution of settlement proceeds to millions of class members. Joint Decl., at ¶33, 40, 46, 53, 60. Cognizant of the need to work efficiently, Class Counsel coordinated their work to avoid duplication of effort and assigned work to associates and paralegal personnel whenever possible and prudent to keep costs low.

These hours were reasonably expended over the course of this litigation, which has been going on for almost four years. Initially, given that this case was the first of its kind, Class Counsel

spent many hours researching and investigating the nature of any potential claims, complicated NACHA Rules, banking regulations, the existence of consumer and regulatory complaints on the same issue, interviewing potential class members, reviewing bank statements and BANA's disclosures, and researching legal precedent that could influence the result. Class Counsel thus spent hundreds of hours investigating these claims before the Complaint was even filed.

After filing, Class Counsel then spent many more hours perfecting the pleadings. This included numerous amendments to the Complaint, as well as briefing the Motion to Dismiss and BANA's objection to Magistrate Judge Cayer's decision on the Motion to Dismiss. Because this Motion to Dismiss was the first of its kind, Class Counsel did not have any template to work from. Class Counsel put substantial effort into presenting the most cogent, persuasive opposition briefing that they could, and were rewarded with an opinion largely denying BANA's Motion.

Following the decision on the Motion to Dismiss, discovery began in earnest. Plaintiffs served three sets of interrogatories and Requests for Production of Documents, as well as numerous 30(b)(6) deposition notices and subpoenas of third parties. BANA served discovery on Plaintiffs, as well, including interrogatories and Requests for Production and Admissions. Joint Decl., at ¶2. The Parties met and conferred and successfully negotiated a protective order; ESI protocol and ESI search terms; and the production of transactional data. *Id.* at ¶3. The Parties then exchanged tens of thousands of pages of documents and relevant information which Plaintiffs' Counsel and their experts reviewed. *Id.* at ¶4. Class Counsel also worked with two experts—a damages expert, and a liability expert—to prepare for class certification. *Id.* at ¶¶7-8. Plaintiffs also served subpoenas on various third parties and took the depositions of several of BANA's corporate representatives. BANA took, and Plaintiffs defended, in-person depositions of several Class Representatives, as well. *Id.* at ¶¶5-6.

In addition to formal discovery, Class Counsel put substantial effort into gathering all necessary information to negotiate a settlement. Class Counsel worked with their expert—one of the most well-respected bank fee damages experts in the country—to analyze BANA's transactional data and estimate classwide damages. *Id.* at ¶7. Class Counsel met face-to-face for a settlement conference with Judge Phillips on August 26, 2019. Though they did not reach a settlement, the Parties engaged in substantial discussions regarding the claims at issue. *Id.* at ¶9. On September 8, 2020, the Parties attended a second, virtual mediation with Judge Phillips. The second mediation also did not result in a settlement, but the parties narrowed their differences. *Id.* at ¶10. Judge Phillips made a mediator's proposal as to the common fund, which the Parties ultimately accepted. *Id.* at ¶11. Following the proposal, when an agreement in principle was reached, the Parties continued to engage in numerous telephonic negotiation sessions, in order to finalize the full Settlement Agreement. *Id.* at ¶12. Class Counsel then worked diligently with the Settlement Administrator to prepare notice for the Settlement Class. *Id.*

In short, the hours Class Counsel spent litigating this Action reflect the efforts required to achieve such an excellent result.

2. <u>Class Counsel's Hourly Rates are Reasonable.</u>

In the attached Declarations, Class Counsel provide their lodestar calculations. Class Counsel's lodestar results in a multiplier of 6.75. Joint Decl., at ¶26. An "attorney's actual billing rate provides a starting point for purposes of establishing a prevailing market rate." *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994) (internal quotation omitted). Here, Class Counsel include leading class action attorneys, especially in financial services litigation. *See* Joint Decl., at ¶¶17-22.

Each of the firms billing rates are explained in detail in the declarations attached hereto. ¶

Joint Decl., at ¶¶23-61. The rates used here are in line with the rates commonly awarded in this district. *See, e.g.*, *In re Neustar*, 2015 WL 8484438, at *10 (approving rates of $260 - $310 for paralegal services, $420 - $700 for associates, and $800 - $975 for partners); *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289, at *8 (M.D.N.C. May 9, 2016) (finding that partner billing rates of $640 - $880 per hour and associate billing rates of $375 - $550 per hour were "within the range of reasonableness" especially given that "the market for class action attorneys is nationwide and populated by very experienced attorneys with excellent credentials"); *Seaman v. Duke Univ.*, No. 1:15-CV-462, 2019 WL 4674758, at *5 (M.D.N.C. Sept. 25, 2019) (Hourly rate of between $590 and $900 for partner, $395 and $510 for the associates, and $280-$390 for paralegals was reasonable).

