**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

*Morris v. Bank of America, N.A.*

*Case No. 18-CV-157*

## DECLARATION OF BRIAN T. FITZPATRICK

### I.  BACKGROUND AND QUALIFICATIONS

1.        I am the Milton R. Underwood Chair in Free Enterprise and Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from the University of Notre Dame in 1997 and Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP. My C.V. is attached as Exhibit 1.  I speak only for myself and not for Vanderbilt.

2.        My teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, the Vanderbilt Law Review, the NYU Journal of Law & Business, the Fordham Law Review, and the University of Arizona Law Review.  My work has been cited by numerous courts, scholars, and media outlets such as the New York Times, USA Today, and Wall Street Journal.  I have also been invited to speak at symposia and other events about class action litigation, such as the ABA National Institutes on Class Actions in 2011, 2015, 2016, 2017, and 2019; the Annual Conference of the ABA's

Litigation Section in 2021; and the ABA Annual Meeting in 2012. Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies. In 2015, I was elected to the membership of the American Law Institute.

3.    In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "*Empirical Study*"). This article is still what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published. Unlike other studies of class actions, which have been confined to one subject matter or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period (2006-2007). *See id*. at 812-13. As such, not only is my study an unbiased sample of settlements, but the number of settlements included in my study is also several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 30 from the Fourth Circuit alone. *See id*. at 817. I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010. Since then, this study has been relied upon regularly by courts, scholars, and testifying experts.[1] I have attached this study as Exhibit 2 and will draw upon it in this declaration.

---

[1] *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *Kuhr v. Mayo Clinic Jacksonville*, No. 3:19-cv-453-MMH-MCR, 2021 WL 1207878, at *12-13 (M.D. Fla. Mar. 30, 2021) (same); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, No. 11 MD 2262 (NRB), 2020 WL 6891417, at *3 (S.D.N.Y. Nov. 24, 2020)

(same); *Shah v. Zimmer Biomet Holdings, Inc.*, No. 3:16-cv-815-PPS-MGG, 2020 WL 5627171, at *10 (N.D. Ind. Sept. 18, 2020) (same); *In re GSE Bonds Antitrust Litig.*, No. 19-cv-1704 (JSR), 2020 WL 3250593, at *5 (S.D.N.Y. June 16, 2020) (same); *In re Wells Fargo & Co. S'holder Derivative Litig.*, No. 16-cv-05541-JST, 2020 WL 1786159, at *11 (N.D. Cal. Apr. 7, 2020) (same); *Arkansas Teacher Ret. Sys. v. State St. Bank & Trust Co.*, No. CV 11-10230-MLW, 2020 WL 949885, 2020 WL 949885, at *52 (D. Mass. Feb. 27, 2020), *appeal dismissed sub nom. Arkansas Tchr. Ret. Sys. v. State St. Corp.*, No. 20-1365, 2020 WL 5793216 (1st Cir. Sept. 3, 2020) (same); *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *34 (N.D. Ga. Jan. 13, 2020) (same); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. 3:07-cv-05634-CRB, 2019 WL 6327363, at *4-5 (N.D. Cal. Nov. 26, 2019) (same); *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-CV-8057 (VEC), 2019 WL 5425475, at *2 (S.D.N.Y. Oct. 23, 2019) (same); *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 1915298, at *2 (S.D.N.Y. Apr. 30, 2019) (same); *Grice v. Pepsi Beverages Co.*, 363 F. Supp. 3d 401, 407 (S.D.N.Y. 2019) (same); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2018 WL 6250657, at *2 (S.D.N.Y. Nov. 29, 2018) (same); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2018 WL 4030558, at *5 (N.D. Cal. Aug. 23, 2018) (same); *Little v. Washington Metro. Area Transit Auth.*, 313 F. Supp. 3d 27, 38 (D.D.C. 2018) (same); *Hillson v. Kelly Servs. Inc.*, No. 2:15-cv-10803, 2017 WL 3446596, at *4 (E.D. Mich. Aug. 11, 2017) (same); *Good v. W. Virginia-Am. Water Co.*, No. 14-1374, 2017 WL 2884535, at *23, *27 (S.D.W. Va. July 6, 2017) (same); *McGreevy v. Life Alert Emergency Response, Inc.*, 258 F. Supp. 3d 380, 385 (S.D.N.Y. 2017) (same); *Brown v. Rita's Water Ice Franchise Co. LLC*, No. 15–3509, 2017 WL 1021025, at *9 (E.D. Pa. Mar. 16, 2017) (same); *In re Credit Default Swaps Antitrust Litig.*, No. 13MD2476 (DLC), 2016 WL 2731524, at *17 (S.D.N.Y. Apr. 26, 2016) (same); *Gehrich v. Chase Bank USA, N.A.*, 316 F.R.D. 215, 236 (N.D. Ill. 2016); *Ramah Navajo Chapter v. Jewell*, 167 F. Supp 3d 1217, 1246 (D.N.M. 2016); *In re: Cathode Ray Tube (Crt) Antitrust Litig.*, No. 3:07-cv-5944 JST, 2016 WL 721680, at *42 (N.D. Cal. Jan. 28, 2016) (same); *In re Pool Products Distribution Mkt. Antitrust Litig.*, No. MDL 2328, 2015 WL 4528880, at *19-20 (E.D. La. July 27, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 2147679, at *2-4 (N.D. Ill. May 6, 2015) (same); *Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11–cv–4462, 2015 WL 1399367, at *3-5 (N.D. Ill. Mar. 23, 2015) (same); *In re Capital One Tel. Consumer Prot. Act Litig.*, 80 F. Supp. 3d 781, 797 (N.D. Ill. 2015) (same); *In re Neurontin Marketing and Sales Practices Litig.*, 58 F.Supp.3d 167, 172 (D. Mass. 2014) (same); *Tennille v. W. Union Co.*, No. 09–cv–00938–JLK–KMT, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Fed. Nat'l Mortg. Association Sec., Derivative, and "ERISA" Litig.*, 4 F. Supp. 3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Prod.*