      3.      <u>The Requested Fee is Reasonable in Light of Class Counsel's Lodestar.</u>

Multiplying the hours reasonably expended by Class Counsel by their hourly rates, Class Counsel's lodestar is $3,702,681.80 Joint Decl., at ¶25. The requested fee represents a multiplier of 6.75. This multiplier is in line with multipliers approved in other settlements both in the Fourth Circuit and nationally. For instance, in *Health Republic Insurance Co. v. U.S.*, 1:16-cv-00259, Dkt. No. 138 (Fed. Cir. Sept. 16, 2021), the Court of Federal Claims criticized the lodestar approach, and the use of a lodestar cross-check for recreating the "same undesirable activities that the percentage method was designed to discourage, namely incentiviz[ing] [class counsel] to multiply filings and drag along proceedings to increase their lodestar." *Id*. at p. 11 (internal citations omitted). In awarding class counsel $185 million in fees, which represented a multiplier of ***18-19***, the court held that the fee was justified both as a percentage of the fund, and even if the court used a lodestar multiplier because "a multiplier of 18–19 would, at least, not be outside the realm of reasonableness." *Id*. at 25.

Many other courts, including in this Circuit, have approved similar multipliers. *See, e.g., Skochin v. Genworth Financial, Inc.,* No. 3:19-cv-49, 2020 WL 6708388 (E.D. Va. Nov. 13, 2020) (finding 9.05 multiplier not unreasonable in lodestar cross-check analysis); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,* No. 03-cv-04578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) (approving 15.6 multiplier); *In re Merry-Go-Round Enters., Inc.,* 244 B.R. 327, 335, 345 (D. Md. 2000) (approving multiplier of 19.6); *New Eng. Carpenters Health Benefits Fund v. First Databank,* No. 05-cv-11148, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (approving 8.3 multiplier); *In re Doral Financial Corp. Securities Litigation,* No. 05-cv-04014-RO (S.D.N.Y. Jul. 17, 2007) (approving 10.26 multiplier); *Beckman v. KeyBank, N.A.,* 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.").

Recently, in a similar bank-fee case where, unlike here, the defendant did not agree to cease the practice challenged in the lawsuit, the court approved an award of $6,125,000 in attorneys' fees, with a lodestar cross-check multiplier of 10.96. *Lloyd v. Navy Fed. Credit Union,* No. 17-CV-1280, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019), *reconsideration denied in part,* No. 17-CV-1280, 2019 WL 2602516 (S.D. Cal. June 25, 2019).

Where, as here, Class Counsel obtained an excellent result, which included a meaningful practice change, despite long odds, it is appropriate to apply the requested reasonable multiplier.

Giving due consideration for all of the foregoing, should the Court decide to conduct a lodestar cross-check, such a cross-check supports that award.

4.     The *Barber* Factors Support the Fee Award

The reasonableness determination is further informed by the following factors: (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to

properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber*, 577 F.2d at 226 n.28. Class Counsel here expended large amounts of time and labor, demonstrated skill commensurate with their preeminent reputations, and achieved an excellent result in this large and complex action. Because the *Barber* factors are largely discussed *supra*, Class Counsel will not repeat them here. Suffice it to say, each factor supports the requested fee award here.[8] Particularly salient here is the 8th factor—the amount in controversy and the results obtained. *See Decohen v. Abbasi*, *LLC*, 299 F.R.D. 469, 481 (D. Md. 2014) ("In the Fourth Circuit, the most critical factor in calculating a reasonable fee award is the degree of success obtained."). Class Counsel have achieved relief that provides substantial benefits for millions of accountholders, making the requested fee more than reasonable.