4.      In addition to my empirical works, I have also published many law-and-economics papers on the incentives of attorneys and others in class action litigation.  *See, e.g.*, Brian T. Fitzpatrick, *A Fiduciary Judge's Guide to Awarding Fees in Class Actions*, 89 Fordham L. Rev. 1151 (2021) (hereinafter "*A Fiduciary Judge*"); Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043 (2010) (hereinafter "*Class Action Lawyers*"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009).  Much of this work was discussed in a book published recently by the University of Chicago Press entitled THE CONSERVATIVE CASE FOR CLASS ACTIONS (2019).  The thesis of the book is that the so-called "private attorney general" is superior to the public attorney general in the enforcement of the rules that free markets need in order to operate effectively and that courts should provide proper incentives to encourage such private attorney general behavior.  This work, too, has been relied upon by courts and scholars,[2] I will also draw upon it in this declaration.

5.      From time to time, I serve as an expert witness on attorneys' fees in class action litigation.  Most relevant here, since 2010, I have served as an expert in dozens of class action

---

*Liab. Litig.*, No. 11–1546, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litig.*, 953 F. Supp. 2d 82, 98-99 (D.D.C. 2013) (same); *In re Se. Milk Antitrust Litig.*, No. 2:07–CV 208, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, No. 10 C 816, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

[2] *See, e.g., Briseno v. Henderson*, 998 F.3d 1014, 1025, 1029 (9th Cir. 2021) (citing THE CONSERVATIVE CASE FOR CLASS ACTIONS); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 960 (11th Cir. 2020) (Jordan, J., dissenting) (same); *Tershakovec v. Ford Motor Co.*, 2021 WL 2700347, at *18 (S.D. Fla. July 1, 2021) (same); *Vita Nuova, Inc. v. Azar*, 2020 WL 8271942, at *3 n.5 (N.D. Tex. Dec. 2, 2020) (same).

cases challenging overdraft fees consolidated in MDL 2036. *See, e.g.*, *In Re: Checking Account Overdraft Litigation* (MDL No. 2036) (S.D. Fla.) (twenty-one different settlements). In addition to my academic work, I will draw on this experience in this declaration.

6. I have been asked by class counsel to opine on whether a fee award of one-third of the cash portion of the settlement in this case would be reasonable in light of the empirical studies and research on economic incentives in class action litigation. In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel, and I have attached a list of these documents in Exhibit 3. As I explain, based on the empirical studies and research on economic incentives, in my opinion this fee request would be reasonable.

II. CASE BACKGROUND

7. This settlement arises out of litigation against Bank of America, N.A., ("BANA") for breach of contract and violation of the North Carolina Unfair and Deceptive Trade Practices Act over its insufficient-funds fee practices. The complaint was filed in March 2018. Since then, the parties have undertaken motions practice and significant discovery, including third party discovery and work with experts. The parties have reached a class-wide settlement. The Court conditionally certified three settlement classes and granted preliminary approval of the settlement on July 29, 2021. The parties are now moving for final approval.