### C. Class Counsel's Costs and Expenses Incurred are Reasonable and Should Be Reimbursed from the Common Fund

The requested fee award also includes Class Counsel's reasonably incurred costs and expenses. As discussed above and in the accompanying declarations, Counsel has incurred $226,863.13 in costs litigating this case. Courts regularly award litigation expenses in addition to

---

[8] The only factors not previously discussed are the 4th, 10th, and 11th factor. Each factor supports the requested fee award. With respect to the 4th factor, Class Counsel lost the opportunity to pursue other matters while pursuing this case. Moreover, there are few attorneys with the level of expertise as Class Counsel in similar litigation challenging the fee assessment practices of sophisticated financial institutions. Finally, Class Counsel has pursued this case on behalf of Plaintiffs for almost four years, further supporting the requested fee.

attorneys' fees in class action cases. *See, e.g.*, *Kabore v. Anchor Staffing, Inc.*, No. L-10-3204, 2012 WL 5077636, at *10 (D. Md. Oct.17, 2012). The Fourth Circuit has explained that such costs and expenses may include "those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Spell v. McDaniel*, 852 F.2d 762, 771 (4th Cir. 1988) (internal quotations omitted). Fourth Circuit courts have awarded costs such as "necessary travel, depositions and transcripts, computer research, postage, court costs, and photocopying." *Singleton*, 2013 WL 5506027, at *17 (D. Md. Oct. 2, 2013); *see also In re Neustar*, 2015 WL 8484438, at *10 (reasonable expenses included mediation fees). Class Counsel's costs here all fall into these categories and were all reasonably incurred in pursuing this litigation. Joint Decl., at ¶¶35,42, 48, 55, 61. Class Counsel's expenses were reasonable and necessary to litigate this case, and the Court should therefore include them in any fee award. *Singleton*, 2013 WL 5506027, at *17 (awarding expenses that the court deemed were "reasonable and typical").

### D. The Requested Service Award is Reasonable and Should Be Paid from the Common Fund

Courts generally recognize that "[i]ncentive or service awards reward representative plaintiffs' work in support of the class, as well as their promotion of the public interest." *Deem*, 2013 WL 2285972, at *6 (citing *Jones*, 601 F. Supp. 2d at 767). Plaintiffs' request a service award for each class representative that is commensurate with their level of involvement in the case. Specifically, for those class representatives who provided discovery and were deposed (Lisa Morris and Michael Bui), the Settlement awards each of them $10,000. For those class representatives who provided discovery but were not deposed (Tumika Williams and Albert Edge), the Settlement awards each of them $5,000. For the class representative who did not provide discovery and was not deposed (Kristen Valperga), the Settlement awards her $1,000.

Service awards have been regularly approved by judges in this Circuit in cases such as this where the class representative took a role in prosecuting the claims on behalf of the class. *See, e..g., In re Cotton*, No. 14-30287, 2019 WL 1233740, at *4 (W.D.N.C. Mar. 15, 2019) (J. Conrad) (approving a service award to each class representative in the amount of $10,000); see also *Ryals v. HireRight Sols., Inc*., No. 3:09cv625, Dkt. No. 127 at 10 (E.D. Va. Dec. 22, 2011) (approving a service award to each class representative in the amount of $10,000); *Manuel v. Wells Fargo Bank, Nat'l Ass'n*, No. 3:14CV238, 2016 WL 1070819, at *6 (E.D. Va. Mar. 15, 2016) (Approving a $10,000 service award). Each of the Class Representatives took a risk, and provided a valuable public service, by putting themselves forward as the class representatives in this case. They each kept abreast of the case's status, reviewed documents provided by their counsel, and discussed with counsel various aspects of the case, including the Settlement. Joint Decl., at ¶49-50. Two of them also prepared and sat for depositions. *Id.* Additionally, the nature of Plaintiffs' claims against BANA necessarily put their finances at issue and publicly disclosed their personal financial difficulties, creating notoriety regardless of the success of their claims.

## III. CONCLUSION

Plaintiff respectfully requests that the Court award a total of $25,000,000.00 in attorneys' fees and $226,863.13 in costs and expenses incurred to Class Counsel, and $31,000.00 in Service Awards to the Class Representatives, as allocated in the Settlement Agreement.


Dated: October 12, 2021                    Respectfully submitted,

                                        By: s/ Larry McDevitt
                                        Larry McDevitt
                                        NC State Bar No. 5032
                                        David M. Wilkerson

NC State Bar No.  35742
THE VAN WINKLE LAW FIRM
11 North Market Street
Asheville, NC 28801
(828) 258-2991
*dwilkerson@vwlawfirm.com*
*lmcdevitt@vwlawfirm.com*

Jeffrey D. Kaliel
Sophia Gold
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
(202) 350-4783
*jkaliel@kalielpllc.com*
*sgold@kalielpllc.com*

James J. Pizzirusso
HAUSFELD LLP
888 16th St., Suite 300
Washington, DC 20006
(202) 540-7200
*jpizzirusso@hausfeld.com*

***Co-Lead and Liaison Counsel for the Class***