8. The proposed settlement classes include "[a]ll holders of BANA consumer checking and/or savings accounts" who, between July 1, 2014, and July 29, 2021: 1) "paid and were not refunded a Retry Transaction Fee," 2) "paid and were not refunded one or more Intrabank Transaction Fees," and 3) "paid and were not refunded an OD and/or an NSF Fee on a . . . transaction that would not have been assessed if BANA had delayed the posting . . . until the posting of a deposit . . . ." Settlement Agreement at ¶¶ 1.9, 3.1. The classes will release BANA

from any claim "arising out of or relating in any way to the allegations" made in this and related litigation, including those "concerning Retry Transaction Fees, Intrabank Transaction Fees, and the Fee Accrual Claims . . . ." *Id.* at ¶ 1.29. In exchange, the class will receive $75 million in cash and BANA will cease the offending "retry" fee practice for at least five years. *See id.* at ¶¶ 1.26, 1.38. After attorneys' fees and other expenses are deducted, the cash will be distributed pro rata to all class members in proportion to the number of fees they incurred. *See id.* at ¶ 7.1.1. These monies will be distributed without the need to file claim forms—monies will be automatically credited to class members' accounts if they are still BANA customers, and, if not, a check will automatically be sent to their most recent known address. *See id. at* ¶¶ 6.6.2.1-6.6.2.3. None of the cash can revert back to BANA; if any checks are uncashed, they will be redistributed to other class members or awarded to a cy pres recipient. *See id.* at ¶ 6.7. The practice change is estimated to save consumers—including approximately the half of the class who are still BANA customers—approximately $318 million over the next five years. *See* Joint Declaration ¶ 15.

9.     Class counsel have now requested a fee award equal to one-third of the cash portion of the settlement. As I explain below, it is my opinion that this fee request would be reasonable in light of the empirical and economic research on class action litigation.

### III. ASSESSMENT OF THE REASONABLENESS OF THE REQUEST FOR ATTORNEYS' FEES

10.     When a class action reaches settlement or judgment and no fee shifting statute is triggered and the defendant has not agreed to pay class counsel's fees, class counsel is paid by the class members themselves pursuant to the common law of unjust enrichment. This is sometimes called the "common fund" or "common benefit" doctrine. It requires the court to decide how much of their class action proceeds it is fair to ask class members to pay to class counsel.

6

11.     At one time, courts that awarded fees in common fund class action cases did so using the familiar "lodestar" approach.  *See* Fitzpatrick, *Class Action Lawyers*, 158 U. Pa. L. Rev. at 2051.  Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors.  *See id.*  Over time, however, the lodestar approach fell out of favor in common fund class actions.  It did so largely for two reasons.  First, courts came to dislike the lodestar method because it was difficult to calculate the lodestar; courts had to review voluminous time records and the like.  Second—and more importantly—courts came to dislike the lodestar method because it did not align the interests of class counsel with the interests of the class; class counsel's recovery did not depend on how much the class recovered, but, rather, on how many hours could be spent on the case.  *See id.* at 2051-52.  According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases, usually those involving fee-shifting statutes or those where the relief is predominantly injunctive in nature (and the value of the injunction cannot be reliably calculated).  *See* Fitzpatrick, *Empirical Study*, 7 J. Empirical L. Stud.  at 832 (finding the lodestar method used in only 12% of settlements).  The other large-scale academic studies of class action fees, authored over time by Geoff Miller and the late Ted Eisenberg, agree with my findings.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 267 (2010) ("*Eisenberg-Miller 2010*") (finding lodestar method used only 13.6% of the time before 2002 and less than 10% of the time thereafter); Theodore Eisenberg et al., *Attorneys' Fees in Class Action Settlements: 2009-2013*, 92 N.Y.U. L. Rev. 937, 945 (2017) ("*Eisenberg-Miller 2017*") (finding lodestar method used less than 7% of the time since 2009).

7

12.     The more common method of calculating attorneys' fees today is known as the "percentage" method. Under this approach, courts select a percentage of the settlement that they believe is fair to class counsel, multiply the settlement by that percentage, and then award class counsel the resulting product. The percentage approach has become the preferred method for awarding fees to class counsel in common fund cases precisely because it corrects the deficiencies of the lodestar method: it is less cumbersome to calculate, and, more importantly, it aligns the interests of class counsel with the interests of the class because the more the class recovers, the more class counsel recovers. *See* Fitzpatrick, *Class Action Lawyers,* 158 U. Pa. L. Rev. at 2052. This is why private parties—including sophisticated corporations—that hire lawyers on contingency almost always use the percentage method over the lodestar method. *See, e.g.*, David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation*, 64 Ala. L. Rev. 335, 360 (2012); Herbert M. Kritzer, Risks, Reputations, and Rewards 39-40 (1998).

13.     The Fourth Circuit has not guided its district courts on which fee method to use. As a result, district courts in this Circuit have said they have discretion to choose between the lodestar method or the percentage method in common fund class actions. *See, e.g., Galloway v. Williams,* 2020 WL 7482191, at *4 (E.D. Va. Dec. 18, 2020) ("The Fourth Circuit has not explicitly mandated which method district courts should use. A district court, therefore, has discretion to use either method." (citations omitted)). In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage method, it is my opinion that courts should use the percentage method in common fund cases whenever the value of the settlement or judgment can be reliably calculated; it is my opinion that the lodestar method should be used only where the value cannot be reliably calculated and the percentage method is therefore not feasible. This is not just my opinion, but also the opinion of leading class action

scholars, *see* Principles of the Law of Aggregate Litigation § 3.13 (2010) (cmt. b) ("Although many courts in common-fund cases permit use of either a percentage-of-the-fund approach or a lodestar . . . most courts and commentators now believe that the percentage method is superior."), and district courts in this Circuit. *See, e.g., Galloway*, 2020 WL 7482191, at *4 ("[T]he favored method for calculating attorneys' fees in common fund cases is the percentage of the fund method."). Because enough of this settlement can be easily valued to justify the requested fee using the percentage method, it is my opinion that the percentage method should be used here. I will therefore proceed under that method.

14.     Under the percentage method, courts must 1) calculate the value of the benefits to the class in the settlement and then 2) select a percentage of that value to award to class counsel. When calculating the value of the benefits, in my opinion, courts should include any cash benefits to class members, cash the defendant must pay to third parties, non-cash benefits that can be reliably valued, attorneys' fees and expenses, and administrative costs paid by the defendant. *See, e.g., In re Heartland Payment Systems, Inc. Customer Data Sec. Breach Litigation,* 851 F.Supp.2d 1040, 1080 (S.D. Tex. 2012) (Rosenthal, J.); Principles of the Law of Aggregate Litigation § 3.13(b) (2010) ("[T]he percentage [should be] based on both the monetary and the nonmonetary value of the judgment or settlement."). Although some of these things do not go directly to the class as compensation, they facilitate compensation to the class, savings to the class, or serve to deter defendants from future misconduct by making defendants pay more when they cause harm. Because both compensation and deterrence of wrongdoing are important goals of our class action system, it is my opinion that class counsel should be rewarded for generating both of them. *See* Fitzpatrick, THE CONSERVATIVE CASE FOR CLASS ACTIONS at 95-96.

15.     When selecting the percentage, courts usually examine a number of factors.  *See* Fitzpatrick, *Empirical Study*, 7 J. Empirical L. Stud. at 832.  Absent Fourth Circuit guidance, district courts in the Circuit, consider the factors adopted by the Third and Fifth Circuits.  *See, e.g., Galloway*, 2020 WL 7482191, at *4 ("[T]here is considerable confusion regarding whether the proper test is the 12-factor *Johnson* test from the Fifth Circuit or the seven-factor *Gunter* test from the Third Circuit.  To address this ambiguity, some courts in this circuit have begun applying both tests to assess the reasonableness of attorneys' fees calculated using the percentage of the fund method.").  There is much overlap between these factors, but I list all nineteen individually here: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases; [13] the results obtained for the class; [14] the quality, skill, and efficiency of the attorneys' involved; [15] the complexity and duration of the case; [16] the risk of nonpayment; [17] awards in similar cases; [18] objections; and [19] the amount of time devoted to the case by plaintiffs' counsel."  *Id*. at *5-6.  In my opinion, the fee requested here is reasonable because it is supported by eighteen of the nineteen factors.[3]

---

[3] The deadline for objections has not yet passed; therefore, it is too early to assess factor [18].  It is important to note that, even if there is opposition to the settlement, not all opposition is created equal.  Although some people file objections because they sincerely believe there is something amiss in the settlement, many others do so only to try to delay final resolution of the case and to

16.     It is important to note that even when non-cash benefits cannot be reliably valued and included in the denominator of the fee calculation, that does not mean they should be ignored. In order to incentivize class counsel to pursue meaningful practice changes, they must be rewarded when they do so even if it is difficult to put a number on the changes. For this reason, when class counsel secures non-monetary relief that has no estimated value to the class, courts often increase the percentage awarded to class counsel from the cash portion alone. *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 946 (9th Cir. 2003) ("The fact that counsel obtained injunctive relief in addition to monetary relief for their clients is . . . a relevant circumstance to consider in determining what percentage of the fund is reasonable as fees."). That is, non-cash benefits secured by a settlement are very much part of the "results" obtained by class counsel in the multi-factor inquiry.

17.     But let me begin with the valuation of the settlement. The cash portion of the settlement is easily valued: $75 million. Additionally, unlike most class action settlements, *see* Fitzpatrick, *Empirical Study*, *supra*, at 824 (finding that 89% of class action settlements included cash relief but only 23% conferred injunctive or declaratory relief), this settlement includes non-monetary benefits in the form of future savings caused by the Defendant's agreement to cease the central fee assessment practice that the litigation concerned. In my opinion, the practice change can be reliably valued by looking at the Defendant's past fee collections of precisely the type of fees that the Defendant has now agreed to forgo collecting. Based on those past collections, it is estimated the practice change will save consumers approximately $318 million. Not all of these savings will inure to class members, but a significant fraction will because over half of the class

---

use that delay to extract side payments from class counsel. This phenomenon is known as objector blackmail, and courts are wise to stand guard against it. *See generally* Fitzpatrick, *Objector Blackmail, supra*.

members are still customers of BANA. This is important to stress: class members will not only receive millions of dollars in direct cash payments, but they will also save millions of dollars they otherwise would have paid to BANA absent the injunctive relief obtained in this settlement. Thus, the total quantifiable value of this settlement is much larger than $75 million. In order to be as conservative as possible, however, I will assume that the quantifiable value of the settlement here is only the cash portion. Nonetheless, as I noted above, this does not mean that the practice change should be ignored in the fee calculation. Rather, it should be factored in when choosing the percentage.

18.     Let me turn now to choosing the percentage. Class counsel have requested one-third of the cash portion of the settlement. As I explain below, even if this settlement consisted only of its cash portion, this request would be reasonable because it would be mainstream compared to other bank fee class action cases—even bank fee class action cases that did not involve the novelty and innovation that this one did. But in light of the fact that this settlement *also* includes multi-hundred-million-dollar savings from the practice changes, the request is more than reasonable. In my opinion, class counsel could have justifiably requested an even greater percentage from the cash portion of the settlement in acknowledgement of the non-cash relief they secured for the class. But they did not.

19.     Consider first factors "(5) the customary fee for legal work," "(12) attorneys' fees awards in similar cases," and "[17] awards in similar cases." A fee award of one-third would be above average in the universe of all class actions if the settlement consisted only of its cash portion. For example, according to my empirical study, the most common percentages awarded by federal courts nationwide using the percentage method were 25%, 30%, and 33%, with a mean award of 25.4% and a median award of 25%. *See* Fitzpatrick, *Empirical Study*, 7 J. Empirical L. Stud. at

833-34, 838. The Eisenberg-Miller studies are in agreement, if not trending even higher. *See Eisenberg-Miller 2010*, 7 J. Empirical L. Stud.at 260 (finding mean and median of 24% and 25%, respectively); *Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median of 27% and 29%, respectively). The same is true when looking at fee awards in the Fourth Circuit alone. In the 19 settlements in my study from the Fourth Circuit where the percentage method was used, the mean and median were 25.2% and 28%, respectively. *See* Fitzpatrick, *Empirical Study*, *supra*, at 836. Again, the Eisenberg-Miller studies found much the same thing. *See Eisenberg-Miller 2017*, *supra*, at 951 (finding mean and median in the Fourth Circuit of 26% and 25%, respectively); *Eisenberg-Miller 2010*, *supra*, at 260 (20% and 21%, respectively).

20.      But a fee request of one-third would be very ordinary compared to other bank fee cases. In November 2019, I attempted to perform a systematic analysis of the fee awards in every such bank fee case I could find, whether in federal or state court and whether or not I had served as an expert. The effort resulted in an expert declaration I filed in a different lawsuit; that declaration is attached as Exhibit 4. As the declaration explains, I found 64 percentage-method fee awards in state or federal court between August 2010 and November 2019. The mean and median percentages were higher than the entire-universe-class-action data I presented above: they were 30.5% and 30%, respectively. Indeed, 28 awards—nearly half—were for 33% or greater. This was the case despite the fact that many of the settlements either did *not* win future savings for the class, or, if they did, the court *included* the value of the savings in the settlement amount from which the fee percentage was calculated (see cases in Exhibit 4 marked with note 2). In this case, by contrast, class counsel *did* secure valuable future savings for the class *but* is seeking one-third from the cash portion alone. By the measure of other class action settlements and other bank fee

class action cases in particular, this fee request is therefore quite modest. These factors therefore weigh in favor of the fee request.

21.     Consider next the factors that speak to the results obtained by class counsel in light of the risks presented by the litigation: "(2) the novelty and difficulty of the questions raised; (3) skill required to properly perform the legal services rendered; (4) the quality of representation;" "(6) the attorney's expectations at the outset of the litigation;" "(8) the amount in controversy and the results obtained;" "(10) the undesirability of the case within the legal community in which the suit arose;" "[13] the results obtained for the class;" "[15] the complexity and duration of the case; [and 16] the risk of nonpayment." The cash portion of the settlement alone is equal to approximately 17% of the class's best-case past damages, depending on how damages are determined. *See* Joint Declaration ¶ 13. This alone is a very good recovery: even looking only at the recovery of past damages, and even assuming the recovery amounted to 17% of damages, the recovery would as good or better than the typical recovery in the class actions for which we have systematic data, antitrust and securities fraud. *See* John M. Connor & Robert H. Lande, *Not Treble Damages: Cartel Recoveries are Mostly Less Than Single Damages,* 100 Iowa L. Rev. 1997, 2010 (2015) (finding the weighted average of recoveries—the authors' preferred measure—to be 19% of single damages for cartel cases between 1990 to 2014); Janeen McIntosh & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2020 Full-Year Review* 20 (Jan. 25, 2021), https://www.nera.com/content/dam/nera/publications/2021/PUB_2020_Full-Year_Trends_012221.pdf (finding recoveries in securities class actions to vary between 1.6% and 2.5% of investor losses between 2012 and 2020). But, when the future savings are factored in, the settlement here would outshine those comparisons; only a small minority of settlements in antitrust and securities cases include practice changes*, see* Fitzpatrick, *Empirical Study, supra*, at 824

14

(finding only 2% of securities fraud settlements and only 7% of antitrust settlements called for business practice changes), let alone practice changes of this magnitude.

22.     Although we do not have similar studies of recovery rates in consumer fraud class actions, I do have access to the recovery rates in the in many recent bank fee cases (though the bank fees at issue were different).  For example, in Table 1, I list the recovery rates in all of the settlements in MDL 2036.  The table only calculates recovery rates of past damages.  Even still, the recovery rate here was sometimes higher than these other cases.  But more importantly: most of these settlements did *not* require practice changes, much less practice changes remotely as valuable as the one in the instant settlement.  Thus, when the recovery of past *and* future damages is considered, the settlement here is impressive even by the standards of these other impressive settlements.

**Table 1: Settlements from Overdraft-Fee Litigation in MDL 2036**

| Defendant | Final Approval | Recovery as % of damages |
|---|---|---|
| BancorpSouth | 7/15/16 | 57% |
| Capital One | 5/22/15 | 35% |
| Synovus Bank | 4/2/15 | 36% |
| M&T Bank | 3/13/15 | 5% |
| Comerica | 6/10/14 | 35% |
| Susquehanna | 4/1/14 | 40% |
| U.S. Bank | 1/6/14 | 13% |
| Compass | 8/7/13 | 16% |
| PNC | 8/5/13 | 45+% |
| Harris | 8/5/13 | 65+% |
| M & I | 8/2/13 | 25+% |
| Great Western | 8/2/13 | 50+% |
| Commerce | 8/2/13 | 57% |
| Associated | 8/2/13 | 50+% |
| TD Bank | 3/18/13 | 42% |
| Citizens | 3/12/13 | 42% |
| Chase | 12/19/12 | 21% |
| Bank of the West | 12/18/12 | 52% |
| Union | 10/4/12 | 63% |
| Bank of OK | 9/13/12 | 46% |

| Bank of America | 11/22/11 | 9-45% |
| --- | --- | --- |

23.     It is true these recovery rates alone do not tell the whole story because not every bank fee case faces the same risks.  But it is my opinion that this litigation faced many risks that other bank fee cases have not.  Indeed, this case had novel claims never before tested—and therefore even greater risks than most of the above settlements.  In my opinion, this makes the recovery here even more impressive.  To begin with, this was the very first case in the entire country filed to challenge the fee practices at issue here and no governmental entity or consumer protection group had ever brought the practices to light before class counsel did.  The probability that the account agreement would be interpreted against these practices—which BANA had engaged in for years—was far from certain.  Even though the Court has thus far interpreted the agreement in the class's favor, this is only the beginning of the matter.  There is still a question whether class members should have been on notice of the fee practices after they incurred their first fee; if so, damages would have been severely limited here.  Moreover, it is not even clear a litigation class would have been certifiable; the answer to that question would have depended heavily on a separate question over whether North Carolina law could be applied to every member of a nationwide class.  Finally, even if the class prevailed on all of these questions, any one of them could have been reversed on appeal.  In other words, not only is the recovery of 17% of potential damages and 100% of future damages better than most bank fee cases, but it is better than the expected value of this lawsuit.  Thus, it is not difficult for me to conclude that the recovery here looks impressive in light of the attendant risks.  These factors, too, therefore weigh in favor of the fee request.

24.     Consider next the factors "(1) the time and labor expended by counsel" and "[19] the amount of time devoted to the case by plaintiffs' counsel."  There are two ways that courts

might consider these factors: qualitatively or quantitatively. The qualitative approach assesses what class counsel did during the years of litigation; i.e., whether class counsel have dug deeply enough into a case to know what it is worth as opposed to selling out the class for a quick fee award. *See, e.g.*, *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 456 (10th Cir. 1988) ("[I]n awarding attorneys' fees in a common fund case, the 'time and labor involved' factor need not be evaluated using the lodestar formulation . . . ."). The quantitative approach is to calculate class counsel's lodestar and to "crosscheck" the fee percentage requested against the lodestar to ensure that the ensuing multiplier is not in some sense "too much." *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 285 (3d Cir. 2001).

25.     The better approach is to assess this factor qualitatively rather than quantitatively. I take this view because the lodestar crosscheck creates perverse incentives for class counsel. In particular, the lodestar crosscheck reintroduces all the bad behaviors of the lodestar method that the percentage method was designed to correct in the first place: either to be indifferent to the size of the recovery or to drag cases out to increase the lodestar. Consider the following examples. Suppose a lawyer had worked on a case for one year and accrued a lodestar of $1 million. If the lawyer believed that a court would award a fee of one-third, or 2 times his lodestar, whichever was lesser, then he would be completely indifferent as between accepting a settlement offer at this point of $6 million or $60 million. Either way he would get only $2 million. Needless to say, the incentive to be indifferent as to the size of the settlement is not good for compensation or deterrence. Or suppose the lawyer had been offered a settlement offer of $12 million after one year of work. If the lawyer again believed the court would not award a fee of one-third unless it was no more than 2 times his lodestar, the lawyer would have the incentive to delay accepting the

settlement until he could generate another $1 million in lodestar and thereby reap the maximum fee. Dragging cases along for nothing is not good for class members or the court system.

26.     For this reason, economic models of rational clients suggest that clients would not want to use the lodestar crosscheck when they hire lawyers on contingency. *See* Fitzpatrick, *A Fiduciary Judge*, 89 Fordham L. Rev. at 1156-59, 1167. In a recent article, I tried to discern whether there was any evidence that real clients in the marketplace ever use the lodestar crosscheck when they hire lawyers on contingency. I could find no such evidence, whether among unsophisticated clients who hire lawyers on contingency for things like personal injury cases or among sophisticated clients who lawyers on contingency for things like patent cases. *See id.* at 1159-63. Real clients follow the economic models: they do not want the lodestar crosscheck because it creates bad incentives for their lawyers. This is important because judges in class actions often say they act as fiduciaries for absent class members. *See* 4 William B. Rubenstein, Newberg on Class Actions § 13:40 (5th ed. 2020) ("[T]he law requires the judge to act as a fiduciary [of absent class members.]"). In my view, this means courts should not saddle absent class members with a fee method like the lodestar crosscheck that they would never choose for themselves. Thankfully, most courts across the country do not perform the crosscheck. *See* Fitzpatrick, *Empirical Study*, *supra*, at 833 (finding that only 49% of courts consider lodestar when awarding fees with the percentage method); *Eisenberg-Miller 2017*, *supra*, at 945 (finding percent method with lodestar crosscheck used 38% of the time versus 54% for percent method without lodestar crosscheck). For example, in *none* of the overdraft fee settlements in MDL 2036 did the court perform the crosscheck. *See also Farrell v. Bank of Am., N.A.,* 327 F.R.D. 422, 432 (S.D. Cal. 2018), *aff'd sub nom. Farrell v. Bank of Am. Corp., N.A.,* 827 F. App'x 628 (9th Cir. 2020), *denying cert Threatt v. Farrell*, No. 20-1349, 2021 WL 4507641 (U.S. Oct. 4, 2021), or in *Lloyd*

*v. Navy Fed. Credit Union,* No. 17-CV-1280-BAS-RBB, 2019 WL 2269958, at *13 (S.D. Cal. May 28, 2019), *reconsideration denied in part,* No. 17-CV-1280-BAS-RBB, 2019 WL 2602516 (S.D. Cal. June 25, 2019). In my opinion, the court here should not do it either.

27.     Instead, the court should assess this factor qualitatively.  Not only did class counsel spearhead an entire new area of litigation against the banking industry, but, in my opinion, there is little doubt that they have now dug deeply enough to know what the litigation is worth.  This litigation has transpired longer than the typical class action does before it reaches settlement.  *See* Fitzpatrick, *Empirical Study,* 7 J. Empirical L. Stud. at 820 (finding the average and median times for class actions to reach final settlement approval was around three years).  The discovery conducted in this litigation has enabled class counsel's expert to calculate precisely what the class's damages would be if the class's view of the account agreement prevails.  The probability of prevailing at this point is largely based on legal questions that will not be refined by further litigation.  Given that the recovery here is better, as I noted, than the expected value of the litigation, it is in no one's interest to continue litigating.  In my opinion, this should be the end of the matter.  Thus, these factors, too, weigh in favor of the fee request.

28.     But given that some courts take the quantitative approach and perform the lodestar crosscheck, I should note that, in my opinion, nothing about the class counsel's lodestar multiplier suggests that it be would be outside the bounds of prior cases.  *See, e.g.*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.6 (9th Cir. 2002) (noting multipliers of up to 19.6); *Steiner v. American Broadcasting Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (affirming fee award where the lodestar multiplier was 6.85); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ.A. 03–4578, 2005 WL 1213926, at *18 (E.D. Pa. May 19, 2005) (awarding fee with 15.6 multiplier); *In re Doral Financial Corp. Securities Litigation*, No. 05-cv-04014-RO (S.D.N.Y. Jul.

17, 2007) (ECF 65) (same with 10.26 multiplier); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 WL 2408560, at *2 (D. Mass. Aug. 3, 2009) (awarding fee with 8.3 multiplier); *Yuzary v. HSBC Bank USA, N.A.*, No. 12 CIV. 3693 PGG, 2013 WL 5492998, at *11 (S.D.N.Y. Oct. 2, 2013) (same with 7.6 multiplier); *Hainey v. Parrott*, No. 1:02-CV-733, 2007 WL 3308027, at *1 (S.D. Ohio Nov. 6, 2007) (same with 7.47 multiplier); *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp 2d 587, 589 (E.D. Pa. 2005) (same with 6.96 multiplier); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (same with 6 multiplier); *In re RJR Nabisco, Inc. Secs. Litig.*, 88 Civ. 7905 (MBM), 1992 WL 210138, at *5 (S.D.N.Y. Aug. 24, 1992) (same with 6 multiplier).

29.     Consider finally the factors that go to the skills of class counsel and their relationship with the plaintiffs: "(4) the attorney's opportunity costs in pressing the instant litigation;" "(7) the time limitations imposed by the client or circumstances;" "(9) the experience, reputation[,] and ability of the attorney;" "(11) the nature and length of the professional relationship between attorney and client"; and "[14] the quality, skill, and efficiency of the attorneys' involved."  Although I was not privy to the attorney-client relationships here, I can say that class counsel count among their number some of the most experienced and highly regarded class action lawyers in the United States, with a special expertise in precisely the consumer financial industry practices at issue here.  These factors, too, therefore weigh in favor of the fee request.

30.     For all these reasons, it is my opinion that a fee percentage of one-third of the cash portion of the settlement would be reasonable in light of the empirical and economic research on class actions.

31.     My compensation for this declaration was $950 per hour and in no way dependent on the outcome of class counsel's fee petition.

Nashville, TN

October 12, 2021

Brian T. Fitzpatrick